FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

AUG 0 4 2022

TAMMY H. DOWNS, CLERK
By: _____
DEP CLERK

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**
**NORTHERN DIVISION**

ERIK KNIGHT, individually and on behalf of all
others similarly situated,

　　*Plaintiff*,

vs.

PROGRESSIVE NORTHWESTERN
INSURANCE COMPANY, an Ohio corporation,

　　*Defendant*.

_____/

**CLASS ACTION**

Case No. 3:22-cv-203-JM

**JURY TRIAL DEMANDED**

This case assigned to District Judge _Moody_
and to Magistrate Judge _Kay_

**CLASS ACTION COMPLAINT**

Plaintiff Erik Knight ("Plaintiff"), by and through undersigned counsel, brings this class

action, individually and on behalf of all others similarly situated, against Progressive Northwestern

Insurance Company ("Progressive" or "Defendant") and alleges as follows:

**INTRODUCTION**

1.　　This is a class action on behalf of Plaintiff and all other similarly situated claimants

in Arkansas who received a payment for the loss of a totaled vehicle from Defendant, where

Defendant used valuation reports prepared by Mitchell International, Inc. ("Mitchell") to

determine the actual cash value ("ACV") of the loss vehicles. Through Mitchell's valuation,

Defendant systemically thumbs the scale when calculating the ACV of claimants' loss vehicles by

applying so-called "Projected Sold Adjustments" that are: (a) arbitrary; (b) contrary to appraisal

standards and methodologies; (c) not based in fact, as they are contrary to the used car industry's

market pricing and inventory management practices; (d) not applied by the major competitor of

Defendant's vendor Mitchell; and (e) on information and belief, not applied by Defendant and

Mitchell to insureds in other states like California and Washington.

2.     In the event of a "total loss" to an insured vehicle—*i.e.*, where repair of the vehicle is impossible or uneconomical—Defendant's uniform insurance policies with Plaintiff and all putative Class members (defined below) promises to pay for the loss, limited to the ACV of the vehicle. Attached as Exhibit A is a copy of Plaintiff's Policy ("Policy"), which is materially identical to the policy for all members of the putative Class.

3.     When valuing total loss claims for vehicles, it is improper for an automobile insurance company, such as Progressive, to undervalue and underpay the claims by manipulating the data used to determine the ACV of the vehicles. Specifically, under their insurance policy terms and applicable Arkansas law, Defendant has a duty to pay, and represent that it will pay, the ACV of a loss vehicle when adjusting total loss claims.

4.     Notwithstanding these obligations and representations, Defendant fails to fulfill this obligation by taking advantage of a valuation process that employs improper and unreasonable adjustments to reduce the value of comparable vehicles specified in the valuation reports, which in turn reduces the valuation of the total loss vehicles and the corresponding claim payment

5.     Specifically, Defendant, through Mitchell, systemically applies a so-called "Projected Sold Adjustment" that results in a significant downward adjustment to the base values of the comparable vehicles used to calculate the ACV of Plaintiff's and Class members' total loss vehicles. This reduction is contrary to appraisal standards and methodologies and is not based in fact, as it is contrary to the used car industry's market pricing and inventory management practices. The adjustment is applied to each of the comparable vehicles on top of adjustments for differences such as mileage, options, and equipment. The only purported explanation for the downward adjustment appears on the last page of the valuation reports and is a general, nondescript statement claiming that the reduction is to "reflect consumer purchasing behavior (negotiating a different price than the listed price)." Exhibit B at p. 9.

2

6.      Neither Progressive nor Mitchell has ever conducted any study or research to determine whether such "consumer purchasing behavior" exists and impacts ACV in the modern used-car market. Worse than this complete lack of curiosity is that Defendant thumbs the scale by discarding vast amounts of relevant data that contradict applying a Projected Sold Adjustment. For example, until July 2021, Defendant, through its vendors, simply threw out all data where the list price equaled or exceeded the sold price. And to this day, it persists in excluding from Projected Sold calculations some data where the list price equaled sold price and all data where the sold price exceeds the list price, even though examples abound of dealerships that charge more than advertised price to customers purchasing a vehicle with cash—i.e. not providing the dealer the opportunity to profit through financing the sale or acquiring a trade-in—which is particularly relevant to the inquiry of determining a vehicle's ACV. Defendant fails to control for whether the vehicle was purchased with cash, or whether there were ancillary purchases or transactions that may influence the "sales price" but not the ACV (e.g., whether the customer traded in a vehicle at time of purchase, bought an extended warranty or service plan, or financed the purchase).

7.      Nevertheless, Progressive applies a Projected Sold Adjustment to the advertised (or listed) price of comparable vehicles when calculating the ACV of total-loss vehicles. For Plaintiff, the Projected Sold Adjustment was approximately 12.6% of two of the four comparable vehicle's value prior to adjustments. To arrive at the Projected Sold Adjustment amount, however, Progressive, through third-party vendors, and as set forth above, categorically excludes transactions that undermine its flawed thesis: for example, transactions where the sold price exceeds list price, transactions from dealerships who market themselves as "no-haggle" dealerships, and every transaction where the sold price equaled the advertised price.

8.      As explained herein, the used auto market is such that, given the ubiquity of Internet advertising and shopping and developments in sophisticated pricing software, car dealerships simply

do not negotiate off of Internet-advertised prices. Any difference between a list and sales price does not reflect a negotiation of the vehicle's cash value, but rather that a dealer shifted its profits to other components of the transaction: for example, profits made through financing or trade-in or ancillary products described above, or that the dealer applied a generally unavailable discount to the cash value of the vehicle (such as employee discount, loyalty discount, military discount, or friends/family discount). But Progressive ignores these market realities and is content with paying insureds and claimants below-market prices for their totaled vehicles.

9.      To arrive at its conclusion that consumers negotiate down the advertised price, Progressive, through its vendors, intentionally distorts the data, excludes transactions that undercut its false hypothesis, and ignores market realities, all for the purpose of applying a capricious and unjustified Projected Sold Adjustment to artificially deflate the value of total loss vehicles.

10.     This pattern and practice of undervaluing comparable and total loss vehicles when paying automobile total loss claims through arbitrary, unsupported, and unjustified adjustments, which benefits the insurer at the expense of the insured, violates Defendant's policies with its insureds.

## PARTIES

11.     Plaintiff Erik Knight, at all relevant times, was a Arkansas citizen. At all relevant times, Plaintiff was contracted with Progressive for automobile insurance. On or about August 28, 2020, Plaintiff was in a car wreck and Defendant deemed his vehicle to be a total loss.

12.     Defendant Progressive Northwestern Insurance Company is an Ohio company with its principal place of business in Ohio. Defendant is a subsidiary of Progressive Group entities. Defendant provides insurance coverage throughout the United States for first-party property damage under collision and/or comprehensive coverage. At all relevant times, Defendant conducted business in Arkansas through insurance agents and other company personnel.

4

## JURISDICTION AND VENUE

13.     Minimal diversity exists under the Class Action Fairness Act ("CAFA"), 28 U.S.C. §§ 1332(d), 1441(a)-(b), and 1453. Plaintiff and the proposed class members are citizens of the State of Arkansas. Defendant is an Ohio Corporation that has its corporate headquarters in Ohio, and, at all relevant times hereto, Defendant was engaged in the business of marketing and selling insurance policies and adjusting insurance claims in the State of Arkansas.

14.     Plaintiff estimates that there are more than 100 putative class members, and the aggregate compensatory damages (in the amount of the Projected Sold Adjustment that were wrongfully deducted), claimed by Plaintiff and the Class are estimated in good faith to exceed $5,000,000.00.

15.     Venue is proper in this District under 28 U.S.C. § 1391, as a substantial portion of the conduct giving rise to Plaintiff's claims occurred in this District, and Defendant transacts business in this District.

## FACTUAL ALLEGATIONS

### Defendant's Systemic Application of Projected Sold Adjustments

16.     On August 28, 2020, Plaintiff was involved in a car wreck and sustained physical damage to his vehicle. At the time of the car wreck, Plaintiff was contracted with Progressive.

17.     Like all members of the putative Class, Plaintiff made a property damage claim to Defendant.

18.     Pursuant to uniform policies and procedures, Defendant declared Plaintiff's vehicle to be a total loss and purported to pay him the ACV of his loss vehicle, as Defendant promised and represented it would under the uniform provisions of its insurance policies and Arkansas law.

19.     When calculating its valuations and claims payments, Defendant systemically employs a routine "total loss settlement process." This process involves obtaining a "Vehicle

Valuation Report" from Mitchell and relying upon the valuation provided by Mitchell as the ACV amount owed under the policy. Defendant provided a Mitchell Vehicle Valuation Report for Plaintiff on September 1, 2020. *See* Exhibit B.

20.     The Mitchell Vehicle Valuation Reports used by Defendant during the relevant period followed the same process, provided and disclosed the same or substantially the same material information, and presented that material information in the same or substantially the same format. These valuation reports purport to contain values for comparable vehicles for sale in the claimant's geographic area. The reports also contain a purported valuation of the loss vehicle based upon these prices for comparable vehicles listed in the report. The report then adjusts the advertised prices of those comparable vehicles to account for differences in equipment, mileage, and vehicle configuration. Exhibit B at p. 9.

21.     In addition, however, the valuation reports used by Defendant make a further adjustment to each loss vehicle called a "Projected Sold Adjustment." For Plaintiff, Projected Sold Adjustments in the amounts of -$728.00 and -$841.00 respectively, were applied to two of the four comparable vehicles. Exhibit B at pp. 6-7.

22.     Defendant provides no data specific to the comparable vehicles or any explanation of industry practices in its valuation reports to support *any* Projected Sold Adjustment, much less the specific downward adjustments used in Plaintiff's valuation report. Instead, the *only* explanation is buried on the last page of each report, stating in full: "Projected Sold Adjustment – an adjustment to reflect consumer purchasing behavior (negotiating a different price than the listed price)." Exhibit B at p. 9.

23.     In truth, Defendant's Projected Sold Adjustments do not reflect market realities (the context in which "consumer behavior" occurs) and run contrary to customary automobile dealer practices and inventory management, where list prices are priced to market to reflect the intense

6

competition in the context of Internet pricing and comparison shopping. Before the ubiquity of online advertising and shopping, "advertised" prices had very little to do with eliciting car buyers to particular dealerships—instead, car buyers generally went to their local used car dealership that had the desired vehicle in stock for sale. The "advertised" price was simply whatever price was listed on the physical window. And consumers could not, as they can now, easily compare that price to Internet advertisements of the same vehicle offered by competitors.

24.     As such, dealerships generally priced vehicles above market knowing that some consumers might be poor negotiators and they would realize an inflated profit on those sales. This above-market "window" price obviously allowed for negotiation, and a downward negotiation would often occur.

25.     But during the Class Period, that is simply no longer how the used car market operates. Now, given the need for Internet advertising, the prevalence of Internet shopping and consumer behavior, developments in sophisticated pricing software universally used by car dealerships, and the ease with which consumers can compare the advertised prices of identical vehicles across multiple competing dealerships, used car dealerships no longer price vehicles above market with room for—and the expectation of—negotiation. Instead, car dealerships use sophisticated pricing software—which provides the advertised prices of all competitors; the average "turn" of a given year, make and model; the amount for which vehicles have sold during a given time-period; etc.—and now appraise vehicles before acquiring them to price them to market and do not negotiate from that price.

26.     This makes sense, because if a car dealership priced a vehicle above market with room for negotiation, consumers would simply not go to that dealership. This is because consumers can easily compare advertised prices and would seek out the vehicle priced to market, rather than the same vehicle priced at a higher amount (i.e., above market). Given the choice between paying

7

less or paying more for an identical vehicle, consumers will choose to pay less.

27.     As such, a negotiated discount off the cash price is highly atypical and is not proper to include in determining ACV. The inclusion of this significant downward adjustment purportedly to "reflect consumer purchasing behavior" is particularly improper in the context of this action—insureds who have suffered a total loss of their vehicle and need to procure a replacement have limited time to search out the illusory opportunity to obtain the below-market deal Defendant assumes always exists without any explanation or support.

28.     Defendant's Projected Sold Adjustments are contrary to appraisal standards. There are multiple generally-recognized and acceptable methodologies for determining ACV, including use of comparable vehicles. Defendant begins the process of valuing loss vehicles using comparative methodology but improperly deviates from that process by thumbing the scales against the insured. Defendant documents the loss vehicle's and each comparable vehicle's mileage, options, and trim, which are compared in the report, and makes dollar adjustments accordingly. Plaintiff does not challenge these documented adjustments. At this stage of the process, however, Defendant abandons the comparative methodology and applies adjustments that are contrary to proper appraisal methodologies for determining ACV. Appraisers use advertised prices and make adjustments based only on observed and verifiable data; appraisal standards do not permit arbitrary adjustments from the advertised price based upon undocumented and unverifiable projections.

29.     Defendant thumbs the scale by discarding vast amounts of relevant data that contradict any application of a Projected Sold Adjustment and by failing to control for material variables, including whether there were ancillary purchases or transactions that may influence what is recorded as the "sales price" but do not influence the ACV (e.g., whether the customer traded in a vehicle at the time of purchase, bought an extended warranty or service plan, or financed the purchase).

30.     Until July 2021, Defendant excluded from the calculation of the Projected Sold Adjustment all transactions in which the list price of a vehicle equaled the sold price.

31.     Even after July 2021, Defendant still excludes some transactions in which the list price of a vehicle equals the sold price.

32.     Defendant has excluded and continues to exclude from the calculation of the Projected Sold Adjustment all transactions in which the sold price of a vehicle is greater than the list price.

33.     Without having performed any investigation or study, Defendant simply assumes all such transactions are anomalies.

34.     Likewise, Defendant has not exercised even a modicum of curiosity to investigate whether market realities support the application of a Projected Sold Adjustment. Nor does Defendant or its vendors attempt to verify—even a single time—for those transactions where the advertised price exceeded sold price, whether the reason for the reduction was negotiation of the cash price of the vehicle and not some other (far more likely) reason, some of which are discussed herein.

35.     Neither Progressive's form Policy nor Arkansas law permit reducing a vehicle's value for invented or arbitrarily assumed justifications.

36.     Moreover, the accuracy of Defendant's data is, at best, suspect, as it contains a significant number of transactions where the advertised date in the database comes after the sold date. As a matter of simply chronology, it makes no sense to advertise a vehicle after it is sold. But here, too, Defendant makes no effort to control for this obvious flaw in the data.

