**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**NORTHERN DIVISION**

| | |
|---|---|
| ERIK KNIGHT, individually and on behalf of others similarly situated, | |
| Plaintiff, | Case No. 3:22-cv-00203-JM |
| v. | |
| PROGRESSIVE NORTHWESTERN INSURANCE COMPANY, | |
| Defendant. | |

<u>**PLAINTIFF'S MOTION FOR CLASS**</u>
<u>**CERTIFICATION AND INCORPORATED BRIEF IN SUPPORT**</u>

## TABLE OF CONTENTS

I.          INTRODUCTION ................................................................................... 1

II.         RELEVANT FACTUAL BACKGROUND ............................................. 5

    A.  Progressive's Form Policy Terms and Uniform Procedures ........................ 5

    B.  Progressive's Total-Loss Valuation Methodology ...................................... 6

    C.  Imposing a PSA is Inconsistent with Market Realities and the Comp Appraisal Methodology ................................................................................ 7

    D.  To Calculate the PSA, Progressive Ignores and Deletes Market Data That Disproves Its Market Theory ....................................................................... 8

III.        ARGUMENT ......................................................................................... 12

    A.  The Class Is Ascertainable ........................................................................ 12

    B.  Common Issues Predominate ..................................................................... 14

      1.  The elements of the breach of contract claim are subject to common proof that predominate over any individual questions. .......................... 15

      2.  Plaintiff's damages model fits his theory of liability, and any individual issues of damages cannot predominate over common issues of liability. ........................... 18

    C.  The Remaining Rule 23(a) Prerequisites Are Met ..................................... 24

      1.  The Class is numerous such that joinder is impracticable ...................... 24

      2.  Plaintiff is typical of, and will adequately represent, the Class. ........... 25

      3.  Class Treatment Is Superior ................................................................... 26

IV.         CONCLUSION ..................................................................................... 29

## TABLE OF AUTHORITIES

**Cases**

*Amchem Products, Inc. v. Windsor, 521 U.S. 591 (1997)* ............................................................. 27

*Brown v. Electrolux Home Prods., Inc.*, 817 F. 3d 1225 (11th Cir. 2016) ................................... 14

*Brown v. Progressive Mt. Ins. Co.*, No. 3:21-cv-175-TCB, 2023 U.S. Dist. LEXIS 136472 (N.D.

    Ga. Aug. 3, 2023).................................................................................................... passim

*Buffington v. Progressive Advanced Ins. Co.*, No. 20-CV-07408 (PMH), 2022 U.S. Dist. LEXIS

    151521 (S.D.N.Y. Aug. 23, 2022) ........................................................................................ 14

*Carnegie v. Household Inter., Inc.,* 376 F.3d 656 (7th Cir. 2004)................................................. 28

*Claffey v. River Oaks Hyundai, Inc.*, 238 F.R.D. 464 (N.D. Ill. 2006)........................................ 24

*Clippinger v. State Farm Mut. Auto. Ins. Co.*, No. 2:23-cv-02482-TLP-cgc, 2023 U.S. Dist.

    LEXIS 153813 (W.D. Tenn. Aug. 25, 2023)...................................................................... passim

*Curran v. Progressive Direct Ins. Co.*, No. 22-cv-00878-NYW-MEH, 2023 U.S. Dist. LEXIS

    224952 (D. Colo. Dec. 18, 2023)........................................................................................ passim

*Drummond v. Progressive Specialty Ins. Co.*, No. 21-4479, 2023 U.S. Dist. LEXIS 140205 (E.D.

    Pa. Aug. 11, 2023) ............................................................................................................. passim

*Eddleman v. Bradley Univ.*, 65 F.4th 335 (7th Cir. 2023).............................................................. 14

Freeman v. Progressive Direct Ins. Co., No. 1:21-cv-03798-DCC (D.S.C.)................................... 5

*Hicks v. State Farm*, 965 F.3d 452 (6th Cir. 2020)........................................................................ 21

*In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585  (3d Cir. 2009).................................... 25

*Klay v. Humana, Inc.*, 382 F.3d 1241 (11th Cir. 2004) ................................................................ 29

*Mitchell v. State Farm*, 954 F.3d 700 (5th Cir. 2020) ............................................................ 21, 22

*Murray v. GMAC Mortg. Corp.*, 434 F.3d 948 (7th Cir. 2006).................................................... 27

*Roach v. T.L. Cannon Corp.*, 778 F.3d 401 (2d Cir. 2015) ......................................................... 14

*Smith v. S. Farm Bureau Cas. Ins. Co.*, 18 F.4th 976 (8th Cir. 2021) .......................................... 16

*Stuart v. State Farm*, 910 F.3d 371 (8th Cir. 2019) .................................................. 21, 22

*Thorogood v. Sears, Roebuck and Co.*, 547 F.3d 742 (7th Cir. 2008) ........................................ 27

*Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442 (2016) ...................................... 15, 23

*Volino v. Progressive Cas. Ins. Co.*, No. 21 Civ. 6243 (LGS), 2023 U.S. Dist. LEXIS 44666

    (S.D.N.Y. Mar. 16, 2023) ....................................................................... passim

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) .................................................. 14

*Wolin v. Jaguar Land Rover North America, LLC,* 617 F.3d 1168 (9th Cir. 2010) .............. 26, 28

## Federal Rules of Civil Procedure

Fed. R. Civ. P. 23(a)(4) ............................................................................. 25, 26

Fed. R. Civ. P. 23(g) .................................................................................... 26

Fed. R. Civ. P. 23(g)(1) .............................................................................. 26

## Other Authorities

Newberg on Class Actions § 12:2 .......................................................................... 18

## I.    INTRODUCTION

This case is one of many virtually identical cases against Progressive currently pending in courts around the country. Six courts addressing materially identical claims and evidence as are presented here have found class certification appropriate. *See Curran v. Progressive Direct Ins. Co.*, No. 22-cv-00878-NYW-MEH, 2023 U.S. Dist. LEXIS 224952 (D. Colo. Dec. 18, 2023); *Drummond v. Progressive Specialty Ins. Co.*, No. 21-4479, 2023 U.S. Dist. LEXIS 140205 (E.D. Pa. Aug. 11, 2023); *Brown v. Progressive Mt. Ins. Co.*, No. 3:21-cv-175-TCB, 2023 U.S. Dist. LEXIS 136472 (N.D. Ga. Aug. 3, 2023), *Rule 23(f) petition denied*, Mandate of 11th Cir. Case No. 23-90024, ECF No. 33-2; *Volino v. Progressive Cas. Ins. Co.*, No. 21 Civ. 6243 (LGS), 2023 U.S. Dist. LEXIS 44666 (S.D.N.Y. Mar. 16, 2023), *Rule 23(f) petition denied*, Mandate of 2d Cir. Case No. 23-0472, at ECF No. 75; *Costello v. Mountain Laurel Assurance Co.*, 2024 WL 239849 (E.D. Tenn. Jan. 22, 2024);[1] *see also Clippinger v. State Farm Mut. Auto. Ins. Co.*, No. 2:23-cv-02482-TLP-cgc, 2023 U.S. Dist. LEXIS 153813 (W.D. Tenn. Aug. 25, 2023). This Court should follow the well-reasoned analyses of these six courts and grant class certification of Plaintiff's claims against Defendant Progressive Northwestern Insurance Company ("Progressive").