37.     These irremediable, and unjustifiable, errors, of course, skew the data in favor of Defendant to the detriment of the insureds.

38.     Moreover, examples abound demonstrating the glaring error of Defendant's cherry-picking practices.

39.     For example, related to the exclusion of sales prices greater than list prices, all advertised prices for comparable vehicles listed in Defendant's valuation reports are scraped from Internet sources—specifically Cars.com, Autotrader.com, Vast.com, and TrueCar.com.

40.     The advertised prices many dealerships publish on these websites include discounts for consumers who are financing and providing a trade-in. Thus, a consumer who was not financing the vehicle through the dealership or who was not trading in a vehicle—obviously, insureds who sustained a total loss almost certainly are not trading a vehicle when purchasing a replacement vehicle—would have to pay in cash more than the price listed on sources where Mitchell scrapes advertisements for comparable vehicles. In determining the ACV of Plaintiff's and class members' totaled vehicles, there is no justification for Defendant to have excluded those transactions from calculating the Projected Sold Adjustment, while only including transactions where the sold price was recorded as less than the list price.

41.     Simply put, there is no justification for Progressive to exclude such transactions as outliers or mistakes when justifying how it calculates the amount of the so-called Projected Sold Adjustment.

42.     Defendant further fails to control whether the vehicle was purchased with discounts unavailable to the public (e.g., employee discounts).

43.     Defendant also fails to control for whether the vehicle was purchased with cash, or whether there were ancillary purchases or transactions that may influence the recorded "sales price" but not the ACV (e.g., whether the customer traded in a vehicle at the time of purchase, bought an extended warranty or service plan, or financed the purchase).

44.     In these instances, the ACV of the vehicle remains priced to market; the dealership simply transferred the anticipated profit through either the sale of an optional ancillary product or by reducing what it would have offered in trade-in value.

10

45.     The impropriety and arbitrariness of Defendant's Projected Sold Adjustments are further demonstrated by the fact that Mitchell's primary competitor in providing valuation reports to insurance companies—CCC Intelligent Solutions, Inc.—does not apply projected sold adjustments in this manner. Instead, CCC Intelligent Solutions uses list prices.

46.     On information and belief, the impropriety and arbitrariness of Defendant's Projected Sold Adjustments are further demonstrated by the fact that Progressive does not apply these adjustments when determining the ACV of total losses in California or Washington. There is no justification for applying these adjustments when valuing total losses in Arkansas while not subjecting California and Washington insureds to the same negative adjustments.

47.     Plaintiff and each member of the proposed Class was damaged by Defendant's application of these Projected Sold Adjustments because they were not paid the ACV they would have received had Defendant applied proper methodologies and appraisal standards.

48.     Were it not for this arbitrary and improper adjustment, the "Base Value" in each valuation report would have been higher, resulting in a higher "settlement value" and in turn a higher payment by Defendant for ACV. Specifically, for Plaintiff, were it not for this arbitrary and improper adjustment, the payment of ACV by Defendant would have been $392.25 higher, before adding the related increase in payments for applicable sales taxes.

## CLASS ACTION ALLEGATIONS

49.     Plaintiff brings this action individually and as a class action under Fed. R. Civ. P 23(a) and (b), on behalf of the following proposed Class:

> All Arkansas citizens insured by Progressive who, from the earliest allowable time through the date an Order granting class certification is entered, received compensation for the total loss of a covered vehicle, where that compensation was based on a vehicle valuation report prepared by Mitchell and the ACV was decreased based upon Projected Sold Adjustments to the comparable vehicles used to determine ACV.

50.     Plaintiff is the proposed class representative for the Class. Excluded from the Class are Defendant and any of its members, affiliates, parents, subsidiaries, officers, directors, employees, successors, or assigns; governmental entities; and the Judge(s) and Court staff assigned to this case and their immediate family members.

51.     Plaintiff reserves his right to amend the Class definition if discovery and further investigation reveal that any Class should be expanded or narrowed, divided into additional subclasses, or modified in any other way.

52.     **Numerosity.** The members of the Class are so numerous that individual joinder of all Class members is impracticable. While Plaintiff is informed and believes that there are thousands of Class members, the precise number is unknown to Plaintiff but may be ascertained from Defendant's books and records. Class members may be notified of the pendency of this action by recognized Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

53.     **Commonality and Predominance.** This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

a.  Whether Defendant systemically used Mitchell's Vehicle Valuation Reports in adjusting total loss claims to determine ACV;

b.  Whether the Mitchell Vehicle Valuation Reports included Projected Sold Adjustments to the value of the comparable vehicles that reduced the base value, and thus the claim amount paid by Defendant for the ACV of Plaintiff's and Class members' total loss vehicles;

c.  Whether Defendant's improper practices injured Plaintiff and members of the Class;

12

  d. Whether Defendant's acts violated its obligations under the policy of insurance;

  e. Whether Plaintiff and members of the Class are entitled to compensatory damages, and if so, the calculation of damages;

  f. Whether Plaintiff and members of the Class are entitled to a twelve percent (12%) penalty pursuant to Ark. Code Ann. § 23-89-208(f); and

  g. Whether Plaintiff and members of the Class are entitled to an injunction restraining Progressive's future acts and practices.

  54. **Typicality.** The claims of the Plaintiff, who is the representative of the Class herein, are typical of the claims of the proposed Class, in that the claims of all members of the proposed Class, including the Plaintiff, depend on a showing of the acts of Progressive giving rise to the right of Plaintiff to the relief sought herein. There is no conflict between the individually named Plaintiff and the other members of the proposed Class with respect to this action, or with respect to the claims for relief set forth herein.

  55. **Adequacy of Representation.** Plaintiff is an adequate representative of the Class because Plaintiff's interests do not conflict with the interests of the other Class members whom he seeks to represent, Plaintiff has retained counsel competent and experienced in complex class action litigation, including successfully litigating class action cases similar to this one, where insurers breached contracts with insureds. The interests of the Class will be fairly and adequately protected by Plaintiff and his counsel.

  56. **Superiority.** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, such that it would be

impracticable for the Class members to individually seek redress for Defendant's wrongful conduct. Even if the Class members could afford litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## FIRST CAUSE OF ACTION
## BREACH OF CONTRACT

57.     Plaintiff hereby repeats and realleges all preceding paragraphs contained herein.

58.     This claim is brought by Plaintiff on behalf of the Class.

59.     Plaintiff made a claim for property damage on his Progressive insurance policy.

60.     At the time of his claim, and in the time since, Plaintiff has performed all obligations under his policy of insurance and was entitled to the benefits he contracted for in his policy.

61.     Through the use of improper and unfounded Projected Sold Adjustments in Mitchell vehicle valuation reports, as detailed above, Defendant handled, adjusted, and paid Plaintiff's claim, and the claims of the members of the proposed Class, for less than the ACV required by the insurance contract.

62.     In addition to the express terms of the contract, the law implies a promise between the parties that they will act in good faith and deal fairly with one another in performing their obligations under the contract and that they will not do anything to prevent or hinder or delay the performance of the contract. Through the use of improper and unfounded Projected Sold Adjustments, Defendant failed to act in good faith and did not deal fairly, but instead paid Plaintiff's claim, and the claims of the members of the Class, in an amount less than the actual cash value required by Defendant's insurance contracts.

63.     As a direct result of Defendant's breaches, Plaintiff and members of the Class

sustained actual damages. Plaintiff's damages are at least $392.25 (before calculation of additional sales tax benefits), plus pre-judgment and post-judgment interest.

64.     Pursuant to Ark. Code Ann. § 23-89-208(f), Plaintiff and other members of the Class are entitled to recover the benefits denied to them, attorney's fees, a twelve percent (12%) penalty, plus pre-judgment and post-judgment interest.

## SECOND CAUSE OF ACTION
## DECLARATORY JUDGMENT

65.     Plaintiff hereby repeats and realleges all preceding paragraphs contained herein.

66.     This claim is brought by Plaintiff on behalf of the Class.

67.     A judiciable dispute between Plaintiff and the proposed Class and the Defendant is before this Court under 28 U.S.C. § 2201, *et seq.*, concerning the construction of the auto insurance policies issued by Defendant and the rights arising under those policies.

68.     Plaintiff, for himself and on behalf of the Class, seeks a declaration of rights and liabilities of the parties herein. Specifically, Plaintiff is seeking a declaration that in paying total loss claims with first-party insureds, it is a breach of the insurance contract with Progressive for Progressive to base the valuation and payment of claims on values of comparable vehicles that have been reduced by factually erroneous Projected Sold Adjustments.

69.     Progressive's unlawful common policy and general business practice of applying Projected Sold Adjustments is ongoing. Accordingly, Progressive has breached, and continues to breach, the express terms of its contracts of insurance with Plaintiff and members of the Class requiring it to settle total loss claims on the basis of the total loss vehicle's ACV.

70.     As a result of these breaches of contract, Plaintiff and the proposed Class members have been injured. Plaintiff's and proposed Class members' damages include the amounts illegally deducted by Progressive from the insureds' payments.

71.     Plaintiff seeks a declaration that Progressive's application of unfounded Projected

Sold Adjustments results in a valuation of less than the ACV Progressive is required under its insurance contracts to pay insureds.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, respectfully requests that this Court:

a)      determine that this action may be maintained as a class action under Federal Rule of Civil Procedure 23, certify the proposed Class for class treatment, appoint Plaintiff as class representative for the Class, and appoint undersigned counsel as Class Counsel;

b)      enter an order finding that Defendant's actions described herein constitute breaches of the express terms of its policies of insurance;

c)      award Plaintiff and members of the Class actual damages according to proof;

d)      enter a declaratory judgment that in paying total loss claims with first-party insureds, it is a breach of the insurance contract with Defendant for Defendant to base the valuation and payment of claims on values of comparable vehicles that have been reduced by Projected Sold Adjustments;

e)      enter further belief based on the declaratory judgment including an order enjoining Defendant from basing the valuation and payment of claims on values of comparable vehicles that have been reduced by Projected Sold Adjustments;

f)      award a twelve (12) percent penalty pursuant to Ark. Code Ann. § 23-89-208(f);

g)      award pre-judgment and post-judgment interest at the maximum rate permitted by applicable law;

h)      award reasonable attorney's fees and litigation costs and expenses pursuant to applicable law; and

i)      grant such other legal and equitable relief as the Court may deem appropriate, including specific performance as an alternative to damages.

Dated: August 4, 2022                                  Respectfully submitted,

**CARNEY BATES & PULLIAM, PLLC**

Joseph Henry "Hank" Bates III (ABN 98063)
Tiffany Wyatt Oldham (ABN 2001287)
Jake G. Windley (ABN 2018187)
519 W. 7th St.
Little Rock, AR 72201
Tel: (501) 312-8500
Fax: (501) 312-8505
Email: hbates@cbplaw.com
Email: toldham@cbplaw.com
Email: jwindley@cbplaw.com

**SHAMIS & GENTILE, P.A.**
Andrew J. Shamis, Esq.
Florida Bar No. 101754
ashamis@shamisgentile.com
14 NE 1st Avenue, Suite 705
Miami, Florida 33132
Telephone: 305-479-2299

**EDELSBERG LAW, P.A.**
Scott Edelsberg, Esq.
Florida Bar No. 0100537
Christopher Gold, Esq.
Florida Bar No. 088733
scott@edelsberglaw.com
chris@edelsberglaw.com
20900 NE 30th Ave., Suite 417
Aventura, FL 33180
Office: (786) 289-9471
Direct: (305) 975-3320
Fax: (786) 623-0915

***Counsel for Plaintiff and the Proposed Class***

# EXHIBIT A



*9610D AR 0507*

# ARKANSAS
## AUTO POLICY



Form 9610D AR (05/07)
version 3.0



*PROGRESSIVE*
DIRECT

## CONTENTS

**INSURING AGREEMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**GENERAL DEFINITIONS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . : . . . . . . . . . . . . . . 1

**PART I - LIABILITY TO OTHERS**
  Insuring Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
  Additional Definitions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
  Additional Payments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
  Exclusions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
  Limits of Liability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
  Financial Responsibility Laws . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
  Other Insurance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
  Out-of-State Coverage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
  Right of Direct Action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

**PART II - PERSONAL INJURY PROTECTION COVERAGE**
  Insuring Agreement - Medical and Hospital Benefits Coverage . . . . . . . . . . . . 6
  Insuring Agreement - Income Disability Benefits Coverage . . . . . . . . . . . . . . . 7
  Insuring Agreement - Accidental Death Benefits Coverage . . . . . . . . . . . . . . . 7
  Additional Definitions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
  Exclusions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
  Limits of Liability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
  Other Insurance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

**PART III - UNINSURED/UNDERINSURED MOTORIST COVERAGE**
  Insuring Agreement - Uninsured Motorist Bodily Injury Coverage . . . . . . . . . . 10
  Insuring Agreement - Underinsured Motorist Bodily Injury Coverage . . . . . . . . 10
  Insuring Agreement - Uninsured Motorist Property Damage Coverage . . . . . . 10
  Notice and Consent Requirement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
  Additional Definitions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
  Exclusions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
  Limits of Liability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
  Other Insurance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
  Arbitration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

**PART IV - DAMAGE TO A VEHICLE**
Insuring Agreement - Collision Coverage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
Insuring Agreement - Comprehensive Coverage . . . . . . . . . . . . . . . . . . . . . . . . 16
Insuring Agreement - Additional Custom Parts or Equipment Coverage . . . . . 17
Insuring Agreement - Rental Reimbursement Coverage . . . . . . . . . . . . . . . . . . 17
Insuring Agreement - Loan/Lease Payoff Coverage . . . . . . . . . . . . . . . . . . . . . 18
Additional Definitions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
Exclusions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
Limits of Liability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
Payment of Loss . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
No Benefit to Bailee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
Loss Payable Clause . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
Other Sources of Recovery . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
Appraisal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

**PART V - ROADSIDE ASSISTANCE COVERAGE**
Insuring Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
Additional Definitions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
Exclusions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
Unauthorized Service Provider . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
Other Insurance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

**PART VI - DUTIES IN CASE OF AN ACCIDENT OR LOSS** . . . . . . . . . . . . . . . . . 25

**PART VII - GENERAL PROVISIONS**
Policy Period and Territory . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
Changes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
Duty to Report Changes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
Settlement of Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
Terms of Policy Conformed to Statutes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
Transfer of Interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
Fraud or Misrepresentation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
Payment of Premium and Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
Cancellation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
Cancellation Refund . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
Nonrenewal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
Automatic Termination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
Legal Action Against Us . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
Our Rights to Recover Payment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
Joint and Individual Interests . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
Bankruptcy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

**ARKANSAS AUTO POLICY**

**INSURING AGREEMENT**

In return for **your** payment of the premium, **we** agree to insure **you** subject to all the terms, conditions, and limitations of this policy. **We** will insure **you** for the coverages and the limits of liability shown on this policy's **declarations page**. **Your** policy consists of the policy contract, **your** insurance application, the **declarations page**, and all endorsements to this policy.