Under Progressive's insurance Policy, if an insured's vehicle is totaled, Progressive must pay the vehicle's actual cash value ("ACV"), which, in turn, must be "determined by" its "market value, age, and condition" at the time of loss. Calculating ACV using this contractually prescribed formula entails taking the average price of comparable vehicles, adjusted for verified differences between each respective comparable vehicle and the insured vehicle in mileage, equipment, and

---

[1] The *Costello* order is a Magistrate Judge's 45-page Report and Recommendation recommending that Plaintiff's motion for class certification be granted. Because the class-certification portion of *Costello* is a recommendation, Plaintiff notes for precision that that six courts have determined class certification is appropriate, and five of those determinations are rulings.

condition. Obviously, Progressive, must "determine" ACV based on the actual market, not a truncated, manipulated, artificially lowered, false market of its own invention.

Yet the latter is precisely what Progressive does. Progressive calculates ACV using the comp methodology, but it makes a critical departure from that otherwise industry-standard methodology: Before making adjustments to comparable vehicles based on verified differences in equipment, condition, and mileage, Progressive reduces the list prices of the comparable vehicles by applying a "Projected Sold Adjustment" ("PSA") to reduce base market values by ██ on average, which it (falsely) represents is the amount consumers can negotiate off list price in a cash transaction. This adjustment—the only line-item adjustment used by Progressive that is speculative and, more importantly, false—is based on a verifiably false assumption about the used-car market.

Auto industry experts explain that Progressive's assumption underlying the PSA—that dealerships overprice vehicles and consumers typically negotiate down from that list price in cash transactions—reflects a long-outdated understanding of the used-car market. Given the ubiquity of Internet comparison shopping and the development of sophisticated pricing tools, car dealerships expect consumers to comparison shop and must now aggressively price vehicles to market. Thus, the norm in the Internet-driven used-car market is for dealers to price vehicles to market and list vehicles for sale on the Internet at that market price. Data on millions upon millions of used-car transactions, including Progressive's own data, confirms this.

So, how can Progressive justify slashing the list prices of vehicles used to determine ACV by (on average) ██? They rig the data—Progressive and its vendors exclude from the PSA calculation every transaction where a used vehicle sold for the Internet list price or a penny higher. In other words, it simply discarded all data that facially invalidated its hypothesis. When the 1-to-

2

1 transactions (those where a vehicle sold for its list price) are considered, rather than discarded—in other words, curing solely this error amongst many in the data analysis—Progressive's data show the median sold-to-list ratio is a negligible difference of ▮, meaning that vehicles in the dataset sell for ▮ of advertised price.

Because Progressive and its vendors deleted from their data all transactions where a vehicle sold at or above its list price, Plaintiff purchased a transparent dataset of list and sold vehicle prices. Plaintiff's expert matched millions of list-price and sold-price records by VIN number and confirmed the auto-industry expert's opinion that vehicles typically sell for list, or market, price. The following graphs contrast Plaintiff's transparent market data with Progressive's purposely truncated data:

FIGURE 1: DMV DATA – RATIO OF SOLD AMOUNT TO LIST PRICE[2]



---

[2] The green bars in Figure 1 (DMV Data) denote transactions that Progressive would have discarded. The prominent green spike in the middle, which towers over all other outcomes, are vehicles that sold for list price. To the right of that typical outcome are vehicles with a sales price recorded as above list, and to the left of that typical outcome are vehicles with a sales price recorded



Other than application of the PSAs, all experts agree Progressive's appraisal and calculation of ACV is reliable and sound—in other words, this case is solely about the PSA. As such, Plaintiff presents a coherent theory of liability and damages, such that common issues clearly predominate this litigation, as six courts have already found: By applying the PSAs, Progressive was not "determining" ACV based on actual market value, but rather was thumbing the scales by creating a false market upon which to determine ACV, in breach of its contractual duty. This uniformly injured class members because the PSA is always a downward adjustment that devalues the vehicle and results in payment of less than ACV. Once the PSA is excised from each detailed valuation report, however, Progressive's valuation reports document a sound, good-faith appraisal

---

below list.  Why? . These graphs, and others showing vehicles typically sell for list, are included in Exhibit 1.

of ACV, where ACV is "determined" by market value, age, and condition, consistent with Progressive's contractual duty. So, Plaintiff also presents a coherent theory of damages—simply remove the thumb from the scales by excising the PSAs from the methodology.

As six courts have determined on materially identical evidence, this case is eminently suitable for class treatment: Plaintiff's claims are based on (1) form contract language and (2) practices that applied uniformly across the Class. Plaintiff's theory is that the PSA deduction can *never* be applied, while Progressive's is that it can *always* be applied. Whether a jury agrees with Plaintiff or Progressive, resolution of that question will resolve virtually the entirety of Class members' claims in a single stroke. Thus, this Court should certify the following Class:

> All persons who made a first-party claim on a policy of insurance issued by Progressive Northwestern Insurance Company to an Arkansas resident where the claim was submitted from August 4, 2017, through the date an order granting class certification is entered, and Progressive determined that the vehicle was a total loss and based its claim payment on an Instant Report from Mitchell where a Projected Sold Adjustment was applied to at least one comparable vehicle.

## II.    RELEVANT FACTUAL BACKGROUND

### A.  Progressive's Form Policy Terms and Uniform Procedures

Progressive uses form insurance policies with materially identical language. Ex. 2 ("Retton Dep.") at 26–29.[3] In Part IV, Progressive promises to pay for "loss" to covered autos. Ex. 3 (Policy) at 16. In the "Limit of Liability" subsection, Progressive limits its liability to the vehicle's ACV, which "is determined by the market value, age, and condition of the vehicle at the time the loss

---

[3] By agreement of the Parties, the deposition of John Retton taken in *Drummond, et al. v. Progressive Specialty Ins. Co., et al.*, No. 5:21-cv-04479-EGS (E.D. Pa.) and *Freeman v. Progressive Direct Ins. Co.*, No. 1:21-cv-03798-DCC (D.S.C.) and the depositions taken in *Volino v. Progressive Cas. Ins. Co.*, 1:21-cv-06243-LGS (S.D.N.Y.) of Michael Silver, Phillip Kroell, and Blaine Bogus are being used in this case because the issues are the same.

occurs." *Id.* at 20–22. Plaintiff and Class members experienced a total loss. Ex. 4 ("Silver Dep.") at 27, 30. Consistent with its Policy terms, Progressive's uniform practice is to base total-loss payments on Mitchell's appraisal of the vehicle's ACV (albeit in an insufficient amount).

### B. Progressive's Total-Loss Valuation Methodology

Progressive's methodology for valuing total-loss vehicles is to utilize a third-party vendor, Mitchell, to generate a valuation report. Retton Dep. at 37–38, 55–59. After an adjuster inputs the vehicle information, the WorkCenter Total Loss system ("WCTL") generates the report. *Id*. at 37–38, 40–42; Ex. 5 ("Kroell Dep.") at 20. Progressive used WCTL reports throughout the Class Period as its default method of calculating ACV. Retton Dep. at 37–38, 41–42, 55–59.