**GENERAL DEFINITIONS**

The following definitions apply throughout the policy. Defined terms are printed in boldface type and have the same meaning whether in the singular, plural, or any other form.

1. "**Additional auto**" means an **auto you** become the owner of during the policy period that does not permanently replace an **auto** shown on the **declarations page** if:
   a. **we** insure all other **autos you** own;
   b. the **additional auto** is not covered by any other insurance policy;
   c. **you** notify **us** within 30 days of becoming the owner of the **additional auto**; and
   d. **you** pay any additional premium due.

   An **additional auto** will have the broadest coverage **we** provide for any **auto** shown on the **declarations page**. If **you** ask **us** to insure an **additional auto** more than 30 days after **you** become the owner, any coverage **we** provide will begin at the time **you** request coverage.

2. "**Auto**" means a land motor vehicle:
   a. of the private passenger, pickup body, or cargo van type;
   b. designed for operation principally upon public roads;
   c. with at least four wheels; and
   d. with a gross vehicle weight rating of 12,000 pounds or less, according to the manufacturer's specifications.

   However, "**auto**" does not include step-vans, parcel delivery vans, or cargo cutaway vans or other vans with cabs separate from the cargo area.

3. "**Auto business**" means the business of selling, leasing, repairing, parking, storing, servicing, delivering, or testing vehicles.

4. "**Bodily injury**" means bodily harm, sickness, or disease, including death that results from bodily harm, sickness, or disease.

5. "**Covered auto**" means:
   a. any **auto** or **trailer** shown on the **declarations page** for the coverages applicable to that **auto** or **trailer**;
   b. any **additional auto**;
   c. any **replacement auto**;
   d. a **trailer** owned by **you**; or
   e. a **loaner vehicle**.

6. "**Declarations page**" means the document showing **your** coverages, limits of liability, **covered autos**, premium, and other policy-related information. The **declarations page** may also be referred to as the Auto Insurance Coverage Summary.

1

7. "**Loaner vehicle**" means an **auto** operated by **you** that is:
   a. loaned to **you** by a duly licensed automobile dealer:
      i. as a temporary substitute for a **covered auto** while the **covered auto** is out of use because of breakdown, repair, or servicing; or
      ii. for use as a demonstrator vehicle; or
   b. rented or leased from a rental company that is in the business of providing primarily private passenger vehicles to the public under a rental agreement for a period not to exceed 90 days.
8. "**Occupying**" means in, on, entering, or exiting.
9. "**Property damage**" means physical damage to, destruction of, or loss of use of, tangible property.
10. "**Punitive or exemplary damages**" means damages which may be imposed to punish a wrongdoer and to deter others from similar conduct.
11. "**Relative**" means a person residing in the same household as **you**, and related to **you** by blood, marriage, or adoption, and includes a ward, stepchild, or foster child. **Your** unmarried dependent children temporarily away from home will qualify as a **relative** if they intend to continue to reside in **your** household.
12. "**Replacement auto**" means an **auto** that permanently replaces an **auto** shown on the **declarations page**. A **replacement auto** will have the same coverage as the **auto** it replaces if the **replacement auto** is not covered by any other insurance policy. However, if the **auto** being replaced had coverage under Part IV - Damage To A Vehicle, such coverage will apply to the **replacement auto** only during the first 30 days after **you** become the owner unless **you** notify **us** within that 30-day period that **you** want **us** to extend coverage beyond the initial 30 days. If the **auto** being replaced did not have coverage under Part IV - Damage To A Vehicle, such coverage may be added, but the **replacement auto** will have no coverage under Part IV until **you** notify **us** of the **replacement auto** and ask **us** to add the coverage.
13. "**Trailer**" means a non-motorized trailer, including a farm wagon or farm implement, designed to be towed on public roads by an **auto** and not being used:
    a. for commercial purposes;
    b. as an office, store, or for display purposes; or
    c. as a passenger conveyance.
14. "**We**", "**us**", and "**our**" mean the underwriting company providing the insurance, as shown on the **declarations page**.
15. "**You**" and "**your**" mean:
    a. a person shown as a named insured on the **declarations page**; and
    b. the spouse of a named insured if residing in the same household at the time of the loss.

## PART I - LIABILITY TO OTHERS

### INSURING AGREEMENT

If **you** pay the premium for this coverage, **we** will pay damages for **bodily injury** and **property damage** for which an **insured person** becomes legally responsible because of an accident.

2

Damages include prejudgment interest awarded against an **insured person**.

**We** will settle or defend, at **our** option, any claim for damages covered by this Part I.

### ADDITIONAL DEFINITIONS

When used in this Part I:
1. "**Insured person**" means:
    a. **you** or a **relative** with respect to an accident arising out of the ownership, maintenance, or use of an **auto** or **trailer**;
    b. any person with respect to an accident arising out of that person's use of a **covered auto** with the permission of **you** or a **relative**;
    c. any person or organization with respect only to vicarious liability for the acts or omissions of a person described in a or b above; and
    d. any Additional Interest shown on the **declarations page** with respect only to its liability for the acts or omissions of a person described in a or b above.
2. "**Property damage**" means physical damage to, destruction of, or loss of use of, tangible property.

### ADDITIONAL PAYMENTS

In addition to **our** limit of liability, **we** will pay for an **insured person**:
1. all expenses **we** incur in the settlement of any claim or defense of any lawsuit;
2. interest accruing after entry of judgment, until **we** have paid, offered to pay, or deposited in court, that portion of the judgment which does not exceed **our** limit of liability. This does not apply if **we** have not been given notice of suit or the opportunity to defend an **insured person**;
3. the premium on any appeal bond or attachment bond required in any lawsuit **we** defend. **We** have no duty to purchase a bond in an amount exceeding **our** limit of liability, and **we** have no duty to apply for or furnish these bonds;
4. up to $250 for a bail bond required because of an accident resulting in **bodily injury** or **property damage** covered under this Part I. **We** have no duty to apply for or furnish this bond; and
5. reasonable expenses, including loss of earnings up to $200 per day, incurred at **our** request.

### <u>EXCLUSIONS</u> - READ THE FOLLOWING EXCLUSIONS CAREFULLY. IF AN EXCLUSION APPLIES, COVERAGE WILL NOT BE AFFORDED UNDER THIS PART I.

Coverage under this Part I, including **our** duty to defend, will not apply to any **insured person** for:
1. **bodily injury** or **property damage** arising out of the ownership, maintenance, or use of any vehicle or trailer while being used:
    a. to carry persons or property for compensation or a fee; or
    b. for retail or wholesale delivery, including, but not limited to, the pickup, transport, or delivery of magazines, newspapers, mail, or food.
    This exclusion does not apply to shared-expense car pools;

3

2. any liability assumed under any contract or agreement by **you** or a **relative**;

3. **bodily injury** to an employee of that **insured person** arising out of or within the course of employment. This exclusion does not apply to domestic employees if benefits are neither paid nor required to be provided under workers' compensation, disability benefits, or similar laws;

4. **bodily injury** or **property damage** arising out of an accident involving any vehicle while being maintained or used by a person while employed or engaged in any **auto business**. This exclusion does not apply to **you**, a **relative**, or an agent or employee of **you** or a **relative**, when using a **covered auto**;

5. **bodily injury** or **property damage** resulting from, or sustained during practice or preparation for:
   a. any pre-arranged or organized racing, stunting, speed, or demolition contest or activity; or
   b. any driving activity conducted on a permanent or temporary racetrack or racecourse;

6. **bodily injury** or **property damage** due to a nuclear reaction or radiation;

7. **bodily injury** or **property damage** for which insurance:
   a. is afforded under a nuclear energy liability insurance contract; or
   b. would be afforded under a nuclear energy liability insurance contract but for its termination upon exhaustion of its limit of liability;

8. any obligation for which the United States Government is liable under the Federal Tort Claims Act;

9. **bodily injury** or **property damage** caused by an intentional act of that **insured person**, or at the direction of that **insured person**, even if the actual injury or damage is different than that which was intended or expected;

10. **property damage** to any property owned by, rented to, being transported by, used by, or in the charge of that **insured person**. This exclusion does not apply to a rented residence or a rented garage;

11. **bodily injury** to **you** or a **relative**;

12. **bodily injury** or **property damage** arising out of the ownership, maintenance, or use of any vehicle owned by **you** or furnished or available for **your** regular use, other than a **covered auto** for which this coverage has been purchased;

13. **bodily injury** or **property damage** arising out of the ownership, maintenance, or use of any vehicle owned by a **relative** or furnished or available for the regular use of a **relative**, other than a **covered auto** for which this coverage has been purchased. This exclusion does not apply to **your** maintenance or use of such vehicle;

14. **bodily injury** or **property damage** arising out of **your** or a **relative's** use of a vehicle, other than a **covered auto**, without the permission of the owner of the vehicle or the person in lawful possession of the vehicle;

15. **bodily injury** or **property damage** arising out of the use of a **covered auto** while leased or rented to others or given in exchange for any compensation. This exclusion does not apply to the operation of a **covered auto** by **you** or a **relative**;

16. **punitive or exemplary damages**; or

4

17. **bodily injury** or **property damage** caused by, or reasonably expected to result from, a criminal act or omission of that **insured person**. This exclusion applies regardless of whether that **insured person** is actually charged with, or convicted of, a crime. For purposes of this exclusion, criminal acts or omissions do not include traffic violations.

## LIMITS OF LIABILITY

The limit of liability shown on the **declarations page** for liability coverage is the most **we** will pay regardless of the number of:
1. claims made;
2. **covered autos**;
3. **insured persons**;
4. lawsuits brought;
5. vehicles involved in the accident; or
6. premiums paid.

If **your declarations page** shows a split limit:
1. the amount shown for "each person" is the most **we** will pay for all damages due to **bodily injury** to one person resulting from any one accident;
2. subject to the "each person" limit, the amount shown for "each accident" is the most **we** will pay for all damages due to **bodily injury** sustained by two or more persons in any one accident; and
3. the amount shown for "property damage" is the most **we** will pay for the total of all **property damage** resulting from any one accident.

The "each person" limit of liability applies to the total of all claims made for **bodily injury** to a person and all claims of others, if allowed by law, derived from such **bodily injury**, including, but not limited to, emotional injury or mental anguish resulting from the **bodily injury** of another or from witnessing the **bodily injury** to another, loss of society, loss of companionship, loss of services, loss of consortium, and wrongful death.

If the **declarations page** shows that "combined single limit" or "CSL" applies, the amount shown is the most **we** will pay for the total of all damages resulting from any one accident. However, without changing this limit of liability, **we** will comply with any law that requires **us** to provide any separate limits.

No one is entitled to duplicate payments for the same elements of damages.

If multiple auto policies issued by **us** are in effect for **you**, **we** will pay no more than the highest limit of liability for this coverage available under any one policy.

An **auto** and attached **trailer** are considered one **auto**. Therefore, the limits of liability will not be increased for an accident involving an **auto** that has an attached **trailer**.

5

**FINANCIAL RESPONSIBILITY LAWS**

When **we** certify this policy as proof of financial responsibility, this policy will comply with the law to the extent required. The **insured person** must reimburse **us** if **we** make a payment that **we** would not have made if this policy was not certified as proof of financial responsibility.

**OTHER INSURANCE**

If there is any other applicable liability insurance or bond, **we** will pay only **our** share of the damages. **Our** share is the proportion that **our** limit of liability bears to the total of all applicable limits. However, any insurance **we** provide for a vehicle or trailer, other than a **covered auto**, will be excess over any other collectible insurance, self-insurance, or bond.

**OUT-OF-STATE COVERAGE**

If an accident to which this Part I applies occurs in any state, territory, or possession of the United States of America or any province or territory of Canada, other than the one in which a **covered auto** is principally garaged, and the state, province, territory, or possession has:

1.  a financial responsibility or similar law requiring limits of liability for **bodily injury** or **property damage** higher than the limits shown on the **declarations page**, this policy will provide the higher limits; or
2.  a compulsory insurance or similar law requiring a non-resident to maintain insurance whenever the non-resident uses an **auto** in that state, province, territory, or possession, this policy will provide the greater of:
    a.  the required minimum amounts and types of coverage; or
    b.  the limits of liability under this policy.

**RIGHT OF DIRECT ACTION**

Any person entitled to payment of damages covered under this Part I, or his or her personal representative, shall be subrogated to the right of the person shown as the named insured on the **declarations page** for payment under this Part I. If a judgment against an **insured person** remains unsatisfied after 30 days from the date notice of entry of judgment was served on either the **insured person**, the attorney for the **insured person**, or **us**, the injured person, or his or her personal representative, may maintain an action against **us** for the amount of the judgment not exceeding **our** Limits of Liability.

## PART II - PERSONAL INJURY PROTECTION COVERAGE

**INSURING AGREEMENT - MEDICAL AND HOSPITAL BENEFITS COVERAGE**

If **you** pay the premium for this coverage, **we** will pay for reasonable and necessary **medical and hospital benefits** because of **bodily injury**:

1.  sustained by an **insured person**;

6

2.   caused by an accident; and
3.   arising out of the ownership, maintenance or use of a motor vehicle.

## INSURING AGREEMENT - INCOME DISABILITY BENEFITS COVERAGE

If **you** pay the premium for this coverage, **we** will pay for **income disability benefits** because of **bodily injury**:
1.   sustained by an **insured person**;
2.   caused by an accident; and
3.   arising out of the ownership, maintenance or use of a motor vehicle.

## INSURING AGREEMENT - ACCIDENTAL DEATH BENEFITS COVERAGE

If **you** pay the premium for this coverage, **we** will pay the amount stated on the **declarations page** if an **insured person** dies within one year of the date of an accident as a result of **bodily injury**:
1.   caused by the accident; and
2.   arising out of the ownership, maintenance or use of a motor vehicle.