These appraisals consist of Mitchell identifying the list price of comparable vehicles. *Id*. at 37, 51, 59. Then, it applies a PSA deduction to these list prices, purportedly to "reflect consumer purchasing behavior (negotiating a different price than the list price)." Retton Dep. at 42–43, 75; *see also* Ex. 6 (Pl.'s Rep.) at 4–9. In other words, Progressive's position is that car dealerships uniformly price vehicles above market and negotiate down to actual market value—so, according to Progressive, the list prices must be reduced by a PSA of (on average) ███ The new reduced "price" of each comparable vehicle is then adjusted based on observed and documented differences, if any, in mileage or equipment. Kroell Dep. at 142–143. The average of the adjusted prices is the vehicle's "base" value. *Id*. at 144–45. From there, Mitchell adjusts the base value amount, higher or lower, based on the total-loss vehicle itself—if the total-loss vehicle was in below- or above-average condition, for example—which establishes what Progressive represents is the vehicle's adjusted market value. *Id*. at 145. Finally, any taxes, fees, and deductible are applied, which becomes the ultimate claim payment amount. Retton Dep. at 74. Progressive maintains this data in its electronic claims file system. Ex. 7 ("Lacey Rep.") at 9–12.

### C. Imposing a PSA is Inconsistent with Market Realities and the Comp Appraisal Methodology

Progressive's assertion that list prices of used autos are bloated and consumers routinely negotiate list prices down is belied by market realities. Plaintiff's industry expert, Kirk Felix, explains Progressive's position is an outdated and false characterization of the market. Ex. 8 ("Felix Rep.") at 2–3. Many years before the Class Period, it was perhaps a fair characterization of market forces: Without Internet advertising and sophisticated pricing tools, the "sticker" price was not really a factor—consumers went to the local dealership with the desired vehicle type and could not easily compare prices across numerous dealerships. *Id*. at 3. Now, not only can dealers identify the amount at which comp vehicles are listed, but so can consumers—and if a dealership prices above market, consumers know it and patronize competing dealerships who price to market. *Id*. at 3–5.

This does not mean vehicles invariably sell for the precise list price—if factors separate from the vehicle's standalone value are in play, or if the deal is structured in various ways that shift profits away from the sale of the car itself, the result can be the reported sale price being higher or lower than market (list) price. Indeed, there are many reasons unrelated to ***cash*** market value why vehicles sell for less or more than list price. For example, a dealership might sell a vehicle for less than list price if (1) the dealership is getting points on a loan; (2) there is a special discount (military, employee, friends/family); (3) a consumer is entitled to apply a "credit" earned through use of the service department; or (4) the purchaser had an attractive trade-in that incentivized the dealership to sell at a below-market price. *Id*. at 6–8. But these reasons are unrelated to the actual market value of the vehicle—the dealer was simply financially motivated to sell at a below-market price or the consumer was entitled to a below-market price. *Id*. at 8.

Additionally, Plaintiff's appraisal expert, Jason Merritt, explains the industry-standard "comp" method, which Progressive uses, where appraisers take list prices of comparable vehicles and make line-item adjustments for documented differences between the comparable vehicle(s) and insured vehicle in mileage, equipment, and condition. Ex. 9 ("Merritt Rep.") at 2–4. Merritt offers three reasons why applying PSAs to list prices flunks that industry standard. *Id.* at 6. First, PSAs rely on no "information about the particular comp in question" "as no effort is made to contact the specific dealer about whether it will sell the specific comp for less than advertised at the time of the valuation." *Id.* Second, PSAs fail "to account for the other profit centers" available to dealerships, "like trade ins, in-house financing, warranties, service plans, [and] special discounts," which "impact recorded sales amounts but not ACV." *Id.* Finally, the PSAs rely on biased data, given "Mitchell does not consider transactions where the vehicle sold for the advertised price and has never considered transactions where the vehicle sold for more." *Id.* at 6–7.

Other than the PSA, everyone agrees the Mitchell reports document a detailed, sound, and reliable appraisal of each loss vehicle that Progressive presents to the insured as ACV. *Id.* at 7–9. As Merritt explains, the proper method for identifying a vehicle's ACV is to take the average price of comparable vehicles, adjusted for documented differences in mileage, condition, and equipment. *Id.* at 2–4. As such, the Mitchell reports for every Class member contains the vehicle's ACV determined by market value, age, and condition—simply remove the thumb from the scale (the PSA deductions), and you have ACV. *Id.* at 7.

### D.  To Calculate the PSA, Progressive Ignores and Deletes Market Data That Disproves Its Market Theory

Notwithstanding these market realities and appraisal standards, Progressive imposes a PSA deduction that averages ███ Lacey Rep. at 13. This is in line with the ████████████████

████████████████████████████████, *id.*, and is achieved by manipulating (and then misrepresenting) the data. Said another way, Progressive, through its vendors, creates a false market upon which it determines ACV, in breach of its contractual duty.

Here is how it works: Mitchell hires Blaine Bogus and a three-person team (the "Bogus Team") at J.D. Power to calculate the PSA. Ex. 10 ("Bogus Dep.") at 17–18. Mitchell provides list price data, all of which comes from Internet advertisements. *Id.* at 21. The Bogus Team compares that data to sales data from its "Power Information Network" ("PIN") of dealers. *Id.* at 21–22. That data is a black box: Neither Progressive nor the Bogus Team has conducted any analysis to determine whether PIN dealers are representative of the used vehicle market and simply "assum[e] it would be reflective of the general market." *Id.* at 155:18–156:16. J.D. Power refuses to disclose any dealership from which it obtains sales data and has designated it as "Highly Confidential— Outside Counsel's Eyes Only." Nevertheless, Progressive accepts the PSA without question as a basis for reducing its insureds' ACV payments.

The most shocking part of this scheme is that, in calculating the PSA, the Bogus Team simply deleted from the data all transactions where the sales price exceeds the list price and, until July 2021, excluded every transaction where the vehicle sold for list price. *Id.* at 57–60; Lacey Rep. at 3–5. This bears repeating: The Bogus Team made the spurious assumption that transactions at or above list price are outliers, notwithstanding that it never conducted a single analysis to determine how often those purported "outliers" occur and, in fact, had no idea how many records were being excluded. Bogus Dep. at 57–58, 61–63. A simple analysis shows that transactions selling at list price—not even counting where a vehicle sold for more than list price—constitute ████ *of the transactions* in the PIN data. Lacey Rep. at 4. Discarding and deleting data because of an undesirable (to Progressive) but relevant characteristic invalidates the data. *Id.* If this *single*

(deliberate) error of omitting transactions at list price is corrected, the average difference between sold and list prices is a negligible ▮▮. *Id.* & Ex. 8 thereto (Lacey Appendix) at 2.

And even this negligible difference is easily explainable given that vehicles often are sold for "less" than list price for reasons completely unrelated to the vehicle's cash market value. Yet, in coming up with the PSA to apply, the Bogus Team does not account for transactions involving a trade-in, financing through the dealership, military/employee/family discount, or other reasons a sold price might be less than list price that are unrelated to a vehicle's market value. Bogus Dep. 73:22–75:5. Instead, after tossing transactions selling at list price or a penny more, they credulously accept that *any difference* up to a staggering ▮▮ between list and sold price is the product of negotiation in a **cash** transaction,[4] despite making no effort to determine whether that is true. *Id.* at 74:20–75:5. Consider that one of the primary reasons a vehicle might sell for less than list price is that a dealership is incentivized to sell for a below market price because the purchaser has an attractive trade-in. Felix Rep. at 6–7. Not only are these instances unrelated to actual market value, they are irrelevant in the context of total-loss insureds who have no vehicle to trade in.[5] Also, instances where a dealership might chop a few hundred dollars off list price because the consumer is financing through the dealership—meaning it will more than make up the profit difference on points—are irrelevant because Progressive owes actual *cash* value, not actual financed value. And that some people may be entitled to a discount unavailable to the public (*e.g.*, military discount) is irrelevant to the *actual* market value.