## ADDITIONAL DEFINITIONS

When used in this Part II:
1.   "**Income disability benefits**" means loss of income from work the **insured person** would have performed had the **insured person** not sustained **bodily injury**. However if the **insured person** is a non-income earner, **income disability benefits** means expenses reasonably incurred for essential services in lieu of those the **insured person** would have performed without income had the **insured person** not sustained **bodily injury**. **Income disability benefits** apply only to the period beginning eight days after the date of the accident and not exceeding 52 weeks. **Income disability benefits** do not include any loss or expense after the death of the **insured person**.
2.   "**Insured person**" and "**insured persons**" mean:
     a.   **you** or any **relative**; and
     b.   any other person:
          (i)   while **occupying** a **covered auto**; or
          (ii)  when struck by a **covered auto** while a pedestrian, bicyclist, or motorcyclist, or while riding on an animal or in a horse-drawn wagon or cart.
3.   "**Medical and hospital benefits**" means all reasonable and necessary expenses for medical, hospital, nursing, dental, surgical, ambulance, funeral and prosthetic services incurred within 24 months after the accident, and may include any non-medical remedial care and treatment rendered in accordance with a recognized religious method of healing. Expenses for hospital charges are limited to semi-private accommodations.

7

**EXCLUSIONS - READ THE FOLLOWING EXCLUSIONS CAREFULLY. IF AN EX-
CLUSION APPLIES, COVERAGE WILL NOT BE AFFORDED UNDER THIS PART II.**

Coverage under this Part II will not apply to **bodily injury**:

1. sustained by any person, other than **you** or a **relative**, who is a named insured or additional insured under any other valid and collectible automobile insurance policy providing the minimum personal injury protection coverages required by law;

2. sustained by any person who intentionally caused such **bodily injury**;

3. sustained by any person while in the commission of a felony or while seeking to elude lawful apprehension or arrest by a law enforcement official;

4. to the extent benefits are paid or payable under any workers' compensation law, disability benefits law or similar law. This exclusion does not apply to Accidental Death Benefits Coverage;

5. to any person resulting from, or sustained during practice or preparation for:
   a. any pre-arranged or organized racing, stunting, speed, or demolition contest or activity; or
   b. any driving activity conducted on a permanent or temporary racetrack or racecourse;

6. sustained by any person while **occupying** or when struck by any vehicle owned by **you** or furnished or available for **your** regular use, other than a **covered auto** for which this coverage has been purchased;

7. sustained by any person while **occupying** or when struck by any vehicle owned by a **relative** or furnished or available for the regular use of a **relative**, other than a **covered auto** for which this coverage has been purchased. This exclusion does not apply to **your** maintenance or use of such vehicle;

8. sustained by any person while **occupying** any vehicle or trailer while located for use as a residence or premises;

9. sustained by any person while **occupying** a **covered auto** while it is being used:
   a. to carry persons or property for compensation or a fee; or
   b. for retail or wholesale delivery, including, but not limited to, the pickup, transport, or delivery of magazines, newspapers, mail, or food.
   This exclusion does not apply to shared-expense car pools.

10. arising out of an accident involving any vehicle while being maintained or used by a person while employed or engaged in any **auto business**. This exclusion does not apply to **you**, a **relative**, or an agent or employee of **you** or a **relative**, when using a **covered auto**;

11. due to a nuclear reaction or radiation;

12. for which insurance:
    a. is afforded under a nuclear energy liability insurance contract; or
    b. would be afforded under a nuclear energy liability insurance contract but for its termination upon exhaustion of its limit of liability;

13. caused directly or indirectly by:
    a. war (declared or undeclared) or civil war;
    b. warlike action by any military force of any government, sovereign or other authority using military personnel or agents. This includes any action taken to

8

      hinder or defend against an actual or expected attack; or

    c.  insurrection, rebellion, revolution, usurped power, or any action taken by a governmental authority to hinder or defend against any of these acts;

14.  caused directly or indirectly by:

    a.  any accidental or intentional discharge, dispersal, or release of radioactive, nuclear, pathogenic, or poisonous biological material; or

    b.  any intentional discharge, dispersal, or release of chemical or hazardous material for any purpose other than its safe and useful purpose; or

15.  to **you** or a **relative** while **occupying** any vehicle, other than a **covered auto**, without the permission of the owner of the vehicle or the person in lawful possession of the vehicle.

## LIMITS OF LIABILITY

The limits of liability shown on the **declarations page** for the coverages provided under this Part II - Personal Injury Protection Coverage is the most **we** will pay for each **insured person** in any one accident, regardless of the number of:

1.  claims made;
2.  **covered autos**;
3.  **insured persons**;
4.  lawsuits brought;
5.  vehicles involved in the accident; or
6.  premiums paid.

The limit of liability for Medical and Hospital Benefits is shown on the **declarations page**.

The limit of liability for Accidental Death Benefits is shown on the **declarations page**.

The limit of liability for Income Disability Benefits is:

1.  70% of the loss of gross income per week, not to exceed $140 per week, if the **insured person** earned income from work at the time of the accident; or
2.  $70 per week, or any fractional part of a week, if the **insured person** did not earn income from work at the time of the accident.

In determining the amount payable under this Part II, the amount of damages sustained by the **insured person** due to **bodily injury** will be reduced by all sums paid or payable for the same elements of damages under:

1.  Part I - Liability To Others; and
2.  Part III - Uninsured/Underinsured Motorist Coverage.

## OTHER INSURANCE

1.  With respect to **bodily injury** sustained by a **relative**, any Medical And Hospital Benefits Coverage or Income Disability Benefits Coverage afforded by this Part II shall be excess over any other similar coverage provided by a motor vehicle insurance policy under which the **relative** is a named insured.

2. If **you** or a **relative** are insured under any other motor vehicle insurance policy providing coverage for income disability benefits or similar coverage, the most that **you** or a **relative** may recover for **income disability benefits** shall not exceed the amount payable under the policy providing the highest limits of liability.

3. No coverage will be provided under this Part II for any person, other than **you** or a **relative**, who is a named insured or additional insured under any other valid and collectible motor vehicle insurance policy providing the minimum personal injury protection coverages required by law.

Subject to 1, 2, and 3 above, if there is other applicable personal injury protection insurance, **we** will pay only **our** share of the loss. **Our** share is the proportion that **our** limit of liability bears to the total of all applicable limits.

No one shall be entitled to recover duplicate payments for **income disability benefits** or **medical and hospital benefits** under this or any other motor vehicle insurance policy.

## PART III - UNINSURED/UNDERINSURED MOTORIST COVERAGE

### INSURING AGREEMENT - UNINSURED MOTORIST BODILY INJURY COVERAGE

If **you** pay the premium for this coverage, **we** will pay for damages that an **insured person** is legally entitled to recover from the owner or operator of an **uninsured motor vehicle** because of **bodily injury**:
1. sustained by an **insured person**;
2. caused by an accident; and
3. arising out of the ownership, maintenance, or use of an **uninsured motor vehicle**.

### INSURING AGREEMENT - UNDERINSURED MOTORIST BODILY INJURY COVERAGE

If **you** pay the premium for this coverage, **we** will pay for damages that an **insured person** is legally entitled to recover from the owner or operator of an **underinsured motor vehicle** because of **bodily injury**:
1. sustained by an **insured person**;
2. caused by an accident; and
3. arising out of the ownership, maintenance, or use of an **underinsured motor vehicle**.

**We** will pay under this Part III only after the limits of liability under all applicable bodily injury liability bonds and policies have been exhausted by payment of judgments or settlements.

### INSURING AGREEMENT - UNINSURED MOTORIST PROPERTY DAMAGE COVERAGE

If **you** pay the premium for this coverage, **we** will pay for damages that an **insured person** is legally entitled to recover from the owner or operator of an **uninsured motor vehicle** due to **property damage**:
1. caused by an accident; and

10

2.   arising out of the ownership, maintenance or use of an **uninsured motor vehicle**.

## NOTICE AND CONSENT REQUIREMENT

In order for coverage under this Part III to apply, an **insured person** must send to **us**, by certified mail, return receipt requested, written notice of any tentative settlement agreement reached with the owner or operator of an **underinsured motor vehicle**, or that person's liability insurer. However, this notice requirement shall not apply when **we** are making that offer of settlement as insurer of the owner or operator of the **underinsured motor vehicle**. The notice shall include:

1.   written documentation of economic losses incurred, including copies of all medical bills;
2.   written authorization or a court order allowing **us** to obtain medical reports from all employers and medical providers; and
3.   written confirmation from the owner or operator's liability insurer as to the amount of the liability limits and the terms of the settlement agreement. The agreement shall not include any sum representing **punitive or exemplary damages**.

Within 30 days of **our** receipt of written notice of the tentative settlement agreement, **we** may pay the sum offered in settlement to the **insured person**. If **we** do this, **we** are subrogated to the **insured person's** right of recovery against the owner or operator of the **underinsured motor vehicle**, to the extent of **our** payment, and the **insured person** must assign to **us** all rights to any amount subsequently paid from all applicable liability bonds and policies.

Any judgment or settlement for damages against an owner or operator of an **uninsured motor vehicle** or an **underinsured motor vehicle** that arises out of a lawsuit brought without **our** written consent is not binding on **us**.

## ADDITIONAL DEFINITIONS

When used in this Part III:

1.   "**Insured person**" means:
    a.   **you** or a **relative**;
    b.   any person while operating a **covered auto** with the permission of **you** or a **relative**;
    c.   any person **occupying**, but not operating, a **covered auto**; and
    d.   any person who is entitled to recover damages covered by this Part III because of **bodily injury** sustained by a person described in a, b, or c above.
2.   "**Property damage**" means physical damage to, destruction of, or loss of use of, a **covered auto**.
3.   "**Underinsured motor vehicle**" means a land motor vehicle or trailer of any type to which a bodily injury liability bond or policy applies at the time of the accident, but its limit of liability for bodily injury is less than the amount of the **insured person's bodily injury** damages.

11

An **underinsured motor vehicle** does not include any vehicle or equipment:

a. owned by **you** or a **relative** or furnished or available for the regular use of **you** or a **relative**;

b. operated on rails or crawler treads;

c. designed mainly for use off public roads, while not on public roads;

d. while located for use as a residence or premises;

e. that is a **covered auto**; or

f. that is an **uninsured motor vehicle**.

4. "**Uninsured motor vehicle**" means a land motor vehicle or trailer of any type:

a. to which no bodily injury liability bond or policy applies at the time of the accident;

b. to which a bodily injury liability bond or policy applies at the time of the accident, but the bonding or insuring company:

    (i) denies coverage; or

    (ii) is insolvent, or becomes so within one year of the date of the accident; or

c. that is a hit-and-run vehicle whose owner or operator cannot be identified and which strikes:

    (i) **you** or a **relative**;

    (ii) a vehicle that **you** or a **relative** are **occupying**; or

    (iii) a **covered auto**;

    provided that the **insured person**, or someone on his or her behalf, reports the accident to the police or civil authority within 24 hours or as soon as practicable after the accident.

An "**uninsured motor vehicle**" does not include any vehicle or equipment:

a. owned by **you** or a **relative** or furnished or available for the regular use of **you** or a **relative**;

b. owned or operated by a self-insurer under any applicable motor vehicle law, except a self-insurer that is or becomes insolvent;

c. operated on rails or crawler treads;

d. designed mainly for use off public roads, while not on public roads;

e. while located for use as a residence or premises;

f. that is a **covered auto**; or

g. that is an **underinsured motor vehicle**.

**EXCLUSIONS - READ THE FOLLOWING EXCLUSIONS CAREFULLY. IF AN EXCLUSION APPLIES, COVERAGE WILL NOT BE AFFORDED UNDER THIS PART III.**

A. Coverage under this Part III will not apply:

1. to **bodily injury** sustained by any person while using or **occupying**:

a. a **covered auto** while being used:

    (i) to carry persons or property for compensation or a fee; or

    (ii) for retail or wholesale delivery, including, but not limited to, the pickup, transport, or delivery of magazines, newspapers, mail, or food. This exclusion does not apply to shared-expense car pools; or

b. a motor vehicle that is owned by or available for the regular use of **you** or a **relative**. This exclusion does not apply to a **covered auto** that is insured under this Part III;

12

2.  to **bodily injury** sustained by **you** or a **relative** while using any vehicle, other than a **covered auto**, without the permission of the owner of the vehicle or the person in lawful possession of the vehicle;

3.  directly or indirectly to benefit any insurer or self-insurer under any of the following or similar laws:
    a.  workers' compensation law; or
    b.  disability benefits law;

4.  to any **punitive or exemplary damages**; or

5.  to **bodily injury** sustained by any person if that person or the legal representative of that person settles without **our** written consent.

B.  Coverage under this Part III will not apply to **property damage**:
    1.  sustained while a **covered auto** is being used:
        a.  to carry persons or property for compensation or a fee; or
        b.  for retail or wholesale delivery, including, but not limited to, the pickup, transport, or delivery of magazines, newspapers, mail, or food.
        This exclusion does not apply to shared-expense car pools;
    2.  resulting from, or sustained during practice or preparation for:
        a.  any pre-arranged or organized racing, stunting, speed, or demolition contest or activity; or
        b.  any driving activity conducted on a permanent or temporary racetrack or racecourse;
    3.  to a **covered auto** for which insurance:
        a.  is afforded under a nuclear energy liability insurance contract; or
        b.  would be afforded under a nuclear energy liability insurance contract but for its termination upon exhaustion of its limit of liability; or
    4.  to a trailer.

**LIMITS OF LIABILITY**

The limit of liability shown on the **declarations page** for Uninsured/Underinsured Motorist Coverage is the most **we** will pay regardless of the number of:
1.  claims made;
2.  **covered autos**;
3.  **insured persons**;
4.  lawsuits brought;
5.  vehicles involved in the accident; or
6.  premiums paid.

If **your declarations page** shows a split limit:
1.  the amount shown for "each person" is the most **we** will pay for all damages due to **bodily injury** to one person;
2.  subject to the "each person" limit, the amount shown for "each accident" is the most **we** will pay for all damages due to **bodily injury** sustained by two or more persons in any one accident; and
3.  the amount shown for "**property damage**" is the most **we** will pay for the aggregate of all **property damage** caused by any one accident.

13

The "each person" limit of liability includes the total of all claims made for **bodily injury** to an **insured person** and all claims of others derived from such **bodily injury**, including, but not limited to, emotional injury or mental anguish resulting from the **bodily injury** of another or from witnessing the **bodily injury** to another, loss of society, loss of companionship, loss of services, loss of consortium, and wrongful death.