---

[4] Like Felix, Plaintiffs use "cash transaction" to encompass transactions where the consumer self-financed as well as where the consumer secured outside financing rather than using the dealership.
[5] There are numerous other flaws in the Bogus Team's analysis, as set forth in Dr. Lacey's Report and Appendix. Critically, Dr. Lacey, for purposes of the Appendix, essentially adopted the Bogus Team's assumptions and demonstrated that even when accepting such flawed assumptions, the Bogus Team's analytical approach does not faithfully represent the data.

And this does not even account for transactions where the sold price exceeded the list price by a penny or more, which the Bogus Team also discarded, keeping no record of how many of such transactions were excluded. Bogus Dep. at 137; Lacey Rep. at 4–5.

Unfortunately, Progressive's vendors claim they no longer have the full transactional data and thus cannot calculate the actual difference (if any) between sold and list prices when considering all transactions. Plaintiff therefore retained a statistician, Jeffrey Martin, to analyze a large set of transparent data reported by all dealers to state DMV offices. Martin identified a robust sample size of 1.4 million–2.4 million matches *per year*. Ex. 11 (Martin Rep.) ¶¶ 27, 34, 41, 48. The results confirm Felix's testimony: As summarized in the figures in Exhibit F to Martin's report, the median sold-to-list ratio for each year is 1.0 (meaning sold and list price is equal), regardless of whether all transactions are considered or if outlier ranges are applied. *Id.* at ¶¶ 29, 31, 34, 36, 38, 41, 41, 43, 45, 47, 50, 52, 55. The mean sold-to-list ratio is a negligible 0.995-to-1.0012 (meaning sold prices were, on average, a mere 0.5% lower than listed prices, at most). *Id.* And the mode (or most common occurrence in the datasets) are of vehicles selling for list price— as graphically depicted with spikes in the middle that tower over all other transactions. These findings confirm that the PSA deduction is invalid. Vehicles typically sell for list price, no matter how you look at it—it's the most common outcome, the average, and the median. These results are summarized in Exhibit 1.

In short, instead of looking at the data honestly, Progressive and its vendors began with a forgone conclusion: Consumers negotiate down the advertised price of vehicles in cash transactions. They then manufactured "support" and thumbed the scale by ignoring and deleting all market data to the contrary, thereby inventing a false "market" upon which to determine ACV. Once this lone invalid adjustment is removed, each Mitchell Report documents a good faith,

reliable appraisal of the ACV of each Class member's loss vehicle, as determined by market value, age, and condition. Certifying this case for class treatment is proper under well-established law and will ensure Class members receive the ACV they are entitled to under their Policies.

## III.    ARGUMENT

To certify a class, the four prerequisites of Rule 23(a) must be satisfied, along with at least one of the requirements listed in Rule 23(b). Although the Court must conduct a rigorous analysis of the Rule 23 factors, "[t]he district court has broad discretion in making these determinations," *Ebert v. Gen. Mills, Inc.*, 823 F.3d 472, 477 (8th Cir. 2016), and "class certification is not the time to address the merits of the parties' claims and defenses." *Elizabeth M. v. Montenez*, 458 F.3d 779, 786 (8th Cir. 2006). Therefore, "merits questions may be considered only to the extent they are relevant to determining whether Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013) (cleaned up). And if a plaintiff shows the Rule 23 elements are met, the Court's discretion disappears. *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co*., 559 U.S. 393, 399 (2010) (Rule 23 "creates a categorical rule entitling a plaintiff" who satisfies the Rule's elements "to pursue his claim as a class action.").

### A.    The Class Is Ascertainable

In the Eighth Circuit, "[a] class is ascertainable 'when its members may be identified by reference to objective criteria." *McKeage v. TMBC, LLC*, 847 F.3d 992, 998 (8th Cir. 2017). For example, a class of persons who received specified faxes from a defendant is ascertainable because "fax logs showing the numbers that received each fax are objective criteria that make the recipient clearly ascertainable." *Sandusky Wellness Ctr., Ltd. Liab. Co. v. Medtox Sci., Inc*., 821 F.3d 992, 997 (8th Cir. 2016). The ascertainability requirement does not require exact precision. *Id.* (finding the objective criteria—fax logs—satisfied the ascertainability requirement even though they were

somewhat overinclusive in that they included fax recipients who did not have rights under the TCPA, because any over-inclusiveness in the class definition could be rectified at the damages phase) *see also McKeage*, 847 F.3d at 999 (discussing *Sandusky*). Further, so long as the class may be identified with objective criteria, such as defendant's customer files, the class is ascertainable—even if applying those criteria requires a "file-by-file review process." *McKeage*, 847 F.3d at 999. And whatever the process of ascertaining the class, "[t]he precise contours of the class need not be ascertained before certification so long as the class members can be identified at some stage of the proceeding." *In re Wholesale Grocery Prods. Antitrust Litig.*, 2016 WL 4697338, at *5 (D. Minn. Sept. 9, 2016).

This ascertainability requirement is met here. As detailed in Dr. Lacey's Report at pages 9-12, the parties and the Court can determine if someone is a Class member based on objective, identifiable criteria in the electronic claims data and documentation maintained by Progressive. Every criterion for membership—insured by Progressive, date of loss, whether it was a covered total-loss claim, whether it was based on a Mitchell Report, and whether a PSA was applied—is objective, not subjective criteria such as state of mind. *See generally Curran*, 2023 U.S. Dist. LEXIS 224952, at *10 n.7 ("[A]ll members of the proposed class are ascertainable by reference to objective criteria, as all class members made ACV claims for total loss vehicles with Progressive Direct and had their payouts valued by Mitchell and reduced with PSAs."); *Volino*, 2023 U.S. Dist. LEXIS 44666, at *18; *Brown*, 2023 U.S. Dist. LEXIS 136472, at *7.

Unsurprisingly, similar total-loss auto claims involving Progressive's data systems were certified for class treatment under this standard. *See, e.g.*, *Drummond*, 2023 U.S. Dist. LEXIS 140205, at *22 n.5 ("[T]he class is ascertainable because it is 'defined with reference to objective criteria' and its potential members can be identified using Progressive's records.") (quoting *Byrd*

13

*v. Aaron's Inc.*, 784 F.3d 154, 163 (3d Cir. 2015)); *see also, e.g.*, *Brown*, 2023 U.S. Dist. LEXIS 136472, at *3 (same); *Buffington v. Progressive Advanced Ins. Co.*, No. 20-CV-07408 (PMH), 2022 U.S. Dist. LEXIS 151521, at *12 (S.D.N.Y. Aug. 23, 2022) ("The Proposed Class is defined by location, subject matter, and time, and these boundaries are sufficient to prevent the need for a 'mini-hearing on the merits' to determine if any given person is a class member."). The Class is similarly ascertainable here.