If the **declarations page** shows that "combined single limit" or "CSL" applies, the amount shown is the most **we** will pay for the total of all damages resulting from any one accident. However, without changing that total limit of liability, **we** will comply with any law that requires **us** to provide any separate limits.

In determining the amount payable under this Part III, the amount of the damages sustained by the **insured person** due to **bodily injury** will be reduced by all sums:
1. paid by or on behalf of any persons or organizations that may be legally responsible;
2. paid under Part I - Liability To Others; and
3. paid or payable because of **bodily injury** under any of the following or similar laws:
   a. workers' compensation law; or
   b. disability benefits law.

The limit of liability for **property damage** to a **covered auto** is the lowest of:
1. the actual cash value of the **covered auto** at the time of the accident;
2. the amount necessary to replace the **covered auto**;
3. the amount necessary to repair the **covered auto** to its pre-loss condition; or
4. the limit of liability shown on the **declarations page** for Uninsured Motorist Property Damage.

The limit of liability for **property damage** under this Part III will be reduced by all sums paid because of **property damage** by or on behalf of any persons or organizations that may be legally responsible, including, but not limited to, all sums paid under Part I - Liability To Others.

Payments for **property damage** under this Part III are subject to the following provisions:
1. any amount payable under this Part III for **property damage** shall be subject to the deductible shown on the **declarations page**;
2. no more than one deductible shall be applied to any one accident;
3. the deductible under this Part III shall not apply if:
   a. the operator of the **uninsured motor vehicle** has been positively identified and is solely at fault; and
   b. the **covered auto** is insured for Collision Coverage under Part IV - Damage To A Vehicle; and
4. IN THE REPAIR OF **YOUR** COVERED MOTOR VEHICLE UNDER THE PHYSICAL DAMAGE COVERAGE PROVISIONS OF THIS POLICY, **WE** MAY REQUIRE OR SPECIFY THE USE OF MOTOR VEHICLE PARTS NOT MADE BY THE ORIGINAL MANUFACTURER. THESE PARTS ARE REQUIRED TO BE

14

AT LEAST EQUAL IN TERMS OF FIT, QUALITY, PERFORMANCE, AND WARRANTY TO THE ORIGINAL MANUFACTURER PARTS THEY REPLACE.

No one will be entitled to duplicate payments for the same elements of damages.

If multiple auto policies issued by **us** are in effect for **you**, **we** will pay no more than the highest limit of liability for this coverage available under any one policy.

## OTHER INSURANCE

If there is other applicable uninsured or underinsured motorist coverage, **we** will pay only **our** share of the damages. **Our** share is the proportion that **our** limit of liability bears to the total of all available coverage limits. However, any insurance **we** provide under this Part III with respect to a vehicle that is not a **covered auto** will be excess over any other uninsured or underinsured motorist coverage.

## ARBITRATION

If **we** and an **insured person** cannot agree on:
1.  the legal liability of the operator or owner of an **underinsured motor vehicle** or **uninsured motor vehicle**; or
2.  the amount of the damages sustained by the **insured person**;
this will be determined by arbitration if **we** and the **insured person** mutually agree to arbitration prior to the expiration of the bodily injury statute of limitations in the state in which the accident occurred.

In the event of arbitration, each party will select an arbitrator. The two arbitrators will select a third. If the two arbitrators cannot agree on a third arbitrator within 30 days, then on joint application by the **insured person** and **us**, the third arbitrator will be appointed by a court having jurisdiction.

Each party will pay the costs and fees of its arbitrator and any other expenses it incurs. The costs and fees of the third arbitrator will be shared equally.

Unless both parties agree otherwise, arbitration will take place in the county in which the **insured person** resides. Local rules of procedure and evidence will apply.

A decision agreed to by two of the arbitrators will determine:
1.  the legal liability of the operator or owner of an **underinsured motor vehicle** or **uninsured motor vehicle**; and
2.  the amount of the damages sustained by the **insured person**;
but will not be binding on either the **insured person** or **us**. The arbitrators will have no authority to award an amount in excess of the limit of liability.

**We** and an **insured person** may agree to an alternate form of arbitration.

15

## **PART IV - DAMAGE TO A VEHICLE**

### **INSURING AGREEMENT - COLLISION COVERAGE**

If **you** pay the premium for this coverage, **we** will pay for sudden, direct, and accidental loss to a:
1. **covered auto**, including an attached **trailer**; or
2. **non-owned auto**;
and its **custom parts or equipment**, resulting from **collision**.

In addition, **we** will pay the reasonable cost to replace any child safety seat damaged in an accident to which this coverage applies.

### **INSURING AGREEMENT - COMPREHENSIVE COVERAGE**

If **you** pay the premium for this coverage, **we** will pay for sudden, direct, and accidental loss to a:
1. **covered auto**, including an attached **trailer**; or
2. **non-owned auto**;
and its **custom parts or equipment**, that is not caused by **collision**.

A loss not caused by **collision** includes:
1. contact with an animal (including a bird);
2. explosion or earthquake;
3. fire;
4. malicious mischief or vandalism;
5. missiles or falling objects;
6. riot or civil commotion;
7. theft or larceny;
8. windstorm, hail, water, or flood; or
9. breakage of glass not caused by **collision**.

In addition, **we** will pay for:
1. reasonable transportation expenses incurred by **you** if a **covered auto** is stolen; and
2. loss of use damages that **you** are legally liable to pay if a **non-owned auto** is stolen.
A combined maximum of $900, not exceeding $30 per day, will apply to these additional benefits. The additional benefit for transportation expenses will not apply if **you** purchased Rental Reimbursement Coverage for the stolen **covered auto**.

Coverage for transportation expenses and loss of use damages begins 48 hours after **you** report the theft to **us** and ends the earliest of:
1. when the **auto** has been recovered and returned to **you** or its owner;
2. when the **auto** has been recovered and repaired;

16

3.   when the **auto** has been replaced; or
4.   72 hours after **we** make an offer to settle the loss if the **auto** is deemed by **us** to be a total loss.

**We** must receive written proof of transportation expenses and loss of use damages.

## INSURING AGREEMENT - ADDITIONAL CUSTOM PARTS OR EQUIPMENT COVERAGE

**We** will pay for sudden, direct, and accidental loss to **custom parts or equipment** on a **covered auto** for which this coverage has been purchased. This coverage applies only if **you** have purchased both Comprehensive Coverage and Collision Coverage for that **covered auto** and the loss is covered under one of those coverages. This coverage applies in addition to any coverage automatically provided for **custom parts or equipment** under Comprehensive Coverage or Collision Coverage.

## INSURING AGREEMENT - RENTAL REIMBURSEMENT COVERAGE

**We** will reimburse rental charges incurred when **you** rent an **auto** from a rental agency or auto repair shop due to a loss to a **covered auto** for which Rental Reimbursement Coverage has been purchased. This coverage applies only if **you** have purchased both Comprehensive Coverage and Collision Coverage for that **covered auto** and the loss is covered under one of those coverages.

Additional fees or charges for insurance, damage waivers, optional equipment, fuel, or accessories are not covered.

This coverage is limited to the each day limit shown on the **declarations page** for a maximum of 30 days.

If Rental Reimbursement Coverage applies, no other coverage under this policy for rental expenses will apply.

Rental charges will be reimbursed beginning:
1.   when the **covered auto** cannot be driven due to a loss; or
2.   if the **covered auto** can be driven, when **you** deliver the **covered auto** to an auto repair shop or one of **our** Claims Service Centers for repairs due to the loss;
and ending the earliest of:
1.   when the **covered auto** has been returned to **you**;
2.   when the **covered auto** has been repaired;
3.   when the **covered auto** has been replaced;
4.   72 hours after **we** make an offer to settle the loss if the **covered auto** is deemed by **us** to be a total loss; or
5.   when **you** incur 30 days worth of rental charges.

**You** must provide **us** written proof of **your** rental charges to be reimbursed.

**INSURING AGREEMENT - LOAN/LEASE PAYOFF COVERAGE**

If **you** pay the premium for this coverage, and the **covered auto** for which this coverage was purchased is deemed by **us** to be a total loss, **we** will pay, in addition to any amounts otherwise payable under this Part IV, the difference between:

1. the actual cash value of the **covered auto** at the time of the total loss; and
2. any greater amount the owner of the **covered auto** is legally obligated to pay under a written loan or lease agreement to which the **covered auto** is subject at the time of the total loss, reduced by:
   a. unpaid finance charges or refunds due to the owner for such charges;
   b. excess mileage charges or charges for wear and tear;
   c. charges for extended warranties or refunds due to the owner for extended warranties;
   d. charges for credit insurance or refunds due to the owner for credit insurance;
   e. past due payments and charges for past due payments; and
   f. collection or repossession expenses.

However, **our** payment under this coverage shall not exceed the limit of liability shown on the **declarations page**. The limit of liability is a percentage of the actual cash value of the **covered auto** at the time of the loss.

This coverage applies only if **you** have purchased both Comprehensive Coverage and Collision Coverage for that **covered auto** and the loss is covered under one of those coverages.

**ADDITIONAL DEFINITIONS**

When used in this Part IV:

1. "**Collision**" means the upset of a vehicle or its impact with another vehicle or object.
2. "**Custom parts or equipment**" means equipment, devices, accessories, enhancements, and changes, other than those that are offered by the manufacturer specifically for that **auto** model, or that are installed by the auto dealership as part of the original sale of a new **auto**, that:
   a. are permanently installed or attached; and
   b. alter the appearance or performance of the **auto**.
3. "**Mechanical parts**" means operational parts on a vehicle that wear out over time or have a finite useful life or duration typically shorter than the life of the vehicle as a whole. **Mechanical parts** do not include external crash parts, wheels, paint, or windshields and other glass.
4. "**Non-owned auto**" means an **auto**:
   a. that is not a **loaner vehicle**; and
   b. that is not owned by or furnished or available for the regular use of **you** or a **relative** while in the custody of or being operated by **you** or a **relative** with the permission of the owner of the **auto** or the person in lawful possession of the **auto**.

18

**<u>EXCLUSIONS</u> - READ THE FOLLOWING EXCLUSIONS CAREFULLY. IF AN EX-CLUSION APPLIES, COVERAGE WILL NOT BE AFFORDED UNDER THIS PART IV.**

Coverage under this Part IV will not apply for loss:

1. to any vehicle while being used:
   a. to carry persons or property for compensation or a fee; or
   b. for retail or wholesale delivery, including, but not limited to, the pickup, transport, or delivery of magazines, newspapers, mail, or food.
   This exclusion does not apply to shared-expense car pools;
2. to a **non-owned auto** while being maintained or used by a person while employed or engaged in any **auto business**;
3. to any vehicle resulting from, or sustained during practice or preparation for:
   a. any pre-arranged or organized racing, stunting, speed, or demolition contest or activity; or
   b. any driving activity conducted on a permanent or temporary racetrack or racecourse;
4. to any vehicle for which insurance:
   a. is afforded under a nuclear energy liability insurance contract; or
   b. would be afforded under a nuclear energy liability insurance contract but for its termination upon exhaustion of its limit of liability;
5. to any vehicle caused by an intentional act committed by or at the direction of **you**, a **relative**, or the owner of a **non-owned auto**, even if the actual damage is different than that which was intended or expected;
6. to a **covered auto** while it is leased or rented to others or given in exchange for compensation. This exclusion does not apply to the operation of a **covered auto** by **you** or a **relative**;
7. due to destruction or confiscation by governmental or civil authorities of any vehicle because **you** or any **relative** engaged in illegal activities;
8. to any vehicle that is due and confined to:
   a. wear and tear;
   b. freezing;
   c. mechanical, electrical, or electronic breakdown or failure; or
   d. road damage to tires.
   This exclusion does not apply if the damage results from the theft of a vehicle;
9. to portable equipment, devices, accessories, and any other personal effects that are not permanently installed. This includes, but is not limited to:
   a. tapes, compact discs, cassettes, DVDs, and other recording or recorded media;
   b. any case or other container designed for use in storing or carrying tapes, compact discs, cassettes, DVDs, or other recording or recorded media;
   c. any device used for the detection or location of radar, laser, or other speed measuring equipment or its transmissions; and
   d. CB radios, telephones, two-way mobile radios, DVD players, personal computers, personal digital assistants, or televisions;
10. to any vehicle for diminution of value;
11. to any vehicle caused directly or indirectly by:
    a. war (declared or undeclared) or civil war;

19

    b.  warlike action by any military force of any government, sovereign or other authority using military personnel or agents. This includes any action taken to hinder or defend against an actual or expected attack; or

    c.  insurrection, rebellion, revolution, usurped power, or any action taken by a governmental authority to hinder or defend against any of these acts;

12.  to any vehicle caused directly or indirectly by:

    a.  any accidental or intentional discharge, dispersal or release of radioactive, nuclear, pathogenic or poisonous biological material; or

    b.  any intentional discharge, dispersal or release of chemical or hazardous material for any purpose other than its safe and useful purpose; or

13.  to any vehicle caused by, or reasonably expected to result from, a criminal act or omission of **you**, a **relative**, or the owner of a **non-owned auto**. This exclusion applies regardless of whether **you**, the **relative**, or the owner of the **non-owned auto** is actually charged with, or convicted of, a crime. For purposes of this exclusion, criminal acts or omissions do not include traffic violations.

## LIMITS OF LIABILITY

1.  The limit of liability for loss to a **covered auto**, **non-owned auto**, or **custom parts or equipment** is the lowest of:

    a.  the actual cash value of the stolen or damaged property at the time of the loss reduced by the applicable deductible;

    b.  the amount necessary to replace the stolen or damaged property reduced by the applicable deductible;

    c.  the amount necessary to repair the damaged property to its pre-loss condition reduced by the applicable deductible; or

    d.  the Stated Amount shown on the **declarations page** for that **covered auto**. However, the most **we** will pay for loss to:

    a.  **custom parts or equipment** is $1,000 unless **you** purchased Additional Custom Parts or Equipment Coverage ("ACPE"). If **you** purchased ACPE, the most **we** will pay is $1,000 plus the amount of ACPE **you** purchased;

    b.  a **trailer** is the limit of liability shown on the **declarations page** for that **trailer**. If the **trailer** is not shown on the **declarations page**, the limit of liability is $500.