### B. Common Issues Predominate

Rule 23(a)(2) requires that there be questions of law or fact common to the class. Commonality is satisfied where the claims include a question "capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of [each claim] in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

In turn, the common issue(s) must, per Rule 23(b)(3), predominate over any individual questions, meaning that "resolution of some of the questions that qualify each class member's case can be achieved through generalized proof and these particular issues are more substantial than the issues subject only to individualized proof." *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015) (cleaned up). The predominance analysis is of the elements of each individual cause of action—which elements are subject to common proof versus those subject to individual proof—and not the lawsuit as a whole. *See In re Smitty's/Cam2 303 Tractor Hydraulic Fluid Mktg.*, No. 4:20-MD-02936-SRB, 2023 WL 9064606, at *8 (W.D. Miss. Dec. 13, 2023); *see also Brown v. Electrolux Home Prods., Inc.*, 817 F. 3d 1225, 1234 (11th Cir. 2016) (explaining courts should identify the elements of the claim(s) and then "classify these issues as common questions or individual questions by predicting how" the elements will be proved). Importantly, the entire notion of predominance implies that the claims need not be identical, and a class can meet this

14

requirement "'even though other important matters will have to be tried separately, such as damages or affirmative defenses." *Custom Hair Designs by Sandy v. Central Payment Co., LLC*, 984 F.3d 595, 601 (8th Cir. 2020) (quoting *Tyson Foods*, *Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016)). Indeed, "[i]t is well established that the presence of individualized questions regarding damages does not prevent certification under Rule 23(b)(3)." *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 815 (7th Cir. 2012) (emphasis added).

### 1. The elements of the breach of contract claim are subject to common proof that predominate over any individual questions.

Commonality is satisfied because whether Progressive's application of the PSA to comparable vehicles' list prices constitutes a breach of the form Policy is subject to common proof and, thus, its answer will apply equally to all Class members. Whether a breach occurred turns on two key questions, both of which are subject to common evidence: (1) whether the PSA deduction is baseless and invalid, considering the data ignored and discarded from the calculation and evidence about dealer pricing practices in the modern used-car market, meaning Progressive created a false market upon which to determine ACV; and (2) whether under the standard appraisal "comp" method, the invalid PSA deduction must be excised from insureds' valuation reports to arrive at an ACV amount that is properly "determined by" the vehicle's true market value, age, and condition. Moreover, Class members were subject to the same Policy language and practices. Retton Dep. at 26–29.

The central question is whether application of the PSA means, as Plaintiff submits, Progressive is not determining ACV by "market value" as contractually required but is, instead, calculating an artificially reduced amount. *See Smith v. S. Farm Bureau Cas. Ins. Co.*, 18 F.4th 976, 980-81 (8th Cir. 2021) (holding that if it were true that the PSA is "contrary to industry practices and consumer experiences and therefore not reflective of the vehicle's fair market value,

then the insurance company did not consider the truck's fair market value; it considered an artificially lower value, in breach of its contractual duty") (cleaned up); *see also Curran*, 2023 WL 8715699, at *10–*11 ("common questions exist where [Plaintiff's] claims turn on the legitimacy of a value estimation mechanism that has been allegedly applied to exact the same underpayment injury on all class members"); *Drummond*, 2023 U.S. Dist. LEXIS 140205, at *32 ("Progressive maintains that PSAs are legitimate. The [] plaintiffs maintain they are inaccurate," and it "is this dispute . . . that is at the center of this action"); *Brown*, 2023 U.S. Dist. LEXIS 136472, at *9 ("Determining whether Progressive's application of the PSA constitutes a breach of its form policy would resolve the primary merits-based 'issue that is central to the validity of each one of the claims in one stroke.'"); *Volino*, 2023 U.S. Dist. LEXIS 44666, at *22 ("[T]he key question for both claims and for all classes and subclasses is, in substance, whether the PSA reflects how cars are valued and sold in the market."); *Clippinger*, 2023 U.S. Dist. LEXIS 153813, at *28.

These common issues predominate over individual issues. "The elements of a common law breach of contract claim in Arkansas are: (1) an enforceable contract exists; (2) the defendant has a duty under the contract; (3) the defendant violated the duty; and (4) the plaintiff was damaged." *Smith*, 18 F.4th at 980 (citing *Smith v. Eisen*, 245 S.W.3d 160, 168–69 (Ark. 2006)). It cannot be disputed that the first two elements are subject to common proof, as Progressive has already identified every total-loss insured covered by its policies during the relevant period, necessarily meaning a valid contract existed and Progressive determined the claim was covered.

The breach element is also subject to common proof: (i) the form Policy language applicable to every Class member, which establishes the relevant duty; (ii) expert testimony that dealerships price to market and therefore the list price of comparable vehicles is reflective of cash market value, as reflected by even Progressive's own purposely truncated data and by the DMV

market data; and (iii) expert testimony that the PSA is unjustified, arbitrary, capricious, and not reflective of the used-car market, but rather derived from a false, truncated, artificially lower market in breach of Progressive's contractual duty. None of the testimony is particular to a given vehicle: Plaintiff's statistical experts will provide their analysis that the PSA is not supported by a proper statistical methodology or by the data, which is not particular to specific vehicles. Felix will testify that, as confirmed by the data, car dealers price to market, which the jury will find persuasive or not—either way, such testimony applies classwide. Merritt will testify that ACV is identified by taking the average of comparable vehicles, adjusted for differences in mileage, equipment, and condition—in other words, the Mitchell method but without the PSA. A jury will either agree or not, but either way, the outcome will apply equally to the Class.

It is well established that "[c]laims arising from interpretations of a form contract appear to present the classic case for treatment as a class action." *McKeage*, 847 F.3d at 999 (citation omitted). The same is true here, where the jury will be presented with two competing viewpoints. Progressive's witnesses will testify that the PSA is a proper part of its uniform method of calculating ACV. Plaintiff will also proffer a uniform method of calculating ACV, but his witnesses will testify that the PSA is invalid, in conflict with market forces and vast empirical evidence, and not a proper element of calculating ACV. Regardless of whether a jury agrees with Progressive or Plaintiff, its answer will apply classwide—and as such, the predominating question in this litigation is common to the Class, and liability issues subject to common proof predominate over any issues subject only to individual proof. *See Volino*, 2023 U.S. Dist. LEXIS 44666, at *24 ("[T]he critical common questions identified by Plaintiffs predominate over those individual inquiries."); *see also Curran*, 2023 U.S. Dist. LEXIS 224952, at *20 ("what matters at this stage is that a jury finding in Plaintiff's favor would do so based on common issues about the PSA's

17

accuracy with respect to ACV."); *Costello*, 2024 WL 239849, at \*20 (similar); *Brown*, 2023 U.S. Dist. LEXIS 136472, at \*17 (similar).

**2. Plaintiff's damages model fits his theory of liability, and any individual issues of damages cannot predominate over common issues of liability.**

As set forth above, whether Progressive breached the contract by failing to consider actual market value in calculating ACV can be shown through common proof. Next, the measure of damages can also be shown through common proof, and that measure of damages fits Plaintiff's liability theory. Plaintiff's theory on the merits is that, because an honest look at vast empirical data (consistent with expert testimony from those with knowledge of how the used auto market works) confirms that vehicles typically sell for their list price, and because any adjustments to the price of comparable vehicles must be based on verified information, not rigged foregone conclusions, the listed price of comparable vehicles adjusted for differences in mileage, options, and condition (which Plaintiff does not challenge) constitutes the actual cash market value of an insured vehicle. If a jury agrees, damages are a ministerial calculation: the difference between the Market Value calculated in each Class Member's Mitchell Report with the PSA deductions and without those deductions, plus applicable sales tax on that difference and prejudgment interest. Merritt Rep. at 7–8; Lacey Rep. at 12–14; *see also* Newberg on Class Actions § 12:2 ("a common method for showing individual damages—a simple formula could be applied to each class member's … records—[is] sufficient for the predominance [] requirement[] to be met.").