2.  Payments for loss to a **covered auto**, **non-owned auto**, or **custom parts or equipment** are subject to the following provisions:

    a.  If coverage applies to a **non-owned auto**, **we** will provide the broadest coverage applicable to any **covered auto** shown on the **declarations page**.

    b.  If **you** have elected a Stated Amount for a **covered auto**, the Stated Amount is the most **we** will pay for all loss to that **covered auto**, including its **custom parts or equipment**.

    c.  Coverage for **custom parts or equipment** will not cause **our** limit of liability for loss to an **auto** under this Part IV to be increased to an amount in excess of the actual cash value of the **auto**, including its **custom parts or equipment**.

    d.  In determining the amount necessary to repair damaged property to its pre-loss condition, the amount to be paid by **us**:

        (i)  will not exceed the prevailing competitive labor rates charged in the area

20

where the property is to be repaired and the cost of repair or replacement parts and equipment, as reasonably determined by **us**; and

   (ii)  will be based on the cost of repair or replacement parts and equipment which may be new, reconditioned, remanufactured, or used, including, but not limited to:

      (a)  original manufacturer parts or equipment; and

      (b)  nonoriginal manufacturer parts or equipment.

e.   To determine the amount necessary to repair or replace the damaged property as referred to in subsection 1, the total cost of necessary repair or replacement may be reduced by unrepaired prior damage. Unrepaired prior damage includes broken, cracked, or missing parts; rust; dents; scrapes; gouges; and peeling paint. The reduction for unrepaired prior damage is the cost of labor, parts, and materials necessary to repair or replace damage, deterioration, defects, or wear and tear on exterior body parts, windshields and other glass, wheels, and paint, that existed prior to the accident and that is eliminated as a result of the repair or replacement of property damaged in the loss.

f.   To determine the amount necessary to repair or replace the damaged property as referred to in subsection 1, an adjustment may be made for betterment or depreciation and physical condition on:

   (i)   batteries;

   (ii)  tires;

   (iii) engines and transmissions, if the engine has greater than 80,000 miles; and

   (iv) any other **mechanical parts** that are nonfunctioning or inoperative.

   **We** will not make an adjustment for the labor costs associated with the replacement or repair of these parts.

g.   The actual cash value is determined by the market value, age, and condition of the vehicle at the time the loss occurs.

3.   No deductible will apply to a loss to window glass when the glass is repaired instead of replaced.

4.   Duplicate recovery for the same elements of damages is not permitted.

5.   Any amount paid or payable under this Part IV shall be reduced by any amount paid for **property damage** to the vehicle under Part III - Uninsured/Underinsured Motorist Coverage.

6.   IN THE REPAIR OF **YOUR** COVERED MOTOR VEHICLE UNDER THE PHYSICAL DAMAGE COVERAGE PROVISIONS OF THIS POLICY, **WE** MAY REQUIRE OR SPECIFY THE USE OF MOTOR VEHICLE PARTS NOT MADE BY THE ORIGINAL MANUFACTURER. THESE PARTS ARE REQUIRED TO BE AT LEAST EQUAL IN TERMS OF FIT, QUALITY, PERFORMANCE, AND WARRANTY TO THE ORIGINAL MANUFACTURER PARTS THEY REPLACE.

## PAYMENT OF LOSS

**We** may, at **our** option:

1.   pay for the loss in money; or

2.   repair or replace the damaged or stolen property.

At **our** expense, **we** may return any recovered stolen property to **you** or to the address shown on the **declarations page**, with payment for any damage resulting from the theft. **We** may keep all or part of the property at the agreed or appraised value.

**We** may settle any loss with **you** or the owner or lienholder of the property.

## NO BENEFIT TO BAILEE

Coverage under this Part IV will not directly or indirectly benefit any carrier or other bailee for hire.

## LOSS PAYABLE CLAUSE

Payment under this Part IV for a loss to a **covered auto** will be made according to **your** interest and the interest of any lienholder shown on the **declarations page** or designated by **you**. At **our** option, payment may be made to both jointly, or to either separately. Either way, **we** will protect the interest of both. However, if the **covered auto** is not a total loss, **we** may make payment to **you** and the repairer of the **auto**.

Protection of the lienholder's financial interest will not be affected by any act or omission by any person entitled to coverage under this policy. However, protection under this clause does not apply:

1. in any case of conversion, embezzlement, secretion, or willful damaging or destruction, of the **covered auto** by or at the direction of **you**, a **relative**, or the owner of the **covered auto**; or
2. to any loss caused by, or reasonably expected to result from, a criminal act or omission of **you**, a **relative**, or the owner of the **covered auto**. This applies regardless of whether **you**, the **relative**, or the owner of the **covered auto** is actually charged with, or convicted of, a crime. For purposes of this clause, criminal acts or omissions do not include traffic violations.

If this policy is cancelled, nonrenewed, or voided, the interest of any lienholder under this agreement will also terminate.

When **we** make payment to a lienholder for loss under this policy, **we** will be subrogated to the rights of the party **we** pay, to the extent of **our** payment. When **we** pay a lienholder for a loss for which **you** are not covered, **we** are entitled to the lienholder's right of recovery against **you** to the extent of **our** payment. **Our** right to subrogation will not impair the lienholder's right to recover the full amount of its claim.

## OTHER SOURCES OF RECOVERY

If other sources of recovery also cover the loss, **we** will pay only **our** share of the loss. **Our** share is the proportion that **our** limit of liability bears to the total of all appli-

cable limits. However, any insurance **we** provide for a **non-owned auto**, or **trailer** not shown on the **declarations page**, will be excess over any other collectible source of recovery including, but not limited to:

1. any coverage provided by the owner of the **non-owned auto** or **trailer**;
2. any other applicable physical damage insurance; and
3. any other source of recovery applicable to the loss.

## APPRAISAL

If **we** cannot agree with **you** on the amount of a loss, then **we** and the **insured person** may mutually agree to an appraisal of the loss. Within 30 days of any agreement to an appraisal, each party shall appoint a competent appraiser and shall notify the other party of that appraiser's identity. The appraisers will determine the amount of loss. If they fail to agree, the disagreement will be submitted to a qualified umpire chosen by the appraisers. If the two appraisers are unable to agree upon an umpire within 15 days, **we** or **you** may request that a judge of a court of record, in the county where **you** reside, select an umpire. The appraisers and umpire will determine the amount of loss. The amount of loss agreed to by both appraisers, or by one appraiser and the umpire, will determine the amount payable under this Part IV, but will not be binding. **You** will pay **your** appraiser's fees and expenses. **We** will pay **our** appraiser's fees and expenses. All other expenses of the appraisal, including payment of the umpire if one is selected, will be shared equally between **us** and **you**. Neither **we** nor **you** waive any rights under this policy by agreeing to an appraisal.

## PART V - ROADSIDE ASSISTANCE COVERAGE

## INSURING AGREEMENT

If **you** pay the premium for this coverage, **we** will pay for **our** authorized service representative to provide the following services when necessary due to a **covered emergency**:

1. towing of a **covered disabled auto** to the nearest qualified repair facility; and
2. labor on a **covered disabled auto** at the place of disablement.

If a **covered disabled auto** is towed to any place other than the nearest qualified repair facility, **you** will be responsible for any additional charges incurred.

## ADDITIONAL DEFINITIONS

When used in this Part V:

1. "**Covered disabled auto**" means a **covered auto** for which this coverage has been purchased that sustains a **covered emergency**.
2. "**Covered emergency**" means a disablement that is a result of:
   a. mechanical or electrical breakdown;
   b. battery failure;
   c. insufficient supply of fuel, oil, water, or other fluid;
   d. flat tire;

23

e.  lock-out; or
f.  entrapment in snow, mud, water, or sand, within 100 feet of a road or highway.

**EXCLUSIONS - READ THE FOLLOWING EXCLUSIONS CAREFULLY. IF AN EX-CLUSION APPLIES, COVERAGE WILL NOT BE AFFORDED UNDER THIS PART V.**

Coverage under this Part V will not apply to:

1.  the cost of purchasing parts, fluid, lubricants, fuel, or replacement keys, or the labor to make replacement keys;
2.  installation of products or material not related to the disablement;
3.  labor not related to the disablement;
4.  labor on a **covered disabled auto** for any time period in excess of 60 minutes per disablement;
5.  towing or storage related to impoundment, abandonment, illegal parking, or other violations of law;
6.  assistance with jacks, levelers, airbags, or awnings;
7.  towing from a service station, garage, or repair shop;
8.  labor or repair work performed at a service station, garage, or repair shop;
9.  auto storage charges;
10. a second service call or tow for a single disablement;
11. disablement that occurs on roads not regularly maintained, sand beaches, open fields, or areas designated as not passable due to construction, weather, or earth movement;
12. mounting or removing of snow tires or chains;
13. tire repair;
14. repeated service calls for a **covered disabled auto** in need of routine mainte-nance or repair;
15. disablement that results from an intentional or willful act or action by **you**, a **rela-tive**, or the operator of a **covered disabled auto**; or
16. a trailer.

## UNAUTHORIZED SERVICE PROVIDER

When service is rendered by a provider in the business of providing roadside assis-tance and towing services, other than one of **our** authorized service representatives, **we** will pay only reasonable charges, as determined by **us**, for:

1.  towing of a **covered disabled auto** to the nearest qualified repair facility; and
2.  labor on a **covered disabled auto** at the place of disablement;

which is necessary due to a **covered emergency**.

## OTHER INSURANCE

Any coverage provided under this Part V for service rendered by an unauthorized ser-vice provider will be excess over any other collectible insurance or towing protection coverage.

24

## PART VI - DUTIES IN CASE OF AN ACCIDENT OR LOSS

For coverage to apply under this policy, **you** or the person seeking coverage must promptly report each accident or loss even if **you** or the person seeking coverage is not at fault. **You** or the person seeking coverage must provide **us** with all accident or loss information including time, place, and how the accident or loss happened. **You** or the person seeking coverage must also obtain and provide **us** the names and addresses of all persons involved in the accident or loss, the names and addresses of any witnesses, and the license plate numbers of the vehicles involved.

If **you** or the person seeking coverage cannot identify the owner or operator of a vehicle involved in the accident, or if theft or vandalism has occurred, **you** or the person seeking coverage must notify the police within 24 hours or as soon as practicable.

A person seeking coverage must:
1. cooperate with **us** in any matter concerning a claim or lawsuit;
2. provide any written proof of loss **we** may reasonably require;
3. allow **us** to take signed and recorded statements, including sworn statements and examinations under oath, which **we** may conduct outside the presence of **you** or any other person seeking coverage, and answer all reasonable questions **we** may ask as often as **we** may reasonably require;
4. promptly call to notify **us** about any claim or lawsuit and send **us** any and all legal papers relating to the claim or suit;
5. attend hearings and trials as **we** require;
6. take reasonable steps after a loss to protect the **covered auto**, or any other vehicle for which coverage is sought, from further loss. **We** will pay reasonable expenses incurred in providing that protection. If failure to provide such protection results in further loss, any additional damages will not be covered under this policy;
7. allow **us** to have the damaged **covered auto**, or any other damaged vehicle for which coverage is sought, inspected and appraised before its repair or disposal;
8. submit to medical examinations at **our** expense by doctors **we** select as often as **we** may reasonably require; and
9. authorize **us** to obtain medical and other records.

## PART VII - GENERAL PROVISIONS

### POLICY PERIOD AND TERRITORY

This policy applies only to accidents and losses occurring during the policy period shown on the **declarations page** and that occur within a state, territory, or possession of the United States of America, or a province or territory of Canada, or while a **covered auto** is being transported between their ports.

25

## CHANGES

This policy contract, **your** insurance application (which is made a part of this policy as if attached hereto), the **declarations page**, and all endorsements to this policy issued by **us**, contain all the agreements between **you** and **us**. Subject to the following, the terms of this policy may not be changed or waived except by an endorsement issued by **us**.

The premium for this policy is based on information **we** received from **you** and other sources. **You** agree to cooperate with **us** in determining if this information is correct and complete, and to notify **us** if it changes during the policy period. If this information is incorrect, incomplete, or changes during the policy period, **you** agree that **we** may adjust **your** premium accordingly. Changes that may result in a premium adjustment are contained in **our** rates and rules. These include, but are not limited to, **you** or a **relative** obtaining a driver's license or operator's permit, or changes in:

1. the number, type, or use classification of **covered autos**;
2. operators using **covered autos**;
3. an operator's marital status;
4. the place of principal garaging of any **covered auto**;
5. coverage, deductibles, or limits of liability; or
6. rating territory or discount eligibility.

The coverage provided in **your** policy may be changed only by the issuance of a new policy or an endorsement by **us**. However, if during the policy period **we** broaden any coverage afforded under the current edition of **your** policy without additional premium charge, that change will automatically apply to **your** policy as of the date the coverage change is implemented in **your** state.

If **you** ask **us** to delete a vehicle from this policy, no coverage will apply to that vehicle as of the date and time **you** ask **us** to delete it.

## DUTY TO REPORT CHANGES

**You** must promptly notify **us** when:

1. **your** mailing or residence address changes;
2. the principal garaging address for a **covered auto** changes;
3. there is a change with respect to the residents in **your** household or the persons who regularly operate a **covered auto**;
4. an operator's marital status changes; or
5. **you** or a **relative** obtain a driver's license or operator's permit.

## SETTLEMENT OF CLAIMS

**We** may use estimating, appraisal, or injury evaluation systems to assist **us** in adjusting claims under this policy and to assist **us** in determining the amount of damages, expenses, or loss payable under this policy. Such systems may be developed by **us** or a third party and may include computer software, databases, and specialized technology.

26

## TERMS OF POLICY CONFORMED TO STATUTES

If any provision of this policy fails to conform to the statutes of the state listed on **your** application as **your** residence, the provision shall be deemed amended to conform to such statutes. All other provisions shall be given full force and effect. Any disputes as to the coverages provided or the provisions of this policy shall be governed by the law of the state listed on **your** application as **your** residence.

## TRANSFER OF INTEREST

The rights and duties under this policy may not be transferred to another person without **our** written consent. However, if a named insured shown on the **declarations page** dies, this policy will provide coverage until the end of the policy period for the legal representative of the named insured, while acting as such, and for persons covered under this policy on the date of the named insured's death.