This damages model is coherent and flows logically from Plaintiff's theory of liability. Plaintiff's damages model "presents a common question not simply because Plaintiff wants a jury to conclude that the PSA does not represent ACV, but because Plaintiff wants a jury to conclude that omitting the PSA from each valuation produced by Mitchell *would* represent ACV." *Curran*, 2023 U.S. Dist. LEXIS 224952, at \*19 (emphasis original). In other words, Progressive breached

its contracts and injured Plaintiff and the Class by thumbing the scale against insureds and removing the thumb remedies the harm. *See Brown*, 2023 U.S. Dist. LEXIS 136472, at \*24 ("[T]he Court finds that Plaintiffs' proposed damages methodology aligns with their liability theory and that common issues predominate with respect to damages. And though the specific determination of damages may require individualized calculations, "the necessity of calculating damages on an individual basis will not necessarily preclude class certification."); *Volino*, 2023 U.S. Dist. LEXIS 44666, at \*32 ("Because Plaintiffs take the position that the PSA should not exist at all, a damages model based on simply removing the PSA and re-running the valuations matches Plaintiffs' liability theory."); *Clippinger*, 2023 U.S. Dist. LEXIS 153813, at \*36–37 ("Plaintiff's damages model that simply removes the [PSA-like adjustment] from the Audatex valuation methodology therefore matches her liability theory."). Other than the application of the PSA, Plaintiff agrees with how Mitchell calculated ACV, i.e., the industry-standard "comp" methodology. *See* Merritt Rep. at 7. Numerous cases across the country—including in the more complicated context of real-property disputes—have been certified as class actions where plaintiffs put on proof that one step in a multistep appraisal process is improper and proposed a damages model of excising the offending portion of the valuation.

In *Curran*, *Drummond*, *Brown*, and *Volino*, courts granted class certification on identical facts—and, in *Costello*, the magistrate judge recommended class certification be granted and in *Clippinger* the court granted class certification on nearly identical facts. In each of the Progressive cases, the plaintiffs challenged Progressive's application of PSA deductions, alleging that the PSAs were unfounded and illegitimate because Progressive "cherry-picks the vehicles used to calculate the PSA, manipulating the dataset to produce a much larger downward adjustment in price than is warranted by current market realities." *Volino*, 2023 U.S. Dist. LEXIS 44666, at \*8.

19

And in those cases, as here, Merritt opined that Progressive's reports documented a sound appraisal of ACV following a standard comp methodology once the PSAs are removed. *Curran*, 2023 U.S. Dist. LEXIS 224952, at \*23–\*25; *Drummond*, 2023 U.S. Dist. LEXIS 140205, at \*18-19; *Brown*, 2023 U.S. Dist. LEXIS 136472, at \*23; *Volino,* 2023 U.S. Dist. LEXIS 44666, at \*13. So "[i]f the factfinder accepts Plaintiffs' evidence on the state of the market, then simply recalculating the valuation using Progressive's methodology without the PSA will accurately value each class member's vehicle." *Volino,* 2023 U.S. Dist. LEXIS 44666, at \*8; *Costello*, 2024 WL 239849, at \*18-20. Thus, each of the six courts found common issues of law and fact predominated and that plaintiffs' "damages model based on simply removing the PSA and re-running the valuations matches Plaintiffs' liability theory." *Volino*, 2023 U.S. Dist. LEXIS 44666, at \*32; *see also Costello*, 2024 WL 239849, at \*20; *Drummond*, 2023 U.S. Dist. LEXIS 140205, at \*36; *Brown*, 2023 U.S. Dist. LEXIS 136472, at \*24. And, while *Clippinger* involved a different valuation company (Audatex) that gave the PSA a different name ("typical negotiation adjustment"), the essential facts and legal conclusions supporting class certification are identical to those supporting certification of the PSA cases. *See Clippinger*, 2023 U.S. Dist. LEXIS 153813.

Likewise, the Eighth, Fifth, and Sixth, Circuits affirmed class certification in the more complicated real-property context where plaintiffs presented evidence that one step in a multistep appraisal process was improper and proposed a damages model of excising the offending portion of the valuation. *See, e.g.*, *Stuart v. State Farm*, 910 F.3d 371, 375–76 (8th Cir. 2019); *Hicks v. State Farm*, 965 F.3d 452, 460–61 (6th Cir. 2020); *Mitchell v. State Farm*, 954 F.3d 700, 710–711 (5th Cir. 2020). In *Hicks*, for example, the Sixth Circuit affirmed class certification where plaintiffs alleged State Farm failed to pay the ACV of their damaged property by improperly deducting labor depreciation. 965 F.3d 452. There, as here, the plaintiffs' theory was that, but for this one improper

20

line-item adjustment, they would have received a proper payment of ACV. *Id.* at 456. So, as here, the plaintiffs presented a damages model that simply excised that line-item deduction. *Id.* at 460.

Moreover, as these three circuit courts explained, class treatment of claims challenging a single line-item deduction is proper even where insurers argue there may have been an **over**payment as to an unchallenged aspect of the ACV calculation. In *Hicks*, State Farm argued certification was inappropriate because, even if it were not permitted to depreciate labor, "it may have miscalculated ACV payments based on individualized errors unrelated to depreciating labor costs" and these other errors may have exceeded the depreciation amount. *Id*. at 460. In other words, it intended to defend against the claims of individual class members "by proving that some insureds were not damaged because it either overestimated ACV payments to such a degree that the deduction of labor depreciation resulted in no damages or it mistakenly reimbursed labor depreciation costs to RCV claimants for more than they were owed." *Id.* The Sixth Circuit rejected this argument because any overestimation might "simply operate[] as an error in the insured's favor" which itself is a common issue. *Id*. at 461 (quoting *Stuart,* 910 F.3d at 376–77*).* And even if "this sub-issue were to become relevant," it might be resolvable through subclasses or bifurcation*. Id.* at 462.

Likewise, the Fifth Circuit stressed that "whether State Farm made an error in estimating" other elements of the ACV calculation "is a question separate from this class litigation," and left it to the district court to determine "how to handle sub-issues that may or may not arise in granting class relief." *Mitchell*, 954 F.3d at 711. Finally, the Eighth Circuit also rejected State Farm's argument because "the only dispute is over including labor depreciation in the calculation, which is a discrete portion of the formula that is easily segregated and quantified." *Stuart*, 910 F.3d at 376. This is all consistent with *Volino*, which explained that arguments that Progressive may have

overvalued some other aspect of the ACV calculation "are speculative and would not defeat predominance even if they were relevant." *Volino*, 2023 U.S. Dist. LEXIS 44666, at *29.