## FRAUD OR MISREPRESENTATION

This policy was issued in reliance upon the information provided on **your** insurance application. **We** may void this policy at any time, including after the occurrence of an accident or loss, if **you**:
1.   made incorrect statements or representations to **us** with regard to any material fact or circumstance;
2.   concealed or misrepresented any material fact or circumstance; or
3.   engaged in fraudulent conduct;
at the time of application. If **we** void this policy, this shall not affect coverage under Part I - Liability To Others for an accident that occurs before **we** notify the named insured that the policy is void. No payment will be made to any person who concealed or misrepresented any material fact or circumstance, or engaged in fraudulent conduct. If **we** void this policy, **you** must reimburse **us** if **we** make a payment.

**We** may deny coverage for an accident or loss if **you** or a person seeking coverage has knowingly concealed or misrepresented any material fact or circumstance, or engaged in fraudulent conduct, in connection with the presentation or settlement of a claim.

## PAYMENT OF PREMIUM AND FEES

If **your** initial premium payment is by check, draft, electronic funds transfer, or similar form of remittance, coverage under this policy is conditioned on payment to **us** by the financial institution. If the financial institution upon presentment does not honor the check, draft, electronic funds transfer, or similar form of remittance, this policy may, at **our** option, be deemed void from its inception. This means **we** will not be liable under this policy for any claims or damages that would otherwise be covered if the check, draft, electronic funds transfer, or similar form of remittance had been honored by the financial institution. Any action by **us** to present the remittance for payment more than once shall not affect **our** right to void this policy.

In addition to premium, fees may be charged on **your** policy. **We** may charge fees for installment payments, late payments, and other transactions. Payments made on **your** policy will be applied first to fees, then to premium due.

## CANCELLATION

**You** may cancel this policy during the policy period by calling or writing **us** and stating the future date **you** wish the cancellation to be effective.

**We** may cancel this policy during the policy period by mailing a notice of cancellation to the named insured shown on the **declarations page** at the last known address appearing in **our** records.

**We** will give at least 10 days notice of cancellation if the policy is cancelled for nonpayment of premium.

**We** will give at least 20 days notice of cancellation in all other cases.

**We** may cancel this policy for any reason if the notice is mailed within the first 59 days of the initial policy period.

After this policy is in effect for more than 59 days, or if this is a renewal or continuation policy, **we** may cancel only for one or more of the following reasons:

1. nonpayment of premium;
2. material misrepresentation or fraud with respect to any material fact in the procurement or renewal of this policy;
3. material misrepresentation or fraud in the submission of any claim under this policy;
4. loss of driving privileges during the policy period, or, if this is a renewal policy, during the policy period or the 180 days immediately preceding the effective date of renewal, through suspension or revocation of an operator's license or motor vehicle registration issued to **you**, any driver in **your** household, or any regular operator of a **covered auto**. However, **we** will not cancel **your** policy solely due to an administrative revocation or suspension of an operator's license pursuant to Arkansas Code Annotated §5-65-104;
5. **you** or any driver of the **covered auto** have been convicted of:
   a. driving while intoxicated;
   b. homicide or assault arising out of the use of a motor vehicle; or
   c. three separate convictions of speeding or reckless driving, or any combination of the two, during the policy period or the three months prior to the effective date of the policy; or
6. any other reason permitted by law.

Proof of mailing will be sufficient proof of notice. If this policy is cancelled, coverage will not be provided as of the effective date and time shown in the notice of cancellation. For purposes of cancellation, this policy is neither severable nor divisible. Any cancellation will be effective for all coverages for all persons and all vehicles.

28

## CANCELLATION REFUND

Upon cancellation, **you** may be entitled to a premium refund. However, **our** making or offering of a refund is not a condition of cancellation.

If this policy is cancelled, any refund due will be computed on a daily pro rata basis. However, **we** will retain a cancellation fee if this policy is cancelled at **your** request or if cancellation is for nonpayment of premium. A cancellation fee will be charged only during the initial policy period.

## NONRENEWAL

If neither **we** nor one of **our** affiliates offers to renew or continue this policy, other than for nonpayment of premium, **we** will mail notice of nonrenewal to the named insured shown on the **declarations page** at the last known address appearing in **our** records. Proof of mailing will be sufficient proof of notice. Notice will be mailed at least 30 days before the end of the policy period.

## AUTOMATIC TERMINATION

If **we** or an affiliate offers to renew or continue this policy and **you** or **your** representative does not accept, this policy will automatically terminate at the end of the current policy period. Failure to pay the required renewal or continuation premium when due will mean that **you** have not accepted **our** offer.

If **you** obtain other insurance on a **covered auto**, any similar insurance provided by this policy will terminate as to that **covered auto** on the effective date of the other insurance.

If a **covered auto** is sold or transferred to someone other than **you** or a **relative**, any insurance provided by this policy will terminate as to that **covered auto** on the effective date of the sale or transfer.

## LEGAL ACTION AGAINST US

**We** may not be sued unless there is full compliance with all the terms of this policy.

**We** may not be sued for payment under Part I - Liability To Others until the obligation of an insured person under Part I to pay is finally determined either by judgment after trial against that person or by written agreement of the insured person, the claimant, and **us**. No one will have any right to make **us** a party to a lawsuit to determine the liability of an insured person.

If **we** retain salvage, **we** have no duty to preserve or otherwise retain the salvage for any purpose, including evidence for any civil or criminal proceeding.

**OUR RIGHTS TO RECOVER PAYMENT**

**We** are entitled to the rights of recovery that the insured person to whom payment was made has against another after the insured person has been fully compensated for his or her loss, to the extent of **our** payment. That insured person may be required to sign documents related to the recovery and must do whatever else **we** require to help **us** exercise those recovery rights, and do nothing after an accident or loss to prejudice those rights.

When an insured person has been paid by **us** and also recovers from another, the amount recovered will be held by the insured person in trust for **us** and reimbursed to **us** to the extent of **our** payment. However, this shall not apply to payment by **us** under any Accidental Death Benefits Coverage provided under Part II - Personal Injury Protection Coverage. If **we** are not reimbursed, **we** may pursue recovery of that amount directly against that insured person.

If an insured person recovers from another without **our** written consent, the insured person's right to payment under any affected coverage will no longer exist.

**Our** right of recovery does not apply to underinsured motorist benefits if:
1. the **insured person** sends **us** written notice, in accordance with the requirements of the Notice And Consent Requirement provision in Part III - Uninsured/Underinsured Motorist Coverage, of any tentative settlement agreement reached with the owner or operator of an underinsured motor vehicle, or such person's liability insurer; and
2. **we** fail to pay the sum offered in settlement to the **insured person** by the owner or operator of the underinsured motor vehicle, or that person's liability insurer, within 30 days of **our** receipt of such notice.

**Our** right of recovery does not apply to underinsured motorist benefits to the extent of any payment **we** have made to the **insured person** under a policy of liability insurance issued by **us** to the owner or operator of an underinsured motor vehicle.

If **we** elect to exercise **our** rights of recovery against another, **we** will also attempt to recover any deductible incurred by an insured person under this policy unless **we** are specifically instructed by that person not to pursue the deductible. **We** have no obligation to pursue recovery against another for any loss not covered by this policy.

**We** reserve the right to compromise or settle the deductible and property damage claims against the responsible parties for less than the full amount. **We** also reserve the right to incur reasonable expenses and attorney fees in pursuit of the recovery.

If the total recovery is less than the total of **our** payment and the deductible, **we** will reduce reimbursement of the deductible based on the proportion that the actual recovery bears to the total of **our** payment and the deductible. A proportionate share

30

of collection expenses and attorney fees incurred in connection with these recovery efforts will also reduce reimbursement of the deductible.

These provisions will be applied in accordance with state law.

**JOINT AND INDIVIDUAL INTERESTS**

If there is more than one named insured on this policy, any named insured may cancel or change this policy. The action of one named insured will be binding on all persons provided coverage under this policy.

**BANKRUPTCY**

The bankruptcy or insolvency of an insured person will not relieve **us** of any obligations under this policy. If execution of a judgment against an **insured person** under Part I - Liability To Others is returned unsatisfied because of the insolvency or bankruptcy of the **insured person**, the person claiming payment for damages under Part I may maintain an action against **us** for the amount of the judgment not exceeding **our** limits of liability.



*9610D AR 0507*

# EXHIBIT B

# Vehicle Valuation Report

Prepared For  Progressive Group of Insurance Companies   (800) 321-9843



## mitchell

## Claim Information

| Claim Number | Policy Number | Loss Type | Owner |
|---|---|---|---|
| 20-3132722-01 | | COLLISION | ERIK KNIGHT 601 MARION ST PARAGOULD, AR 72450 |

| Loss Date | Reported Date | Valuation Report Date | Valuation Report ID | Version Number |
|---|---|---|---|---|
| 08/28/2020 | 08/28/2020 | 09/01/2020 | 1010604655 | 1 |

## Vehicle Information

| Year | Make | Model | Location | Mileage |
|---|---|---|---|---|
| 2001 | Chevrolet | Silverado 1500 LT 2 Door Extended Cab 7 Foot Bed 5.3L 8 Cyl Gas A 4WD | AR 72450 | 133,689 miles |

| Ext Color | License | VIN | Title History |
|---|---|---|---|
| Dark Carmine Red Metallic | | 2GCEK19T111340413 | No |

## Valuation Summary

### Loss Vehicle Adjustments
Adjustments specific to your vehicle

| | |
|---|---|
| Base Value = | $6,104.33 |
| Condition - | $238.69 |
| Prior Damage | $0.00 |
| Aftermarket Parts + | $640.00 |
| Refurbishment | $0.00 |
| Market Value = | $6,505.64 |

### Settlement Adjustments
Adjustments specific to your policy

| | |
|---|---|
| Deductible - | $450.00 |
| Settlement Value = | $6,055.64 |

## Settlement Value:
# $6,055.64

Mitchell **WorkCenter**
Total Loss
© 2018 Mitchell International, Inc. All Rights Reserved.

# Loss Vehicle Detail

Loss vehicle: **2001 Chevrolet Silverado 1500 | LT 2 Door Extended Cab 7 Foot Bed | 5.3L 8 Cyl Gas A 4WD**

## Standard Equipment

### Exterior

| | |
|---|---|
| Chrome front bumper w/Matte Black cover | Chrome rear step bumper w/step pad |
| Color-keyed body-side molding w/bright trim | Dark argent air dam |
| Daytime running lamps | Deep tinted rear door/back glass |
| Deluxe chrome grille | Dual auto composite halogen headlamps |
| Dual cargo area lamps | Dual chrome fold away pwr heated mirrors |
| Dual rear access doors hinged to rear of cab | Fog lamps |
| Insulation-inc: cab, acoustic, thermal panel | Intermittent windshield wiper system |
| Removable tailgate w/badge name/decal | Solar-Ray tinted glass |
| Swing-out rear door windows | |

### Interior

| | |
|---|---|
| 3-passenger folding rear bench seat w/simulated leather trim | Air conditioning |
| Auto programmable pwr door locks-inc: auto lock at 15 mph, backlit switches | Color-keyed cloth headliner w/matching retainer moldings |
| Color-keyed full-floor carpeting w/front/rear rubber floor mats | Color-keyed soft vinyl door trim panels w/cloth inserts-inc: map pockets w/carpeted trim, door reflectors |
| Cruise control | Driver message center warnings-inc: trans overheat, low fuel, low coolant, vehicle security, oil level/pressure/change needed |
| Dual coat hooks | Dual color-keyed padded cloth sunshades w/driver storage clip, passenger mirror |
| Dual covered pwr outlets | Dual rear cup holders |
| Dual seat-mounted cup holders | Elect rear window defogger |
| Electrochromic rearview mirror w/8-point compass & outside temp display | ETR AM/FM stereo w/compact disc, cassette-inc: seek-scan, digital clock, auto tone control, cassette search/repeat, theft lock, speed compensated volume, 6 speakers |
| Floor console | Full overhead console-inc: map lights, garage door opener compartment, storage spaces |
| Gauges-inc: speedometer, tachometer, odometer, trip odometer, voltmeter, fuel level, engine temperature, oil pressure, hour meter | Illuminated entry |
| Leather reclining heated front bucket seats w/inboard armrest, dual pwr recline/lumbar, 2-position 6-way memory driver seat | Leather-wrapped steering wheel |
| Lighting-inc: dome w/delayed entry feature, ashtray, glove box, underhood | LT decor |
| Onstar 3-button communication system-inc: roof-mounted antenna | Passenger assist handles |
| Passlock II theft deterrent security system | Pwr windows w/backlit switches |
| Rear passenger heat ducts | Remote keyless entry-inc: 2-transmitters, panic button, content theft alarm |
| Tilt steering wheel | Warning tones-inc: key-in ignition, seat belt, headlamp-on, turn signal |

### Mechanical

| | |
|---|---|
| 105 amp alternator | 16" cast aluminum wheels |
| 2 front tow hooks | 26 gallon fuel tank |
| 4-wheel anti-lock brake system | 6400# GVWR (3600 front/3750 rear), springs (3600 front/3750 rear), axles (3925 front/3750 rear) |

| | |
|---|---|
| 7-lead trailering wire harness | Aluminized stainless steel exhaust system |
| AutoTrac active transfer case | Aux transmission oil cooler |
| Double-wall steel construction 6.5' pickup box w/extensive corrosion protection | Four wheel drive |
| Front stabilizer bar | Full-size spare tire w/steel wheel |
| HD 600 CCA battery | HD water-to-oil engine oil cooler |
| Independent front suspension w/torsion bars | Multi-leaf spring rear suspension |
| P245/75R16 all-season SBR BSW tires | Pwr 4-wheel disc brakes |
| Pwr steering | Under-body mounted locking winch-type spare tire carrier |

Safety

| | |
|---|---|
| Brake/transmission shift interlock | Driver & front passenger airbags w/passenger side deactivation switch |
| Head restraints at outboard seating positions | High/low note horn |
| Manual lap safety belts, center seat positions | Manual lap/shoulder safety belts, front/rear outboard seat positions |
| Side Door Guard Beams | |

## Packages

**OFF-ROAD CHASSIS PKG**

-inc: high pressure Bilstein 46mm gas shocks, off-road jounce bumpers, HD stabilizer bar, skid plate pkg, high capacity air cleaner

## Optional Equipment

HD TRAILERING SPECIAL EQUIPMENT              LOCKING DIFFERENTIAL

**\*DIO/PIO =**   Dealer Port Installed Options

# Loss Vehicle Base Value

Loss vehicle   2001 Chevrolet Silverado 1500 | LT 2 Door Extended Cab 7 Foot Bed | 5.3L 8 Cyl Gas A 4WD