The sole order denying class certification in a similar case, *Kroeger v. Progressive Universal Insurance Co.*, 2023 WL 9059523 (S.D. Iowa Nov. 20, 2023), does not alter these conclusions because, as the *Curran* court noted, it is substantively incorrect. *Curran,* 2023 WL 8715699, at *9 n.9. *Kroeger* erred by, inter alia, denying certification based on its view that Progressive cannot have breached its contract so long as it arrived at a reasonable estimate of ACV in hindsight, regardless of the chicanery it engaged in to get there. As an initial matter, Plaintiff presents common evidence that Progressive did *not* pay ACV, which a jury could reasonably credit and which is equally applicable class wide. Furthermore, the *Kroeger* court's assumption is simply wrong. Progressive contractually promised that ACV would be "determined by market value, age, and condition of the vehicle at the time of loss." If Progressive "determined" ACV in some other manner—say, using examples Progressive has used before, by having a monkey throw darts at numbers on a wall or using a random number generator—then it has breached its contractual duty, even if sometimes the monkey miraculously landed on a sound ACV. And, under Plaintiff's theory, damages resulted here and can be calculated in a common, coherent manner that flows logically from Plaintiff's liability theory. As *Curran* put it in finding *Kroeger* to be unpersuasive, "[i]f a jury is convinced that Progressive's methodology is accurate as to ACV—except for the PSAs— the difference in valuation could be carried over to all class members to assess damages." *Id*. Respectfully, *Costello*, *Curran*, *Volino*, *Drummond*, *Brown*, and *Clippinger* are far more persuasive than *Kroeger*'s self-acknowledged outlier decision.

Moreover, *Kroeger* misunderstood and misapplied the Eighth Circuit's decision in *Stuart*. The court tried to distinguish *Stuart* on grounds the insurance company there (State Farm) was

required to calculate ACV according to a specific formula, namely "replacement cost less depreciation." 2023 WL 9059523, *6. But Progressive *also* had to calculate ACV "in line with a prescribed formula—that is, by market value, age, and condition at the time of the loss[,]" *Clippinger*, 2023 U.S. Dist. LEXIS 153813, at n.8, and it breached that duty. So, there is no distinction—it is not as if "replacement cost less depreciation" is self-executing, nor was State Farm's vendor Xactimate the only possible vendor for calculating ACV when defined as or in reference to replacement cost less depreciation. State Farm still had to calculate ACV under the agreed ACV formula, just as Progressive had to calculate ACV based on its agreed formula of market value, age, and condition. Just as the plaintiffs and absent class members in *Stuart*, *Mitchell*, and *Hicks* could use the common evidence of State Farm's own valuation (after excising labor depreciation) as a factual matter, Plaintiff and absent class members can use Progressive's own valuation (after existing the PSAs).

Here, the clearly predominant question is whether Progressive's application of the PSA means ACV was not "determined by the *market* value, age, and condition" of the vehicle, as required by its form Policy, but was instead determined by the false market manufactured to justify PSA deductions. *See Smith*, 18 F.4th at 980–81. If so, the clear, and logical, remedy—just as in the numerous cases discussed above—is awarding damages calculated by backing out the invalid PSA deduction from the Mitchell reports.

"When 'one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members.'" *Tyson Foods*, 577 U.S. at 453. "In fact, Rule 23 explicitly envisions class actions with such individualized damages determinations." *Gunnells v.*

*Healthplan Servs.*, 348 F.3d 417, 428 (4th Cir. 2003). As set forth above, whether Progressive breached its duty to "determine" ACV based on actual market value by, instead, determining ACV based on a false, truncated, and artificially lower "market" is subject to common evidence. So, even if damages were subject to individualized determinations—and to be clear, they will not be—class treatment would remain appropriate.

In summary, the claims here are "sufficiently cohesive to warrant adjudication by representation." *In re Zurn Plex Plumbing Prods. Liab. Litig.*, 644 F.3d 604, 618 (8th Cir. 2011); *see also Curran*, 2023 U.S. Dist. LEXIS 224952, at *23–*25; *Drummond*, 2023 U.S. Dist. LEXIS 140205, at *32; *Brown*, 2023 U.S. Dist. LEXIS 136472, at *24; *Volino*, 2023 U.S. Dist. LEXIS 44666, at *32; *Costello*, 2024 WL 239849, at *20; *Clippinger*, 2023 U.S. Dist. LEXIS 153813, at *33.

### C. The Remaining Rule 23(a) Prerequisites Are Met

#### 1. The Class is numerous such that joinder is impracticable.

The numerosity requirement of Rule 23(a)(1) requires the Court to consider whether the class is "so numerous that joinder of all members is impracticable." *Eastwood v. S. Farm Bureau Cas. Ins. Co.*, 291 F.R.D. 273, 292 (W.D. Ark. 2013). "There are no particular rules governing the necessary size of the class, but the most obvious factor is the number of persons in the proposed class." *Id.* (citing *Paxton v. Union Nat. Bank*, 688 F.2d 552, 559 (8th Cir.1982)). "[C]ourts have stated as few as forty class members is sufficient to show joinder is impracticable." *Harris v. D. Scott Carruthers & Assoc.*, 270 F.R.D. 446, 450 (D. Neb. 2010). Progressive produced claims data for the putative Class showing there are nearly ███ potential members of the Class. Lacey Rep. at 12. This easily satisfies Rule 23(a)(1). *See, e.g.*, *Volino*, 2023 U.S. Dist. LEXIS 44666, at *18–19.

2.  **Plaintiff is typical of, and will adequately represent, the Class.**

Typicality "is fairly easily met so long as other class members have claims similar to the named plaintiff." *DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171, 1174 (8th Cir. 1995). "Factual variations in the individual claims will not normally preclude class certification if the claim arises from the same event or course of conduct as the class claims, and gives rise to the same legal or remedial theory." *Custom Hair*, 984 F.3d at 604.

Progressive's practices are uniform. It is undisputed that the form Policies contain identical language, and that Progressive applied a PSA to the listed price of comparable vehicles for every Class Member, which is the practice that gave rise the claim. *See* Lacey Rep. at 9–12; *id.* at Ex. 4. This case will turn on whether this uniform practice is authorized by the plain language of the Policy. The claims arise from the same challenged conduct and share the same essential characteristics, which satisfies the typicality requirement. *See Brown*, 2023 U.S. Dist. LEXIS 136472, at *11 (finding typicality where "the putative class's claims all arise from the same 'course of conduct'—that is Progressive allegedly undervaluing total-loss claims by applying a PSA"); *Volino*, 2023 U.S. Dist. LEXIS 44666, at *19–*21 (rejecting Progressive's challenges to typicality and finding that, "[c]ontrary to Progressive's argument, the named Plaintiffs' claims, and Progressive's related defenses, are typical of the class as a whole."); *see also Costello*, ECF No. 156, at 33–34 (finding "Plaintiff has satisfied the typicality requirement" because "Plaintiff and all other potential class members share common facts and a common legal question."); *Drummond*, 2023 U.S. Dist. LEXIS 140205 (finding "the putative plaintiffs are typical because they raise a breach-of-contract claim that applies to all Progressive insureds within the class—there is no suggestion that they have any unique circumstances or plan to raise individualized defenses that will become a 'focus of the litigation' or that their interests are not 'aligned' with other members

25

of the class") (quoting *In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 599 (3d Cir. 2009)).

Plaintiff also satisfies the Rule 23(a)(4) adequacy requirement. *See Nelson v. Wal-Mart Stores, Inc.,* 245 F.R.D 358, 371 (E.D. Ark. 2007) (explaining that typicality and adequacy requirements generally "merge"). Adequacy requires the court to consider two criteria: "whether the named representatives (1) have common interests with the members of the class and (2) will vigorously prosecute the interests of the class through qualified counsel." *In re Target Corp. Customer Data Sec. Breach Litig.*, 847 F.3d 608, 613 (8th Cir. 2017), *amended*, 855 F.3d 913 (8th Cir. 2017).