## Comparable Vehicle Information

Search Radius used for this valuation  **125 miles from loss vehicle zip/postal code.**

Typical Mileage for this vehicle  **170,000 miles**

| # | Vehicle Description | Mileage | Location | Distance From Loss Vehicle | Price | Adjusted Value |
|---|---|---|---|---|---|---|
| 1 | 2001 CHEVROLET SILVERADO 1500 LT 2D EXT CAB PKP 8 5.3NORMAL GAS A 4WD | 109,759 | 38340 | 113 miles | $6,000.00 Sold Price | $5,730.07 |
| 2 | 2001 CHEVROLET SILVERADO 1500 BASE REGULAR CAB PKP 6 4.3NORMAL GAS A 2WD | 93,115 | 38115 | 80 miles | $4,398.00 Sold Price | $6,129.23 |
| 3 | 2001 CHEVROLET SILVERADO 1500 LS 2D EXT CAB PKP 8 5.3NORMAL GAS A 4WD | 179,371 | 63901 | 45 miles | $5,800.00 List Price | $5,766.62 |
| 4 | 2001 CHEVROLET SILVERADO 1500 LS 2D EXT CAB PKP 8 5.3NORMAL GAS A 4WD | 196,920 | 65775 | 89 miles | $6,700.00 List Price | $6,791.38 |

**Base Value:**  **$6,104.33**

# Loss Vehicle Adjustments

Loss vehicle: 2001 Chevrolet Silverado 1500 | LT 2 Door Extended Cab 7 Foot Bed | 5.3L 8 Cyl Gas A 4WD

## Condition Adjustments

Condition Adjustment: **-$238.69**          Overall Condition **2.78-Good**          Typical Vehicle Condition **3.00**

| Category | Condition | Comments |
|---|---|---|
| **Interior** | | |
| HEADLINER | 3 Good | NO DAMAGE |
| GLASS | 3 Good | NO DAMAGE |
| DOORS/INTERIOR PANELS | 3 Good | MARKS,SOILING,SCUFFS |
| SEATS | 2 Fair | SIGNIFICANT WEAR,SOILING, TEAR,CREASING |
| DASH/CONSOLE | 3 Good | MARKS,SOILING,SCUFFS |
| CARPET | 2 Fair | SIGNIFICANT WEAR,SOILING,STAINS |
| **Exterior** | | |
| PAINT | 3 Good | SCRATCHES,CHIPS,SCRAPES |
| BODY | 3 Good | DINGS,SCRATCHES,SMALL DENT REAR RT BEDSIDE |
| TRIM | 2 Fair | SCRATCHES,CHIPS,FLARES PEELING |
| VINYL/CONVERTIBLE TOP | Typical | |
| **Mechanical** | | |
| ENGINE | 3 Good | DUSTY NEEDS WASHED |
| TRANSMISSION | 3 Good | DUSTY NEEDS WASHED |
| **Tire** | **3 Good** | **RF7 LF7 RR7 LR7** |

Typical Vehicle Condition reflects a condition similar to the same year, make and model. Amount of wear and tear/ damage consistent with its age.

Comments:

## After Market Parts and OEM Equipment Adjustments

| Category | Description | Adjustment Type | Purchase Date | Amount Paid | Adjustment Amount |
|---|---|---|---|---|---|
| EXTERIOR | AFTERMARKET WHEELS | INSTANT QUOTE | | | $125.00 |
| MECHANICAL | LIFT KIT - FULL-SIZE VEHICLE (1-4 INCH) | INSTANT QUOTE | | | $405.00 |
| INTERIOR | WINDOW TINT- EXTENDED CAB | INSTANT QUOTE | | | $20.00 |
| EXTERIOR | TONNEAU COVER (SOFT / SNAP TOP / ROLL-UP) | INSTANT QUOTE | | | $90.00 |

# Comparable Vehicles

Loss vehicle: 2001 Chevrolet Silverado 1500 | LT 2 Door Extended Cab 7 Foot Bed | 5.3L 8 Cyl Gas A 4WD

### ① 2001 CHEVROLET SILVERADO 1500 LT 2D EXT CAB PKP 8 5.3 NORMAL GAS A4WD

**Sold Price: $6,000.00**

| VIN | Stock No | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|---|---|---|---|---|
| 2GCEK19T511XXXXXX | | 05/27/2020 | 38340 | 113 miles |

Source

DEALER SALE - BUILDSHEET - J.D. POWER

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|
| Mileage | 133,689 | 109,759 | -$269.93 |
| | | Total Adjustments: | -$269.93 |
| | | **Adjusted Price:** | **$5,730.07** |

Comparable Vehicle Package Details:

OFF-ROAD CHASSIS PKG

Comparable Vehicle Option Details:

HD TRAILERING SPECIAL EQUIPMENT, LOCKING DIFFERENTIAL

---

### ② 2001 CHEVROLET SILVERADO 1500 BASE REGULAR CAB PKP 6 4.3 NORMAL GAS A2WD

**Sold Price: $4,398.00**

| VIN | Stock No | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|---|---|---|---|---|
| 1GCEC14W31ZXXXXXX | | 06/22/2020 | 38115 | 80 miles |

Source

DEALER SALE - BUILDSHEET - J.D. POWER

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|
| Vehicle Configuration Adjustment | | | $2,427.46 |
| Mileage | 133,689 | 93,115 | -$500.88 |
| Equipment | | | |
| OFF-ROAD CHASSIS PKG | Yes | No | $83.09 |
| EXTERIOR APPEARANCE PKG | No | Yes | -$150.33 |
| HD TRAILERING SPECIAL EQUIPMENT | Yes | No | $59.95 |
| LOCKING DIFFERENTIAL | Yes | No | $59.95 |
| AIR CONDITIONING | No | Yes | -$209.85 |
| ETR AM/FM STEREO W/CASSETTE | No | Yes | -$38.16 |
| | | Total Adjustments: | $1,731.23 |
| | | **Adjusted Price:** | **$6,129.23** |

Comparable Vehicle Package Details:

EXTERIOR APPEARANCE PKG  (CHROME REAR STEP BUMPER W/STEP PAD)

Comparable Vehicle Option Details:

AIR CONDITIONING, ETR AM/FM STEREO W/CASSETTE

| 8 | 2001 CHEVROLET SILVERADO 1500 LS 2D EXT CAB PKP 8 5.3 NORMAL GAS A4WD | | | | List Price: $5,800.00 |

| VIN | Stock No |
| --- | --- |
| 1GCEK19T01E147443 | 9635-p |

| Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
| --- | --- | --- |
| 05/03/2020 | 63901 | 45 miles |

Source

DEALER WEB LISTING - BUILDSHEET - AUTOTRADER.COM

HENDERSON AUTO SALES

240 SOUTH WESTWOOD BOULEVARD

POPLAR BLUFF MO 63901

573-785-8433

| Adjustments | Loss Vehicle | This Vehicle | Amount |
| --- | --- | --- | --- |
| Projected Sold Adjustment | | | -$728.00 |
| Vehicle Configuration Adjustment | | | $452.07 |
| Mileage | 133,689 | 179,371 | $615.23 |
| Equipment | | | |
| OFF-ROAD CHASSIS PKG | Yes | Yes | -$1.93 |
| FRONT HIGH-BACK RECLINING BUCKET SEATS | No | Yes | -$228.55 |
| SOLAR-RAY DEEP TINTED GLASS | No | Yes | -$18.74 |
| AUTOTRAC ACTIVE 4WD TRANSFER CASE | No | Yes | -$65.67 |
| (4) CAST ALUMINUM WHEELS | No | Yes | -$26.27 |
| ETR AM/FM STEREO W/REMOTE COMPACT DISC,STEREO CASSETTE, AUTO TONE CONTROL | No | Yes | -$31.52 |

| | |
| --- | --- |
| Total Adjustments: | -$33.38 |
| **Adjusted Price:** | **$5,766.62** |

Comparable Vehicle Package Details:

OFF-ROAD CHASSIS PKG

Comparable Vehicle Option Details:

HD TRAILERING SPECIAL EQUIPMENT, LOCKING DIFFERENTIAL, FRONT HIGH-BACK RECLINING BUCKET SEATS, SOLAR-RAY DEEP TINTED GLASS, AUTOTRAC ACTIVE 4WD TRANSFER CASE, (4) CAST ALUMINUM WHEELS, ETR AM/FM STEREO W/REMOTE COMPACT DISC,STEREO CASSETTE, AUTO TONE CONTROL

| ④ 2001 CHEVROLET SILVERADO 1500 LS 2D EXT CAB PKP 8 5.3 NORMAL GAS A4WD | | | | List Price: **$6,700.00** |
|---|---|---|---|---|

| VIN | Stock No | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|---|---|---|---|---|
| 2GCEK19T411270728 | 270728 | 08/17/2020 | 65775 | 89 miles |

Source

DEALER WEB LISTING -
BUILDSHEET - CARS.COM

SOUTH 63 MOTORS

301 W BROADWAY

WEST PLAINS MO 65775

417-256-2600

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|
| Projected Sold Adjustment | | | -$841.00 |
| Vehicle Configuration Adjustment | | | $522.21 |
| Mileage | 133,689 | 196,920 | $983.71 |
| Equipment | | | |
| OFF-ROAD CHASSIS PKG | Yes | Yes | -$2.23 |
| FRONT HIGH-BACK RECLINING BUCKET SEATS | No | Yes | -$264.01 |
| SOLAR-RAY DEEP TINTED GLASS | No | Yes | -$21.65 |
| COLOR-KEYED WHEEL OPENING FLARES | No | Yes | -$35.40 |
| ELECTRIC REAR WINDOW DEFOGGER | No | Yes | -$35.41 |
| ELECTROCHROMIC INSIDE REARVIEW MIRROR W/ 8-POINT COMPASS & OUTSIDE TEMP DISPLAY | No | Yes | -$35.41 |
| AUTOTRAC ACTIVE 4WD TRANSFER CASE | No | Yes | -$75.86 |
| (4) CAST ALUMINUM WHEELS | No | Yes | -$30.34 |
| FRONT FOG LAMPS | No | Yes | -$28.32 |
| ETR AM/FM STEREO W/REMOTE COMPACT DISC,STEREO CASSETTE, AUTO TONE CONTROL | No | Yes | -$36.41 |
| DUAL CHROME FOLD AWAY PWR HEATED MIRRORS | No | Yes | -$8.50 |

| | Total Adjustments: | $91.38 |
|---|---|---|
| | **Adjusted Price:** | **$6,791.38** |

Comparable Vehicle Package Details:

OFF-ROAD CHASSIS PKG

Comparable Vehicle Option Details:

HD TRAILERING SPECIAL EQUIPMENT, LOCKING DIFFERENTIAL, FRONT HIGH-BACK RECLINING BUCKET SEATS, SOLAR-RAY DEEP TINTED GLASS, COLOR-KEYED WHEEL OPENING FLARES, ELECTRIC REAR WINDOW DEFOGGER, ELECTROCHROMIC INSIDE REARVIEW MIRROR W/ 8-POINT COMPASS & OUTSIDE TEMP DISPLAY, AUTOTRAC ACTIVE 4WD TRANSFER CASE, (4) CAST ALUMINUM WHEELS, FRONT FOG LAMPS, ETR AM/FM STEREO W/REMOTE COMPACT DISC,STEREO CASSETTE, AUTO TONE CONTROL, DUAL CHROME FOLD AWAY PWR HEATED MIRRORS

## Sub-Model Comparison

| Sub-Model Description | Configuration | Original MSRP |
|---|---|---|
| 2001 Chevrolet Silverado 1500 LT | 2 Door Extended Cab 7 Foot Bed 5.3L 8 Cyl Gas  4WD | $32,450.00 |
| 2001 CHEVROLET SILVERADO 1500 BASE | REGULAR CAB PKP 6 4.3 NORMAL GAS A 2WD | $17,290.00 |
| 2001 CHEVROLET SILVERADO 1500 LS | 2D EXT CAB PKP 8 5.3 NORMAL GAS A 4WD | $28,961.00 |

# Vehicle Valuation Methodology Explanation

WorkCenter Total Loss was designed and built in conjunction with J.D. Powers, experts in data analysis and vehicle pricing and a highly trusted name among consumers. With years of experience in vehicle pricing, J.D Power is a credible, third-party expert whose name provides consumer recognition and confidence. WCTL provides a consistent methodology across all vehicles and it includes valid comparable vehicles that most closely resemble the totaled vehicle and are similar to the vehicles a consumer would find in their own research.

WorkCenter Total Loss produces accurate and easy-to-understand vehicle valuations via this five step process:

**Step 1 - Locate Comparable Vehicles**

Locate vehicles that are the closest match to the loss vehicle in the same market area. WorkCenter Total Loss utilizes consumer-based vehicle sources along with inventory directly from Dealerships. When available WCTL also provides sold vehicle records from sources such as J.D. Powers.

**Step 2 - Adjust Comparable Vehicles**

Make adjustments to the prices of the comparable vehicles. The comparable vehicles are identical to the loss vehicle except where adjustments are itemized. There are several types of comparable vehicle adjustments

- Projected Sold Adjustment - an adjustment to reflect consumer purchasing behavior (negotiating a different price than the listed price).
- Vehicle Configuration Adjustment- an adjustment for differences in configuration between the comparable vehicle and the loss vehicle (e.g. differences in trim).
- Mileage Adjustment - an adjustment for differences in mileage between the comparable vehicle and the loss vehicle.
- Equipment- adjustments for differences in equipment between the comparable vehicle (e.g. equipment packages and options) and the loss vehicle.

**Step 3 - Calculate Base Vehicle Value**

The base vehicle value is calculated by averaging the adjusted prices of the comparable vehicles.

**Step 4 - Calculate Loss Vehicle Adjustments**

There are four types of loss vehicle adjustments:

- Condition Adjustment:

  Adjustments to account for the condition of the loss vehicle prior to the loss.

- Prior Damage Adjustment:

  Adjustments to account for any prior damage present on the loss vehicle prior to the loss.

- After Market Part Adjustment:

  Adjustments to account for any after market parts present on the loss vehicle prior to the loss.

- Refurbishment Adjustment:

  Adjustments to account for any refurbishment performed on the loss vehicle prior to the loss.

**Step 5 - Calculate the Market Value**

The Market Value is calculated by applying the loss vehicle adjustments to the base value.