Plaintiff possesses personal interests in the outcome of this case, presents no claims that would be detrimental to the Class's interests, and all Class members would benefit from a finding that the PSA is improper and constitutes a breach. Ex. 12 ("Bates Decl.") ¶¶ 10–13. Further, Plaintiff has retained qualified counsel with experience litigating class action cases and who are committed to expending the resources necessary to prosecute this claim. *Id.* ¶¶ 3–9. Both Rule 23(a)(4) and Rule 23(g) are satisfied. *See* Fed. R. Civ. P. 23(g)(1); *see also Curran*, 2023 WL 8715699, at *6 (same); *Drummond*, 2023 U.S. Dist. LEXIS 140205, at *26–30 (same); *Brown*, 2023 U.S. Dist. LEXIS 136472, at *11-13 (same; rejecting Progressive's argument that "certain class members would have benefitted from the application of the PSA" under a different methodology); *Volino*, 2023 U.S. Dist. LEXIS 44666, at *21 ("Contrary to Progressive's argument, 'the representative parties will fairly and adequately protect the interests of the class.'").

### 3. Class Treatment Is Superior

"[T]he purpose of [Rule 23(b)(3)'s] superiority requirement is to assure that the class action is the most efficient and effective means of resolving the controversy." *Wolin v. Jaguar Land*

*Rover North America, LLC,* 617 F.3d 1168, 1175 (9th Cir. 2010) (quoting 7AA Charles Wright et al., Fed. Prac. and Proc. § 1779 at 174 (3d ed. 2005). Factors relevant to determining whether class treatment is superior to other forms of adjudication are: (A) any interest in individually controlling prosecution; (B) whether any litigation has already commenced; (C) the desirability of concentrating litigation; and (D) manageability. Fed. R. Civ. P. 23(b)(3).

Here, Plaintiff's PSA damages are $376.91. Lacey Rep. at 13-144 & Ex. 7 thereto. This amount is small relative to the cost of litigating against a large insurance company. In *Amchem*, the Supreme Court noted that the central policy underlying the class action mechanism is "to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights." *Amchem*, 521 U.S. at 617. The fact that the costs of bringing individual actions outweigh the expected recovery is often dispositive of superiority. *See Beaton*, 907 F.3d at 1030 ("Rule 23(b)(3) was designed for situations such as this, in which the potential recovery is too slight to support individual suits, but injury is substantial in the aggregate") (citing *Murray v. GMAC Mortg. Corp.*, 434 F.3d 948, 953 (7th Cir. 2006)); *Thorogood v. Sears, Roebuck and Co*., 547 F.3d 742, 744 (7th Cir. 2008) ("the class action is an ingenious device for economizing on the expense of litigation and enabling small claims to be litigated.").

All the superiority factors favor class certification here. First, given the common questions on liability, the relatively small damages compared to the cost of litigating individually against a large insurance company, and the Class members' ability to opt-out, Class members have an extremely diminished interest in individually controlling this action. *See Custom Hair*, 984 F.3d at 605 ("A class action is the superior mechanism to try this case. Plaintiffs' individual claims are for tens or hundreds of dollars. Absent a class action, no plaintiff is likely to pursue their claim individually. The district court did not abuse its discretion in finding a class action superior here.")

Second, to Plaintiff's knowledge, there are no competing cases pending in this or any other forum. Third, concentrating this lawsuit in this Court is desirable as all potential class members currently reside or did reside in Arkansas during the Class period, all relevant transactions occurred in Arkansas, and all claims are governed by Arkansas law. *See Gregory v. EBF & Associates, L.P.*, 2010 WL 11537515, *2 (D. Minn. May 7, 2010) (finding the "concentration of all class members' claims in one forum appears desirable, given this may be the only feasible manner for recovery by" class members).

Finally, class treatment is manageable. *See, e.g.*, *Volino*, 2023 U.S. Dist. LEXIS 44666, at *34–*35; *Curran*, 2023 U.S. Dist. LEXIS 224952, at *25–*27; *Drummond*, 2023 U.S. Dist. LEXIS 140205, at *37–*38; *Brown*, 2023 U.S. Dist. LEXIS 136472, at *27–*28. Liability will be established through common evidence of Progressive's uniform Policy provisions and method for valuing total-loss claims. Given the predominance of common issues and defenses, the case can be tried almost entirely using class-wide proof, and "the scope of the class action will not be much greater than if [Plaintiff] were to pursue [their] claims on an individual basis." *Etzelsberger v. Fisker Auto., Inc.*, 300 F.R.D. 378, 385 (C.D. Cal. 2013). It is "far more efficient" to litigate Plaintiff's claims, which arise from a common course of conduct, "on a classwide basis rather than in thousands of individual and overlapping lawsuits." *Wolin*, 617 F.3d at 1176; *see also Carnegie v. Household Inter., Inc.*, 376 F.3d 656, 661 (7th Cir. 2004). To be sure, class treatment is more manageable than managing ███ individual cases, which is why manageability concerns rarely preclude class treatment. *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 140 (2d Cir. 2001) ("[F]ailure to certify an action under Rule 23(b)(3) on the sole ground that it would be unmanageable is disfavored and should be the exception rather than the rule"); *accord Klay v. Humana, Inc.*, 382 F.3d 1241, 1272–73 (11th Cir. 2004) (explaining superiority is a comparative

28

analysis and, thus, manageability concerns "will rarely, if ever, be in itself sufficient to prevent certification of a class"). Here, there are no manageability concerns—identifying Class members is formulaic and based on objective, verifiable data in Progressive's records. Lacey Rep. at 9–12.

Accordingly, classwide adjudication is the superior method for resolving this dispute. *See Curran*, 2023 WL 8715699, at *9–10 (finding class action superior).

## IV.    CONCLUSION

For the foregoing reasons, the Court should grant Plaintiff's Motion.

Dated: January 25, 2024

Lee Lowther (ABN 2013142)
Hank Bates (ABN 98063)
Tiffany Oldham (ABN 98063)
*Attorneys for Plaintiff*
**CARNEY BATES & PULLIAM, PLLC**
519 West Seventh Street
Little Rock, AR 72201
Telephone: (501) 312-8500
Email: llowther@cbplaw.com
Email: hbates@cbplaw.com
Email: toldham@cbplaw.com

Christopher Berman (*pro hac vice*)
Edwin Eliu Elliott (*pro hac vice*)
Andrew J. Shamis (*pro hac vice*)
**SHAMIS & GENTILE, P.A.**
14 NE 1st Avenue, Suite 705
Miami, Florida 33132
Telephone: (305) 479-2299
Email: cberman@shamisgentile.com
Email: edwine@shamisgentile.com
Email: ashamis@shamisgentile.com

Christopher Gold (*pro hac vice*)
**EDELSBERG LAW, P.A.**
20900 NE 30th Avenue, Suite 417
Aventura, FL 33180
Telephone: (786) 289-9471
Email: chris@edelsberglaw.com

Joshua R. Jacobson (*pro hac vice*)

**NORMAND PLLC**
3165 McCrory Place, Suite 175
Orlando, FL 32803
Telephone: (407) 603-6031
Email: josh.jacobson@normandpllc.com