## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF ARKANSAS
## NORTHERN DIVISION

ERIK KNIGHT, individually and on behalf of
all others similarly situated,

       Plaintiff,

v.

PROGRESSIVE NORTHWESTERN
INSURANCE COMPANY, an Ohio
corporation,

       Defendant.

_____ /

**Case No. 3:22-cv-00203**

**HEARING REQUESTED**

## <u>DEFENDANT'S OPPOSITION TO</u>
## <u>PLAINTIFF'S MOTION FOR CLASS CERTIFICATION</u>

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ............................................................................................................. 1

BACKGROUND ............................................................................................................. 4

I.      Plaintiff's Claim Under His Arkansas Insurance Policy with Progressive. ........................ 4

II.     The PSA Is Based on Real Transaction Data. ...................................................... 6

III.    Evidence Regarding the Market for Used Vehicles and the PSA. ....................................... 7

IV.     Evidence Regarding the Valuation and Appraisal of Used Vehicles. ............................. 10

ARGUMENT ............................................................................................................. 12

I.      The Predominant Question Is Whether Progressive Paid Each Class Member the
        ACV of Their Vehicle, and That Question Is Inherently Individualized. ........................ 12

        A.      Binding Eighth Circuit precedent precludes class certification. ........................... 13

        B.      Determining the ACV of each putative class member's vehicle is the
                predominant question in this litigation. ................................................ 16

        C.      Determining whether Progressive's valuation accurately estimated ACV is an
                individualized question. ................................................................ 20

        D.      The record is replete with additional examples of individualized evidence
                bearing on the question of underpayment. .............................................. 25

II.     Plaintiff Is an Atypical and Inadequate Class Representative. ......................................... 29

III.    Class Treatment Is Not Superior and the Class Is Not Ascertainable. ............................... 31

CONCLUSION ............................................................................................................. 33

## TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Alpern v. UtiliCorp United, Inc.*,
   84 F.3d 1525 (8th Cir. 1996) ...............................................................29

*Ambrosio v. Progressive Preferred Ins. Co.*,
   No. CV-22-00342-PHX-SMB, 2024 WL 915184 (D. Ariz. Mar. 4, 2024)..................... *passim*

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
   568 U.S. 455 (2013)...........................................................................12

*Avritt v. Reliastar Life Ins. Co.*,
   615 F.3d 1023 (8th Cir. 2010) .............................................................19

*Blades v. Monsanto Co.*,
   400 F.3d 562 (8th Cir. 2005) ..............................................................11

*Bourque v. State Farm Mut. Auto. Ins. Co.*,
   89 F.4th 525 (5th Cir. 2023) ..............................................................21

*Brown v. Progressive Mountain Ins. Co.*,
   No. 3:21-cv-00175-TCB, 2023 WL 7219499 (N.D. Ga. Aug. 3, 2023)........................ *passim*

*Cannon v. State*,
   265 Ark. 270 (1979).................................................................4, 14, 15, 17

*Chadwick v. State Farm Mut. Auto. Ins. Co.*,
   No. 4:21-CV-1161-DPM, 2024 WL 1156944 (E.D. Ark. Mar. 18, 2024) ......................15, 16

*Comcast Corp. v. Behrend*,
   569 U.S. 27 (2013)............................................................................24

*Costello v. Mountain Laurel Assurance Co.*,
   No. 2:22-CV-35, 2024 WL 239849 (E.D. Tenn. Jan. 22, 2024)..............................24

*Curran v. Progressive Direct Ins. Co.*,
   No. 22-CV-00878-NYW-MEH, 2023 WL 8715699 (D. Colo. Dec. 18, 2023) ............. *passim*

*Curtis v. Progressive N. Ins. Co.*,
   No. CIV-17-1076-PRW, 2020 WL 2461482 (W.D. Okla. May 12, 2020) ............................19

*Denning v. Bond Pharmacy, Inc.*,
   50 F. 4th 445 (5th Cir. 2022) ..............................................................28

*Drummond v. Progressive Specialty Ins. Co.*,
   No. 5:21-cv-04479-EGS, 2023 WL 5181596 (E.D. Pa. Aug. 11, 2023) ............................8, 23

*Elizabeth M. v. Montenez*,
    458 F.3d 779 (8th Cir. 2006) ...........................................................................24, 29

*Erica P. John Fund, Inc. v. Halliburton Co.*,
    563 U.S. 804 (2011).................................................................................................12

*Ginardi v. Frontier Gas Servs., LLC*,
    No. 4:11-CV-00420-BRW, 2012 WL 1377052 (E.D. Ark. Apr. 19, 2012) ...................12, 24

*Greenwell v. Boatwright*,
    184 F.3d 492 (6th Cir. 1999) .................................................................................26

*Hall v. Lhaco, Inc.*,
    140 F.3d 1190 (8th Cir. 1998) ...............................................................................29

*Johannessohn v. Polaris Indus. Inc.*,
    9 F.4th 981 (8th Cir. 2021) ....................................................................................31

*Kartman v. State Farm Mut. Auto. Ins. Co.*,
    634 F.3d 883 (7th Cir. 2011) .................................................................3, 17, 23, 25

*Kroeger v. Progressive Universal Ins. Co.*,
    No. 4:22-CV-00104, 2023 WL 9059523 (S.D. Iowa Nov. 20, 2023) ........................... *passim*

*Lara v. First Nat'l Ins. Co. of Am.*,
    25 F.4th 1134 (9th Cir. 2022) ............................................................................... *passim*

*McKeage v. TMBC, LLC*,
    847 F.3d 992 (8th Cir. 2017) .................................................................................31

*In re Milk Products Antitrust Litig.*,
    195 F.3d 430 (8th Cir. 1999) .................................................................................29

*Moffit v. State Farm Mut. Auto. Ins. Co.*,
    11 F.4th 958 (8th Cir. 2021) ..................................................................................20

*Ngethpharat v. State Farm Mut. Auto. Ins. Co.*,
    No. C20-454-MJP, 2022 WL 1404526 (W.D. Wash. May 4, 2022)......................................16

*Osborn v. Bank of Prescott*,
    No. CA 85-238, 1986 WL 5832 (Ark. Ct. App. May 21, 1986)............................................25

*Passman v. Peloton Interactive, Inc.*,
    No. 19-CV-11711 (LJL), 2023 WL 3195941 (S.D.N.Y. May 2, 2023) ..................................30

*Pieczonka v. Progressive Select Ins. Co.*,
    840 F. App'x 856 (6th Cir. 2021) ..........................................................................4

*Pipes v. Life Invs. Ins. Co. of Am.*,
    254 F.R.D. 544 (E.D. Ark. 2008)............................................................30

*In re Pre-Filled Propane Tank Antitrust Litig.*,
    No. 14-02567-MD-W-GAF, 2021 WL 5632089 (W.D. Mo. Nov. 9, 2021) ..........................12

*Progressive Specialty Ins. Co. v. Drummond*,
    No. 23-8035 (3d Cir. 2024)............................................................23

*Prudhomme v. GEICO*,
    No. 21-30457, 2022 WL 510171 (5th Cir. Feb. 21, 2022) ....................................30

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
    725 F.3d 244 (D.C. Cir. 2013) ............................................................17

*Richardson v. Progressive Am. Ins. Co.*,
    No. 2:18-cv-715-Ftm-99MRM, 2022 WL 154426 (M.D. Fla. Jan. 18, 2022) ......................19

*Sampson v. United Servs. Auto. Ass'n*,
    83 F.4th 414 (5th Cir. 2023) ............................................................ *passim*

*In re State Farm Fire & Cas. Co.*,
    872 F.3d 567 (8th Cir. 2017) ............................................................ *passim*

*Stuart v. State Farm Fire & Cas. Co.*,
    910 F.3d 371 (8th Cir. 2018) ............................................................ *passim*

*Sullivan v. State Farm Mut. Auto. Ins. Co.*,
    No. 23-00169-CV-W-GAF, 2023 WL 9381439 (W.D. Mo. Nov. 17, 2023) ........................14

*TransUnion LLC v. Ramirez*,
    141 S. Ct. 2190 (2021)............................................................12

*Tyson Foods, Inc. v. Bouaphakeo*,
    577 U.S. 442 (2016)............................................................13

*Ultracuts Ltd. v. Wal–Mart Stores, Inc.*,
    33 S.W.3d 128 (Ark. 2000)............................................................12

*United States v. One Lincoln Navigator 1998*,
    328 F.3d 1011 (8th Cir. 2003) ............................................................28

*United States v. Rushing*,
    388 F.3d 1153 (8th Cir. 2004) ............................................................26

*Volino v. Progressive Cas. Ins. Co.*,
    No. 21-cv-06243-LGS, 2023 WL 2532836 (S.D.N.Y. Mar. 16, 2023)........................ *passim*

*Wal-Mart Stores, Inc. v. Dukes*,
　564 U.S. 338 (2011)................................................................................ *passim*

*In re Wertz*,
　557 B.R. 695 (Bankr. E.D. Ark. 2016) ...................................................25

*Yasevich v. Heritage Co., Inc.*,
　No. 3:20-CV-00019-KGB, 2021 WL 8999318 (E.D. Ark. Feb. 12, 2021) ...........................29

*In re Zurn Pex Plumbing Prod. Liab. Litig.*,
　644 F.3d 604 (8th Cir. 2011) ..................................................................13

**Rules**

Fed. R. Civ. P. 23 ......................................................................................... *passim*

Fed. R. Evid. 702 .......................................................................................19

**Statutes**

Ark. Code Ann. § 23-89-211 ......................................................................4

**Other Authorities**

Ark. R. 054.00.43-10(a) ............................................................................. *passim*

Ark. R. 235.19.1-3 .....................................................................................6

**INTRODUCTION**

Plaintiff Erik Knight alleges that Progressive breached his insurance policy by paying him less than the actual cash value ("ACV") of his totaled vehicle. As one court in this circuit held on a virtually identical claim, "[b]inding Eighth Circuit precedent does not permit [a] [c]ourt to certify a class in these circumstances." *Kroeger v. Progressive Universal Ins. Co.*, No. 4:22-CV-00104, 2023 WL 9059523, at *1 (S.D. Iowa Nov. 20, 2023). Whether an insurance company's valuation methodology "produce[d] an unreasonable estimate of the actual cash value" of insured property is an individualized issue that "may only be determined based on all the facts surrounding a particular insured's … loss." *In re State Farm Fire & Cas. Co.*, 872 F.3d 567, 577 (8th Cir. 2017) ("*LaBrier*") (reversing class certification); *see also Stuart v. State Farm Fire & Cas. Co.*, 910 F.3d 371, 376 (8th Cir. 2018) (reaffirming *LaBrier* and holding that where a contract does not specify how ACV must be calculated, "whether [the insurance company] was in breach would depend on whether its methodology produced a reasonable estimate of ACV … in an individual case," which "could not be answered on a class basis.").

Plaintiff nevertheless insists that his case is suitable for class treatment because the jury would need to resolve only one question: whether it is appropriate to adjust the list price of comparable vehicles used to estimate a vehicle's value to estimate the price at which those comparable vehicles will sell. Plaintiff is wrong. While Plaintiff's theory is that such an adjustment ("the Projected Sold Adjustment" or "PSA") can never be applied because it is categorically improper, the only claim he seeks to certify is for breach of contract. And the contract says nothing about whether Progressive may use any particular adjustment to estimate the value of a totaled vehicle; it only requires Progressive to pay the ACV of Plaintiff's totaled vehicle. This is precisely why the *Kroeger* court held that Eighth Circuit precedent precludes class certification. *Kroeger*,

1

2023 WL 9059523, at *6–8 (explaining "there are too many variables in the market value analysis to make class certification appropriate").

Analyzing the same policy language at issue here, the *Kroeger* court held that "whether Progressive failed to pay ACV as determined by market value, age, and condition of the vehicle at the time the loss occur[red]" cannot be answered on a class-wide basis because the evidence shows that "use of the Projected Sold Adjustment does not per se mean every Progressive policyholder received less than market value for their total-loss vehicles." *Id*. Evaluating testimony and reports from the same experts that Plaintiff relies on here, the court explained that application of the PSA "will result in a predicted market value that is too high in some cases and too low in others." *Id.* at *6. Thus, "the question of breach must be evaluated on a policyholder-by-policyholder basis," making class certification "inappropriate." *Id.* at *7.

Another district court analyzing the same claims recently denied class certification for similar reasons, explaining that "determining whether Plaintiffs were paid less than ACV . . . would require the Court, and a jury, to look at not just the Mitchell valuation, but also several other valuations to determine whether *each individual Plaintiff* was paid below market." *Ambrosio v. Progressive Preferred Ins. Co.*, No. CV-22-00342-PHX-SMB, 2024 WL 915184, at *7 (D. Ariz. Mar. 4, 2024) (emphasis in original). The court reasoned that Progressive could have used alternative valuation methods—such as the NADA Guide or Kelley Blue Book ("KBB")—which in many instances "returned with the same or lower ACV estimate than Mitchell's estimate which included a PSA." *Id.* That is also true here. Out of a sample of 140 claims, the challenged Mitchell values were higher than the corresponding NADA values nearly 48.5% of the time. *See* Ex. A, Walker Rpt. ¶ 41. "So, although *one adjustment* (the PSA) from *one methodology* (Mitchell) was applied across the proposed class, 'other compensating adjustments and the ultimate valuation are

made individually. And it's those other things that would require more individualized inquiries' than common inquires here." *Ambrosio*, 2024 WL 915184, at *8 (emphasis in original) (quoting *Lara v. First Nat'l Ins. Co. of Am.*, 25 F.4th 1134, 1140 (9th Cir. 2022)).

As Plaintiff notes, district courts in other jurisdictions have diverged from the common-sense reasoning in *Kroeger* and *Ambrosio* and have certified classes in cases that raise the same individualized valuation issues as this case. *See* Dkt. 41, Pl.'s Mot. ("Mot.") at 1. None of those courts, however, were bound by *LaBrier* and *Stuart*. In addition, those courts erred by failing to conduct the "rigorous analysis" that the Supreme Court requires when deciding whether to certify a class. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350–51 (2011) ("Rule 23 does not set forth a mere pleading standard."). As the Supreme Court has observed, class actions are the exception, not the rule, and because class actions raise fundamental due process concerns, classes should not be certified lightly. A rigorous analysis here demonstrates why multiple appellate courts have held that where a claim turns on "looking into the actual pre-accident value of the car" of every putative class member, "common questions do not predominate." *Lara*, 25 F.4th at 1139; *Kartman v. State Farm Mut. Auto. Ins. Co.*, 634 F.3d 883, 888–91 (7th Cir. 2011) (requirements for class certification not met where "each [insured's] claim of underpayment required individualized determination on the merits"); *Sampson v. United Servs. Auto. Ass'n*, 83 F.4th 414, 422 (5th Cir. 2023) (reversing class certification in similar claim related to valuation of total loss vehicles). There is no way to adjudicate Plaintiff's claims without individually determining the value of his (and each class member's) vehicle.

Plaintiff cannot skirt these individual issues by proposing an alternative valuation method he prefers—*i.e.*, simply removing the PSA from Progressive's valuations and relying on the advertised prices of comparable vehicles. *Sampson*, 83 F.4th at 419–20. Even if this were a valid

3

valuation method, there are "other valuation methods" that are "equally legal and legitimate." *Id.* This "creates an explosion of predominance issues because [the insurer] has the due process right to argue, for each individual plaintiff, that [ACV] should be determined by a different legally permissible method." *Id.* Whether Progressive "produce[d] an unreasonable estimate of the actual cash value" of Plaintiff's or any putative class member's vehicle "may only be determined based on all the facts surrounding a particular insured's … loss." *LaBrier*, 872 F.3d at 577.

As such, Plaintiff cannot meet his burden to satisfy Rule 23, and his motion for class certification should be denied.

## BACKGROUND

**I.    Plaintiff's Claim Under His Arkansas Insurance Policy with Progressive.**

Plaintiff's policy (the "Policy") requires Progressive to pay "the actual cash value of the stolen or damaged property at the time of the loss reduced by the applicable deductible." Dkt. 41-3, Policy at 26. The Policy expressly states that "actual cash value" is determined by the "market value" of the vehicle at the time the loss occurs. *Id.* at 30; *see also Pieczonka v. Progressive Select Ins. Co.*, 840 F. App'x 856, 858 (6th Cir. 2021) (distinguishing Progressive's policy language explaining ACV is determined by "market value" from insurance policies that did not include such language). Under Arkansas law, the "[m]arket value of an automobile is what it will bring on the open market when sold by a willing seller to a willing and able buyer." *Cannon v. State*, 265 Ark. 270, 273 (1979). Arkansas regulations allow an insurance company to determine the market value of a total-loss vehicle through several different methods, including: (1) the cost of replacement; (2) the "cost of a comparable automobile in the local market area" **or** the cost as calculated by quotations from two or more local dealers; or (3) "a basis which deviates from these methods" so long as certain criteria are met. *See* Code Ark. R. 054.00.43-10(a)(2)-(3) ("Rule 43"); *see also* Ark. Code Ann. § 23-89-211.

In August 2020, Plaintiff totaled his 2001 Chevrolet Silverado and submitted a claim under his Policy. *See* Ex. B, Knight Dep. Tr. 42:1-4. Like many insurance carriers, Progressive uses a software designed by a third party, Mitchell International Inc. ("Mitchell"), to estimate the value of totaled vehicles. The software, called WorkCenter Total Loss ("WCTL"), estimated the value of Plaintiff's vehicle based on an analysis of four comparable vehicles. *See* Dkt. 41-6 (Plaintiff's Vehicle Valuation Report) at 4. Two of the four comparable vehicles were listed for sale at local dealerships, so Mitchell applied a PSA to their advertised prices to account for the fact that used cars typically sell for less than list price. *Id.* at 7–10. The other two comparable vehicles had recently sold, so WCTL relied on the vehicles' sold prices and no PSA was applied. *Id.* at 6. WCTL then adjusted the prices of all four comparable vehicles to account for ways in which they differed from Plaintiff's totaled vehicle, such as in mileage and equipment. *Id.* at 6–8; *see also* Ex. C, Kroell Dep. Tr. 143:15-144:23; Ex. E, Kroell Dep. Ex. 7 at 6–7, 32.

The adjusted values of the four comparable vehicles in Plaintiff's WCTL report ranged from \$5,730.07 to \$6,791.38. Dkt. 41-6 at 4. Averaging these values resulted in a base value of \$6,104.33 for Plaintiff's vehicle. *Id*. After adjustments for condition, and the value of aftermarket parts, the estimated market value of Plaintiff's vehicle came to \$6,505.64. *Id.* at 1. Accounting for taxes, fees, and the deductible, Progressive ultimately paid the total settlement amount of \$6,564.53 to Plaintiff's lienholder. *See* Ex. F, Knight Dep. Exs. 2 & 3 (Settlement Summary and Payment to Lienholder). The lienholder then waived the remaining balance on Plaintiff's loan. Ex. B, Knight Dep. Tr. 53:5–54:12. Plaintiff did not dispute Progressive's valuation of his vehicle when his claim was settled. *See* Ex. G (Plaintiff's Claim Notes) at PGR_KNIGHT_0000008 (noting that when the settlement offer was extended to Plaintiff's wife, she was "happy with" and accepted because it was higher than she expected). Notably, under Arkansas's Rule 43, Progressive

could have made a settlement offer based on the cost of just one of the comparable vehicles identified in Plaintiff's WCTL report, and if it had done so based on the first comparable vehicle listed, it would have paid Plaintiff nearly $400 less—even without applying a PSA. *See* Dkt. 41-6 at 4 (showing that the WCTL base value Plaintiff challenges exceeds the sold price of comparable vehicle one, even after adjusting for mileage); *see also* Code Ark. R. 054.00.43-10(a)(2)-(3).

## II.    The PSA Is Based on Real Transaction Data.

Mitchell developed WCTL in partnership with J.D. Power. Ex. H, Kroell Dep. Ex. 5 at 3. As described above, the software estimates the market value of a vehicle by identifying the market value of similar vehicles nearby. *Id.* at 4–5. The sold-price data comes from J.D. Power's Power Information Network ("PIN"), which gathers daily point-of-sale transaction data from ███████

██████████████████████████████████████████████████████████████████

████████████████████████████████████.[1] *Id.* at 5; *see also* Ex. D, Bogus Dep. Tr. 22:9-12, 23:1-3; Ex. H, Kroell Dep. Ex. 5 at 3–5. The list-price data comes from Mitchell's database of advertisements from sources such as Autotrader.com and Cars.com. Ex. D, Bogus Dep. Tr. 21:25– 22:25. When WCTL identifies a nearby comparable vehicle listed for sale by a dealer, a PSA is applied to project the sold price—unless the vehicle is listed at a "no haggle" or "one price" dealership. Ex. E, Kroell Dep. Ex. 7 at 32. J.D. Power calculates PSAs by comparing the list and sold prices of used vehicles. Ex. D, Bogus Dep. Tr. 20:21–22:8; 138:12–140:16 (describing the statistical model used to calculate the PSA).

████████████████████████████████████████████████████████

██████████████████████████████████████ Ex. D, Bogus Dep. Tr. 61:19–

---

[1] J.D. Power's PIN has remained the largest retail transaction data source of its kind for nearly three decades. *See* https://www.jdpower.com/business/pin-automotive-products.

62:17, 135:3–136:20. ████████████████████████████████████████

████████████████████, *id.* at 136:21–137:14, as it is unlawful in many states, including Arkansas,

for a dealership to refuse to honor its advertised price, *see generally* Code Ark. R. 235.19.1-3

(requiring that "[t]he advertised price of a motor vehicle must be the full cash price for which the

dealer will sell or lease the vehicle to any consumer…"). Before the global pandemic-induced

vehicle shortages, ████████████████████████████████████████████

████████████████████████████████████████████████████. Ex. D,

Bogus Dep Tr. 58:13–59:13, 62:18–63:15, 164:23–165:16, 166:22–168:16. In 2021, however,

████████████████████████████████████████████████████

████████████████████████████████. *Id.* at 37:11–38:1, 91:8-13.

The evidence shows that, on average, PSAs are remarkably accurate. Progressive's expert,

Dr. Jonathan Walker, analyzed 526 transactions in which both list prices and sold prices were

available. Ex. A, Walker Rpt. ¶ 78. For each, Dr. Walker compared the PSA that would have

applied to the actual difference between list price and sold price. *Id.* On average, ████

████████████████████████████████████████████████████

████████████████. *Id.* ¶ 79. For ████ of the 526 transactions Dr. Walker analyzed, the "PSA

understated the actual discount off list"—in some cases, ████████████████ *Id.* ¶¶ 79, 161.

Even Plaintiff's expert, Dr. Michelle Lacey, acknowledges that ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████ Ex. I, Lacey *Volino* Dep. Tr. 87:1–88:11.

## III.    Evidence Regarding the Market for Used Vehicles and the PSA.

Plaintiff contends that the primary "common" issue is whether the PSA is categorically

improper because used-car dealers allegedly price vehicles to market and allegedly do not

negotiate prices. Mot. at 20. According to Plaintiff, the list price of a comparable vehicle—not the price for which it sold—reflects its market value. *Id.* The evidence proves otherwise.

To begin, Plaintiff's experts concede that dealers negotiate and used vehicles often sell for less than list price. For example, when Dr. Lacey reviewed the July 2021 PIN data, she found that "40% of vehicles [nationwide] sold at list price," meaning that 60% of the vehicles in the J.D. Power database sold for less than list price. Dkt. 41-7, Lacey Rpt. at 8. Jeffrey Martin, another statistician, acknowledged based on his review of a different data set that between 27.07% and 44.61% of vehicles sold for less than list price, depending on the state and year analyzed. *See* Dkt. 41-11, Martin Rpt. ¶¶ 32–33, 39–40, 46–47, 53–54.[2]

Plaintiff's appraisal expert admits that sold prices are the "best data" for estimating ACV. Ex. L, Merritt *Volino* Dep. Tr. 123:24–124:11. And Plaintiff's dealership expert, Kirk Felix, admits that negotiation occurs. *See* Ex. M, Felix *Curran* Dep. Tr. 123:24–124:14; *see also* Ex. N, Felix *Brown* Dep. Tr. 72:13–73:10. Felix's report claims that car dealers use "sophisticated pricing tools or software" like vAuto to price used vehicles "to market." Dkt. 41-8, Felix Rpt. at 2–3. But when questioned, Felix admitted that he did not mean that there was "no negotiation." Ex. N, Felix *Brown* Dep. Tr. 196:7-24. In fact, the creator of vAuto—who Felix recognizes as an authority on dealer pricing—has written that dealers who use vAuto typically list their vehicles, on average, "about $1,000 higher than the system recommends," leaving ample room for negotiation. Ex. O, Felix *Curran* Dep., Ex. 10; *see also* Ex. M, Felix *Curran* Dep. Tr. 40:15-41:5, 58:21–59:23, 67:14-17, 68:10–71:1, 72:24–74:2. As Felix acknowledged, "different dealers run[] their departments in

---

[2] Martin's numbers should be much higher because his report relies on the taxable value of vehicle sales, not their market values. As Martin acknowledges, the taxable value of a used car may include ancillary dealer fees, warranties, service contracts, or accessories. Ex. J, Martin *Drummond* Dep. Tr. 76:21–80:7, 83:19–85:1; *see also* Ex. K, Declaration of John Scheuren ("Scheuren Decl.").

different ways." Ex. P, Felix *Ambrosio* Dep. Tr. 27:4–29:19. Finally, while Felix contends that sales below list price could be due to negotiation in other aspects of the transaction unrelated to market value, there is no evidence that any of these scenarios ever occur. Ultimately, Felix explains that whether a used car will sell for its list price or less is highly dependent on the particular transaction, Ex. M, Felix *Curran* Dep. Tr. 137:7–138:18, and one must review the "deal jacket for any given transaction" to understand why a vehicle sold for less than list price. Ex. P, Felix *Ambrosio* Dep. Tr. 55:22–57:11.

Progressive's expert, Marc Spizzirri, performed market research to ascertain how frequently negotiation occurs in today's market. Ex. Q, Spizzirri Rpt. ¶¶ 104–06. In a sample of over 600 used car dealers, more than 75% were willing to negotiate the price of a used car. *Id.* Spizzirri also investigated the practices of the dealers that vAuto holds out to be "success stories" on its website. *Id.* ¶¶ 107–117, App'x 3. Spizzirri's research revealed that over 75% of those dealers were willing to sell a used vehicle for less than the advertised price—with most starting at a negotiated discount of $500 or more based on just a phone call or text message. *Id.* Spizzirri also contacted five local Arkansas dealers to ask about their sales process and whether they negotiate. *Id.* ¶¶ 118–120. All five dealerships were willing to negotiate a price for less than advertised, and suggested negotiation was possible with statements ranging from "bring an offer" to "we have room to negotiate" to discounts between "$500 - $2,500." *Id.* ¶¶ 120–23.

Finally, Plaintiff's request to certify a class spanning from August 2017 through the present ignores changes that have occurred in the used-vehicle market over time. Mot. at 9. Plaintiff's experts admit that beginning in 2020, the pandemic changed the market. Ex. M, Felix *Curran* Dep. Tr. 76:3–77:7; 79:22–81:14 ("[V]alues are just crazy after COVID."); 86:14–89:2 (calling the post-pandemic market "very unusual"); 131:17–132:15 (noting "constant change" in the used

car market); Ex. I, Lacey *Volino* Dep. Tr. 106:9-21 (agreeing that ███████████████ ███████████████████████████████████████ and that this should be considered ███ ██████████████████████████████████████ ).

## IV.    Evidence Regarding the Valuation and Appraisal of Used Vehicles.

As Plaintiff's appraisal expert concedes, "there is no single methodology to arrive at a proper opinion as to a loss vehicle's actual cash value." Dkt. 41-9, Merritt Rpt. at 3. There are many methods, tools, books, and products available to estimate ACV, which will result in a range of possible ACV estimates. Ex. L, Merritt *Volino* Dep. Tr. 70:13–71:25 (agreeing that ACV is not a single amount and appraisers will come up with different valuations); *see also* Code Ark. R. 054.00.43-10(a) (describing the permissible methods of estimating ACV in Arkansas). Even Progressive's claim files can contain multiple valuations for the same vehicle. For many vehicles, Progressive generates multiple WCTL reports, each of which produces a different value for the same car. *See* Ex. R, Merritt *Sibert* Dep. Tr. 33:6–38:23 (testifying that three valuation reports, which produced different values varying by up to $500 for the same vehicle, were all "accurate" because they followed the same methodology); *id.* at 57:2-7 (testifying that he had "no way of verifying" which WCTL report would be "the most accurate in estimating market value").

It thus makes sense that the pricing tools that dealers use to determine list prices provide a "range" of prices for individual used cars "because every used vehicle is different." *See* Ex. S, Felix *Freeman* Dep. Tr. 68:8–70:12; *see also* Dkt. 41-8, Felix Rpt. at 3–5. In addition to variations that WCTL accounts for—like mileage, options, and car history reports—other car features not captured by the reports (like color) can also result in different sale prices. Ex. S, Felix *Freeman* Dep. Tr. 69:22–71:1. Plaintiff's WCTL report bears this out. It identified four comparable vehicles

and, after adjustments to account for differences like mileage and equipment, none of these vehicles had the exact same value; they spanned a range of more than $1,000. Dkt. 41-6 at 4.

Because each used vehicle is different and appraisers could reach different valuations, Merritt agrees that the proper way to determine the accuracy of an ACV estimate is to compare it "with other appraisals." Ex. T, Merritt *Freeman* Dep. Tr. 17:7-17. But in this case, neither Merritt nor any other expert appraised Plaintiff's vehicle. *See* Ex. U, Merritt *Knight* Dep. Tr. 20:15–26:18, 27:14–28:1, 29:6–32:8 (explaining that he did not speak to Plaintiff, inspect his vehicle, or verify its condition; and did not do any work to verify accuracy of the adjustments or comparable vehicles used to determine the ACV of Plaintiff's vehicle). Progressive, on the other hand, introduced evidence of NADA valuations showing that 48.5% of a sample of 140 vehicles during the class period had a WCTL estimate that exceeded the NADA estimate. Ex. A, Walker Rpt. ¶ 41.

Plaintiff tries to avoid the individualized nature of estimating ACV by contending that Progressive's process was inappropriate across-the-board because the PSA purportedly runs afoul of the "industry standard" for appraisals. Mot. at 11–12. But Merritt has not identified any appraisal standards that the PSA violates. Ex. V, Merritt *Brown* Dep. Tr. 23:12–24:3 ("Q. Are there any written standards on which you rely for purposes of conducting appraisals? A. No."). Nor has Merritt opined that a downward adjustment to account for a dealer's willingness to negotiate is inherently improper. In fact, he explains that a downward adjustment (like the PSA) is appropriate when a dealer will "take a specified cash price … for that particular comparable vehicle." *See* Dkt.41-9, Merritt Rpt. at 7. Yet Merritt never verified the sale price of any of the comparable vehicles at issue, so he cannot say whether any PSA resulted in an improper valuation. *See* Ex. U, Merritt *Knight* Dep. Tr. 23:3-10.

**ARGUMENT**

Plaintiff bears the burden of establishing that his proposed class meets Rule 23's requirements. *Blades v. Monsanto Co.*, 400 F.3d 562, 568 (8th Cir. 2005). A court should not certify a class unless its "rigorous analysis" confirms that all the Rule 23 prerequisites have been satisfied. *Dukes*, 564 U.S. at 350–51. A rigorous analysis often "entail[s] some overlap with the merits," as "it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question." *Id.*; *see also Ginardi v. Frontier Gas Servs., LLC*, No. 4:11-CV-00420-BRW, 2012 WL 1377052, at *2 (E.D. Ark. Apr. 19, 2012) ("Rule 23 does not set forth a mere pleading standard … the 'rigorous analysis' under Rule 23 must involve consideration of what the parties must prove."). Where, as here, a party seeks certification based on expert testimony, the Court must consider "not only the admissibility of expert evidence" but also "whether that expert evidence is persuasive, which may require the Court to resolve methodological disputes." *In re Pre-Filled Propane Tank Antitrust Litig.*, No. 14-02567-MD-W-GAF, 2021 WL 5632089, at *5 (W.D. Mo. Nov. 9, 2021). For reasons set forth below, Plaintiff has not met his burden under Rule 23, and controlling appellate precedent confirms that no class can be certified here.

**I.     The Predominant Question Is Whether Progressive Paid Each Class Member the ACV of Their Vehicle, and That Question Is Inherently Individualized.**

"Considering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011). To prove a breach-of-contract claim under Arkansas law, a plaintiff must show "the existence of an agreement, breach of the agreement, and resulting damages." *Ultracuts Ltd. v. Wal–Mart Stores, Inc.*, 33 S.W.3d 128, 133 (Ark. 2000). Plaintiff must also prove Article III standing, which requires proof that each class member suffered a concrete

injury. *See TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021).[3] The predominance inquiry does not ask whether class members will ultimately prevail on the merits of their claims "but whether they will prevail or fail in unison.'" *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 460 (2013). It is also not whether a plaintiff's "theory" presents mostly common questions, but rather, whether a jury could return a verdict in favor of plaintiff and the class without undertaking individualized fact-finding. *See Dukes*, 564 U.S. at 346 (reinforcing the need for evidence that is "significant" and "convincing proof" to meet the elements of Rule 23); *see also Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) ("The predominance inquiry 'asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues.'"). Undertaking a rigorous analysis, "[a] district judge may not duck hard questions by observing that each side has some support, or that considerations relevant to class certification also may affect the decision on the merits. Tough questions must be faced and squarely decided, if necessary by holding evidentiary hearings and choosing between competing perspectives." *In re Zurn Pex Plumbing Prod. Liab. Litig.*, 644 F.3d 604, 626 (8th Cir. 2011) (Gruender, J., dissenting) (citing *West v. Prudential Sec., Inc.*, 282 F.3d 935, 938 (7th Cir. 2002)).

A.     **Binding Eighth Circuit precedent precludes class certification.**

The Eighth Circuit has established a framework to guide whether a class may be certified in cases that turn on determining the value of insured property. In *LaBrier*, the Eighth Circuit addressed a putative class action challenging a single line-item deduction in State Farm's computerized valuation methodology for estimating ACV. 872 F.3d at 570. As here, the plaintiff in *LaBrier* argued the deduction breached the insurer's policy obligation to pay ACV. *Id.* The

---

[3] Plaintiff did not move for certification on his declaratory judgment claim, *see* Mot. at 14–18, so Progressive does not address that claim here.

Court of Appeals reversed the district court's certification of the class, explaining that while it was possible that State Farm's estimation software could "produce an unreasonable estimate of the actual cash value of some [] losses, this issue may only be determined based on all the facts surrounding a particular insured's [] loss." *Id.* at 577. For each property, "[c]onflicting estimates [of ACV] must be determined by a jury." *Id.* at 574.

The Eighth Circuit reaffirmed this principle in *Stuart*, holding that class certification may be appropriate where the insurance policies at issue "specified the method for calculating ACV payments" and required the insurer "to calculate the ACV payment in accordance with the prescribed formula." 910 F.3d at 376. The key difference in *Stuart* was that the plaintiffs challenged a deduction that was expressly prohibited by state law. *Id.* at 374. While affirming class certification in that scenario, the *Stuart* court explained that class certification is not permitted where "[d]ifferent methods may be used to estimate [ACV], and the policies at issue … did not specify which should be used." *Id*. at 376. Thus, the *Stuart* court distinguished *LaBrier* because the contract at issue in *LaBrier* "did not specify how ACV payments would be calculated," and thus "whether [the insurer]'s chosen methodology produced a reasonable estimate" of ACV is "a question for the jury to determine on a case-by-case basis," precluding class certification. *Id*.

Plaintiff strains to argue that the Policy here requires Progressive to calculate ACV in line with a "contractually prescribed formula," such that *Stuart* controls. Mot. at 1. But what Plaintiff mislabels as a "formula" is just a promise to value vehicles based on "market value, age, and condition." Dkt. 41-3, Policy at 27. Plaintiff never explains how "market value" differs from "actual cash value." *See LaBrier*, 872 F.3d at 573 n.2 (noting that "'fair market value' and 'actual cash value' are 'substantially synonymous.'"). Determining a vehicle's market value—*i.e.*, what a willing buyer would pay a willing seller—depends on all the same individualized evidence as

determining its ACV.[4] As explained above, Arkansas law allows for multiple methods of estimating the market value of a totaled vehicle. *See* Code Ark. R. 054.00.43-10(a)(2)-(3). And Plaintiff cannot point to any Arkansas law that prohibits the application of a PSA in estimating market value. In short, this case is not like *Stuart* because there is no "prescribed" formula or method for estimating ACV that Progressive has allegedly violated.

Indeed, the *Kroeger* court rejected the same attempt to shoehorn this case within the confines of *Stuart*. 2023 WL 9059523, at *7 (agreeing that "*LaBrier* and *Stuart* control the question" of class certification but that based on identical policy language as here, *LaBrier* determines the outcome). Based on a careful analysis of *LaBrier* and *Stuart*, the *Kroeger* court denied class certification in a virtually identical case challenging the PSA because Progressive's policy does not require a specific formula or methodology for calculating ACV. *Kroeger*, 2023 WL 9059523, at *5–9. As the *Kroeger* court explained, the obligation to pay ACV based on "market value, age, and condition" does not amount to a "prescribed formula" because there are many methods of estimating market value, and nothing in state law precludes the application of a PSA in estimating market values. *Id.* at *7. As in Iowa, *see id.* at *1, market value in Arkansas is simply "what it will bring on the open market when sold by a willing seller to a willing and able buyer." *Cannon*, 265 Ark. at 273. "[D]etermining market value is an art, not a science, and often requires subjective judgments." *Kroeger*, 2023 WL 9059523, at *5. This case is on all fours with

---

[4] Though *LaBrier* arose under Missouri law, Arkansas applies a materially similar definition of market value. *Compare Sullivan v. State Farm Mut. Auto. Ins. Co.*, No. 23-00169-CV-W-GAF, 2023 WL 9381439, at *4 (W.D. Mo. Nov. 17, 2023) ("as used in auto insurance, 'actual cash value' [is] defined as the difference between the property's before and after 'fair market value.' 'Fair market value' is, in turn, defined … as 'the price that the property in question would bring when offered for sale by one willing but not obliged to sell it and when bought by one willing or desirous to purchase it but who is not compelled to do so."), *with Cannon*, 265 Ark. at 273.

*LaBrier*, and class certification "would be an abuse of discretion." *Id.* at *6.[5]

### B. Determining the ACV of each putative class member's vehicle is the predominant question in this litigation.

The central question in this case—key for standing, breach, and damages—is whether Progressive paid Plaintiff (and each putative class member) less than his vehicle's ACV. Dkt. 41-3, Policy at 26. As explained above, because there is no mandated formula or methodology for calculating ACV under the policy or Arkansas law, "the jury would have to be asked … whether Progressive failed to pay ACV as determined by the market value, age, and condition of" each class member's vehicle, which cannot be done on a class-wide basis. *Kroeger*, 2023 WL 9059523 at *7. Plaintiff tries to avoid this individualized issue by pointing the court to a different question: "whether the PSA deduction is baseless and invalid." Mot. at 15. That question is not common because answering it would not materially "drive the resolution of the litigation" and because it cannot yield a common answer. *Dukes*, 564 U.S. at 350–51. But even if it is a "common" question at some level of abstraction, it is not the predominant question in this case.

Numerous appellate and district courts are aligned with the Eighth Circuit in rejecting the argument that a purported methodological flaw in estimating value—divorced from actual

---

[5] While a court in this district recently granted class certification in a case against State Farm related to its application of the "typical negotiation adjustment" in valuing total loss vehicles, it did so without conducting the rigorous analysis required under Rule 23. *See Chadwick v. State Farm Mut. Auto. Ins. Co.*, No. 4:21-CV-1161-DPM, 2024 WL 1156944 (E.D. Ark. Mar. 18, 2024). Indeed, the *Chadwick* court does not even discuss—much less apply—*LaBrier* and *Stuart*. In addition, the decision in *Chadwick* depended on treating the term "actual cash value" as ambiguous because State Farm's insurance policy did not define that term. *Id.* at *2. As a result, the *Chadwick* court concluded that the ambiguity must be construed "in favor of Chadwick and strictly against State Farm." *Id.* Here, however, Progressive's insurance policy expressly states that "actual cash value" will be determined by "market value." Dkt. 41-3, Policy at 27. The *Chadwick* court itself acknowledged that the Arkansas model civil jury instructions define "fair market value," *see id.*, as "the price that the [property] would bring on the open market in a sale between a seller who is willing to sell and a buyer who is willing and able to buy after a reasonable opportunity for negotiations." AMI 2221 (2023). Accordingly, *Chadwick* is inapposite to the operative policy language and law here.

underpayment—can satisfy predominance under Rule 23. In *Lara*, for example, the Ninth Circuit explained that even if a challenged adjustment were "illegal," that would not establish predominance because a breach-of-contract claim "require[s] proof of an injury." 25 F.4th at 1140; *see also Ngethpharat v. State Farm Mut. Auto. Ins. Co.*, No. C20-454-MJP, 2022 WL 1404526, at *3–5 (W.D. Wash. May 4, 2022) (denying class certification because "Plaintiffs bear the burden of providing evidence that what State Farm offered is less than the [ACV] for each loss vehicle"). Regardless of an adjustment's "validity" in isolation, "if a putative class member was given [ACV] or more, then he or she cannot win." *Lara*, 25 F.4th at 1139; *see also In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 252 (D.C. Cir. 2013) ("[P]laintiffs must … show that they can prove, through common evidence, that all class members were … injured"). The Fifth Circuit likewise held that it is not enough for a plaintiff to allege that the insurer's valuation methodology "is not a legal method;" instead, class members must be able to prove underpayment of their own claims. *See Sampson*, 83 F.4th at 417. And the Seventh Circuit reversed class certification in an insurance case, explaining that "[i]f a given policyholder was fully compensated for the damage …, then [the insurance company] will have satisfied its contractual obligation regardless of whether it used a 'uniform and objective' or an ad hoc standard." *Kartman*, 634 F.3d at 890. Simply put, the validity of the PSA will not drive the litigation forward.

Moreover, the evidence shows that whether a particular PSA was "invalid" is an individualized question. In his Motion, Plaintiff claims that he will show that the PSA is "baseless and invalid" because "dealerships price to market and therefore the list price of comparable vehicles is reflective of cash market value." Mot. at 19–20. This theory directly contradicts Arkansas law, which defines market value as the amount a vehicle "will bring on the open market **when sold**." *Cannon*, 265 Ark. At 273 (emphasis added). There is no evidence that all dealers

always price to market, never negotiate, and that list prices always reflect market value. In fact,

the evidence shows the opposite. Plaintiff himself testified that "negotiation still occurs in the used

car market[.]" Ex. B, Knight Dep. Tr. 92:9-14. And Plaintiff's experts concede that dealers price

vehicles differently; some dealers negotiate prices; vehicles frequently sell for less than list price;

and it is appropriate to adjust list prices to account for the difference between an advertised price

and the sale price:

- Dr. Lacey admits that a significant number of used vehicles sold for less than list price in 2020 and 2021. *See* Dkt. 41-7, Lacey Rpt. at 8; *see also id.* at 61–63.

- According to Martin, sales data from Texas, Ohio, and Virginia shows that a significant percentage of vehicles—up to 44.61%—sold for less than list price during the putative class period. *See* Dkt. 41-11, Martin Rpt. ¶¶ 32–33, 39–40, 46–47, 53–54.

- Felix admits there are "dealers that negotiate price[.]" Ex. M, Felix *Curran* Dep. Tr. 123:24–124:14; *see also* Ex. N, Felix *Brown* Dep. Tr. 72:13–73:10, 196:7-24.

- Felix also recognizes that not all dealers use pricing software and that even among those who do, many choose to advertise at prices above what the software recommends. Ex. M, Felix *Curran* Dep. Tr. 68:8–73:19.

- Merritt concedes that appraisers properly make downward "take price" adjustments when determining ACV if a dealer would sell a car for less than list price. *See* Dkt.41-9, Merritt Rpt. at 7.

This evidence establishes that negotiation exists and that many cars sell for less than list price.[6]

The evidence also proves that the PSA accurately reflects the negotiation that Plaintiff and

his experts concede still happens. After analyzing 526 transactions, Dr. Walker concluded that

prices adjusted by the PSA more accurately reflected sales prices than unadjusted list prices. Ex. A,

Walker Rpt. ¶¶ 87, 124, 161. On average, ███████████████████████████████████

███████████████. *Id.* ¶ 79. And for ████████████████████████████████

---

[6] Plaintiff also argues that the PSA is invalid because the data used to calculate the PSA is purportedly flawed. Mot. at 9. But the data used to calculate each individual PSA is unique. *Supra* at 6–7. Thus, for an insured to show that a particular PSA was based on "flawed" data, he would need to present individualized evidence about the transactions used to calculate that PSA.

██████████████████████████████████████████ *Id.* ¶¶ 79, 161. As the *Kroeger*

court explained, "[s]ometimes the actual sale price will end up higher than the [PSA] predicted,

other times it will end up lower." 2023 WL 9059523, at *6. The evidence therefore does not

produce a common answer for every member of the putative class.

Plaintiff also suggests that the PSA is categorically invalid because it violates the industry

standard for appraisals. But his appraisal expert fails to identify a single rule, standard, or guideline

supporting his opinion. *See generally* Dkt. 41-9, Merritt Rpt. And Merritt is unfamiliar with widely

accepted standards, including the Uniform Standards of Professional Appraisal Practice or

American Society of Appraisers Monograph 7, which instruct that "actual realized prices in the

relevant market are more reliable indicators of value than asking prices," Ex. V, Merritt *Brown*

Dep. Tr. 51:20–52:19, and that using the Sales Comparison Approach requires the appraiser to

distinguish between prices asked and prices realized. Ex. W, Kinney Rpt. at 4–6.  This complete

failure to offer "convincing proof" is relevant to class certification—not just to the merits of

Plaintiff's case. *See Avritt v. Reliastar Life Ins. Co.*, 615 F.3d 1023, 1029 (8th Cir. 2010) (affirming

the district court's decision to deny certification on breach-on-contract claims reiterating that "a

'rigorous analysis' [under Rule 23] … includes examination of what the parties would be required

to prove at trial [and t]he court may also be called upon to 'resolve disputes concerning the factual

setting of the case.'"); *see also* Fed. R. Evid. 702.

Moreover, Plaintiff does not contend that his Policy or Arkansas law require Progressive

to use any particular "industry standard." In fact, Arkansas law allows Progressive to use multiple

methods for determining market value, including the "cost of a comparable automobile in the local

market area." Code Ark. R. 054.00.43-10(a)(2)-(3). Thus, even if the PSA violated some appraisal

standard, so long as it complies with Rule 43, that would "not … prove that the putative class

members were underpaid" in violation of the Policy. *See Richardson v. Progressive Am. Ins. Co.*, No. 2:18-cv-715-Ftm-99MRM, 2022 WL 154426, at *23 (M.D. Fla. Jan. 18, 2022) (denying class certification in case challenging Progressive's use of the WCTL methodology); *Curtis v. Progressive N. Ins. Co.*, No. CIV-17-1076-PRW, 2020 WL 2461482, at *3 (W.D. Okla. May 12, 2020) (denying class certification, finding that "the answer to the question of whether Progressive's use of the [WCTL] software violated law or contract will not result in a common answer for the purported class, and will require an in-depth look at specific claims, which contravenes the purpose of class litigation"); *cf. Moffit v. State Farm Mut. Auto. Ins. Co.*, 11 F.4th 958, 960 (8th Cir. 2021) (affirming dismissal of claims for underpayment because Rule 43 does not require that the insurer "justify" its methodology).

In short, Plaintiff must demonstrate that Progressive paid him and each putative class member less than the ACV of their vehicles. Whether the PSA has been applied or not does not help the court resolve this question. "Progressive's use of the [PSA], standing alone, does not mean there has (or has not) been a breach in any particular case of Progressive's contractual duty to determine the vehicle's 'market value' as part of calculating ACV." *Kroeger*, 2023 WL 9059523, at *6. Any class member who was paid ACV or more cannot prove a breach. *Lara*, 25 F.4th at 1139; *see also Ambrosio*, 2024 WL 915184, at *8 ("Progressive would still be entitled to show that despite the PSA deduction, a plaintiff was still paid their vehicle's correct ACV.").

## C. Determining whether Progressive's valuation accurately estimated ACV is an individualized question.

Plaintiff argues that estimating the ACV of each class member's vehicle is not a highly individualized because his expert will testify that ACV can be determined by applying the "Mitchell method but without the PSA." Mot. at 21. But as multiple courts have held, a plaintiff cannot establish predominance by arbitrarily selecting a single valuation methodology when

20

multiple valuation methodologies are valid. As the District of Arizona explained in *Ambrosio*, Plaintiff's challenge to the legitimacy of the PSA addresses "only part of one method of ACV calculations"—but there are other permissible ways of estimating ACV, and "Progressive is not bound to use any one ACV methodology." 2024 WL 915184, at *7. Thus, the claims "would require the Court, and a jury, to look at not just the Mitchell valuation, but also several other valuations to determine whether each individual Plaintiff was paid below market." *Id.*

The Fifth Circuit applied this precise reasoning to reverse class certification in a similar car-valuation case. *See Sampson*, 83 F.4th at 419–23. In *Sampson*, the plaintiffs alleged that an auto insurance company breached its contract by calculating ACV using a specific methodology, claiming that the insurer should have instead used the NADA Guide. *Id.* at 417. The district court certified a class of insureds where the insurer used the challenged methodology and paid an amount less than the NADA value. *Id.* The Fifth Circuit reversed: "[P]laintiffs have not demonstrated that NADA equates to ACV *in fact* … nor put forward a coherent theory on which NADA, but not KBB or Edmunds, etc., can serve as a determinant of injury and liability *as a matter of law*." *Id.* at 423 (emphasis in original). So "even if NADA values could be treated as proof of ACV ... it would follow that KBB values (and Edmunds, etc.) *can also* be treated as proof of ACV," thus "creat[ing] an explosion of predominance issues because [the insurance company] has the due process right to argue, for each individual plaintiff, that [ACV] should be determined by a different legally permissible method." *Id.* at 420, 423; *see also Bourque v. State Farm Mut. Auto. Ins. Co.*, 89 F.4th 525, 528 (5th Cir. 2023) (class certification is improper where plaintiff's proposed methodology is "just one of many statutorily acceptable methods for calculating ACV").

The Ninth Circuit in *Lara* identified similar predominance concerns. There (as here), the plaintiffs alleged that the "amount of the deduction" from the challenged adjustment was common

evidence of injury. *Lara*, 25 F.4th at 1140. But the Ninth Circuit held that this did not satisfy predominance: even if the plaintiffs have some common "relevant evidence" about alleged underpayment in the form of the "amount of the deduction," much of the valuation evidence "wouldn't be" common. *Id.*

Plaintiff cannot argue that his methodology is the only valid way to estimate a vehicle's value. Indeed, Merritt admitted that had he done an appraisal "starting from scratch," it would be "unlikely" that he would have reached the same ACV estimate as simply subtracting PSAs from Plaintiff's WCTL report. Dkt. 41-9, Merritt Rpt. at 7–8. Merritt also testified that removing PSAs from Mitchell reports is just one of multiple acceptable methods of estimating ACV. Ex. T, Merritt *Freeman* Dep. Tr. 17:7-17 (the best way to ascertain ACV for a given vehicle is to confirm it against multiple estimates). And Arkansas law expressly allows for multiple methodologies under Rule 43. *See* Code Ark. R. 054.00.43-10(a)(2)-(3). It is therefore undisputed that Progressive "could have used alternative methodologies for valuing total-loss vehicles." *Kroeger*, 2023 WL 9059523 at *7; *see also Ambrosio*, 2024 WL 915184, at *7–8.

Progressive has a "due process right to argue, for each plaintiff, that damages should be determined by a different legally permissible method that would produce lower damages" than plaintiff's proposed damages model. *See Sampson*, 83 F.4th at 420; *see also Ambrosio*, 2024 WL 915184, at *8 ("[E]ven if Plaintiffs established that a PSA should not have been applied under the Mitchell method, Progressive would still be entitled to show that despite the PSA deduction, a plaintiff was still paid their vehicle's correct ACV."). Notably, many putative class members would have received less if Progressive used an alternative methodology. Ex. A, Walker Rpt. ¶ 41 (approximately 48.5% of a sample of 140 putative class members had NADA estimates that were lower than WCTL estimates), ¶ 42 (approximately 73.9% of a sample of 69 putative class

members' WCTL reports that had at least one "sold" comparable vehicle that was lower than one or more of the PSA-adjusted values).

A jury would therefore need to consider each unique vehicle and weigh the "[c]onflicting estimates" provided by (for example) WCTL, NADA, KBB, and any other appraisals or valuation methods Plaintiff or Progressive might offer into evidence. *LaBrier*, 872 F.3d at 574; *Kartman*, 634 F.3d at 888 (noting that the requirements for class certification under Rule 23(b)(3) were not met when "each plaintiff's claim of underpayment required individualized determination on the merits"). Determining ACV will "involve an inquiry specific to [each] person," defeating predominance under Rule 23. *Lara*, 25 F.4th at 1139 ("[F]iguring out whether each individual putative class member was harmed would involve an inquiry specific to that person … [I]t would involve looking into the actual pre-accident value of the car and then comparing that with what each person was offered."); *Sampson*, 83 F.4th at 423 ("[P]laintiffs have not demonstrated that NADA equates to ACV in fact … nor put forward a coherent theory on which NADA, but not KBB or Edmunds, etc., can serve as a determinant of injury and liability as a matter of law.").

Plaintiff does not meaningfully address the weight of appellate authority in this Circuit and others denying class certification in similar cases. Instead, he takes refuge in one side of the district court split on whether certification of these cases is appropriate. *See generally* Mot. (relying on *Volino v. Progressive Cas. Ins. Co.*, No. 21-cv-06243-LGS, 2023 WL 2532836 (S.D.N.Y. Mar. 16, 2023); *Brown v. Progressive Mountain Ins. Co.*, No. 3:21-cv-00175-TCB, 2023 WL 7219499 (N.D. Ga. Aug. 3, 2023); *Drummond v. Progressive Specialty Ins. Co.*, No. 5:21-cv-04479-EGS, 2023 WL 5181596 (E.D. Pa. Aug. 11, 2023); and *Curran v. Progressive Direct Ins. Co.*, No. 22-CV-00878-NYW-MEH, 2023 WL 8715699 (D. Colo. Dec. 18, 2023)).

The decisions on Plaintiff's side of the split were wrongly decided and are at odds with Eighth Circuit precedent. And Plaintiff altogether fails to mention that the Third Circuit granted Progressive's Rule 23(f) appellate petition in *Drummond*—so the parties will soon have guidance from another appellate court on these very issues. *See Progressive Specialty Ins. Co. v. Drummond*, No. 23-8035 (3d Cir. 2024). For example, in *Curran*, the District of Colorado found that for purposes of class certification, it must "accept the substantive allegations of the complaint as true." 2023 WL 8715699, at *3. That is simply incorrect in the Tenth Circuit, just as it is incorrect here. *Dukes*, 564 U.S. at 350–51; *Ginardi*, 2012 WL 1377052, at *2. So, while the *Curran* court disagreed with *Kroeger*—finding that the plaintiff presented a common model regarding the accuracy of Progressive's method but without the PSAs—that analysis was based on blind acceptance of plaintiff's framing of the case without consideration of the applicable policy language, relevant law, or evidence. *Curran*, 2023 WL 8715699, at *9. The other courts that have certified classes similarly accepted Plaintiff's theory of the case—that the predominant issue is whether the PSA is valid, not whether Progressive paid ACV—without probing whether the policy or the plaintiffs' evidence could support that theory. *See, e.g.*, *Volino*, 2023 WL 2532836, at *8 (deferring to the plaintiffs' bare allegation that resolution of their claims turned on whether "applying the PSA was a legitimate methodology" and did "not depend" on whether any individual PSA was accurate); *Brown*, 2023 WL 7219499, at *8 (same); *Costello v. Mountain Laurel Assurance Co.*, No. 2:22-CV-35, 2024 WL 239849, at *19 (E.D. Tenn. Jan. 22, 2024) (report and recommendation finding that the "core issue" in the case was the propriety of the PSA). That is not the "rigorous analysis" that the Supreme Court and Eighth Circuit precedent require. *See Comcast Corp. v. Behrend*, 569 U.S. 27, 27–28 (2013) ("Courts may have to 'probe behind the pleadings before coming to rest on the certification question' … certification is proper only if 'the

trial court is satisfied, after a rigorous analysis, that Rule 23's prerequisites have been satisfied.'"); *Montenez*, 458 F.3d at 788 (finding district court abused its discretion in certifying a class without conducting a rigorous analysis of what the parties must prove).

This Court should decline Plaintiff's invitation to follow non-binding district court opinions, and instead, should follow the controlling appellate authority in *LaBrier* and *Stuart* that aligns with the well-reasoned opinions in *Kroeger, Ambrosio, Kartman, Sampson*, and *Lara.* As in those cases, Plaintiff here can only "win on the merits" by showing that Progressive paid him less than the ACV of his vehicle. *See Lara*, 25 F.4th at 1139. And Progressive has a due process right to introduce individualized evidence showing that it paid an adequate amount for each vehicle. *See Sampson*, 83 F.4th at 420. The central question the jury must answer here is whether Progressive paid insureds an amount that reflects an accurate estimate of ACV. *See Ambrosio*, 2024 WL 915184, at *7. As numerous courts—including the Eighth Circuit—have recognized, there is no way to answer that question with common evidence. *Supra* at 12–15. Because determining the value of each car is an individualized issue that predominates over all others, Rule 23(b)(3) bars class certification.

> ### D.    The record is replete with additional examples of individualized evidence bearing on the question of underpayment.

The record in this case illustrates why predominance cannot be satisfied where a claim turns on payment of ACV of individual property. Out of 140 total-loss claims during the class period, WCTL values exceeded NADA values roughly 48.5% of the time. Ex. A, Walker Rpt. ¶ 41; *cf. Osborn v. Bank of Prescott*, No. CA 85-238, 1986 WL 5832, at *1–2 (Ark. Ct. App. May 21, 1986) ("Factors which have been utilized in establishing the reasonable fair-market value of [a vehicle] include price handbooks."); *see also In re Wertz*, 557 B.R. 695, 703 (Bankr. E.D. Ark. 2016) (considering expert testimony regarding the NADA estimate of a vehicle to determine its

value in bankruptcy proceedings). In addition, at least 35 out of a sample of 150 claims involve multiple WCTL reports for a single vehicle, reflecting different values for the same totaled car, making it impossible to determine which WCTL report formed the basis of the settlement without reviewing the insured's entire claim file. Ex. X, Retton Decl. ¶¶ 54–55. Plaintiff's appraisal expert, Jason Merritt, said it best: where there are multiple versions of a WCTL report generated for a single vehicle, he cannot provide an opinion on which report accurately estimated the vehicle's ACV without undertaking further research. *See, e.g.*, Ex. R, Merritt *Sibert* Dep. Tr. 33:6-39:1, 40:2-43:5, 45:3-17 (discussing three different WCTL reports in a claim file for the same vehicle and explaining that he would need to "dig into the report more deeply" to determine which one accurately reflected ACV). If Plaintiff's appraisal expert, applying his own methodology, cannot determine the ACV for any of those cars without individualized research, the question of value is clearly not common.

Individualized evidence may also call into question the validity of the assumptions undergirding Plaintiff's proposed methodology as applied to a particular vehicle. Although Merritt assumes that stripping out the PSA from the WCTL report reflects ACV, Mitchell's corporate representative submitted a declaration saying the opposite. *See* Ex. Y, Kroell Decl. ¶¶ 13-20. Plaintiff also testified that this was not true for his vehicle. *See* Ex. B, Knight Dep. Tr. 135:8-20 (claiming Progressive undervalued his vehicle by about $3,500). According to Plaintiff, there were multiple errors in his WCTL report unrelated to the PSA. *See, e.g.*, *id.* at 71:14–74:14 (disagreeing with Progressive's adjustments and rating for condition), 76:20–78:19 (alleging Progressive undervalued his lift kit, window tint, and aftermarket wheels). The record, including Plaintiff's own testimony, thus defeats Merritt's assumption that the WCTL report minus PSAs is an accurate method to arrive at ACV. *See United States v. Rushing*, 388 F.3d 1153, 1156 (8th Cir. 2004)

("Expert testimony should not be admitted when it is speculative, it is not supported by sufficient facts, or the facts of the case contradict or otherwise render the opinion unreasonable."); *Greenwell v. Boatwright*, 184 F.3d 492, 497 (6th Cir. 1999) ("Expert testimony, however, is inadmissible when the facts upon which the expert bases his testimony on contradict the evidence."). This is an issue that is likely to arise often because Merritt admits that he does not have any familiarity with WCTL, does not know how the PSA is calculated, and did not investigate whether WCTL reports without PSAs accurately estimate ACV. Ex. T, Merritt *Freeman* Dep. Tr. 18:1-22, 148:6152:19; Ex. R, Merritt *Sibert* Dep. Tr. 13:24-14:15, 18:20-22:15, 25:9-26:18. Individual evidence on the accuracy of WCTL reports is essential to consider when adjudicating each putative class member's claim.

Progressive would also be entitled to present individualized evidence showing that other parts of the valuation were inaccurate in insured's favor, causing Progressive to overpay a claim. For example, in at least two claims in the sample, Progressive removed the negative condition adjustment because it applied a title history adjustment. Ex. X, Retton Decl. ¶¶ 39–41. This benefit can dwarf the PSA. *Id.* ¶ 40 (describing a claim where waiving the -$1,737.84 condition adjustment overshadowed the average PSA of -$572.40 applied in the report). In fifteen claims, Progressive was unable to inspect the vehicle or certain parts of the vehicle for condition and thus automatically applied a "typical" rating of "3-Good" (and no downward adjustment). *Id.* ¶¶ 44–46. Also in fifteen claims, Progressive had to estimate the mileage of the loss vehicle because the odometer was inaccessible or because the vehicle had been stolen. *Id.* ¶ 47. These assumptions often work in the insured's favor where actual mileage was much greater or condition much worse than Progressive's assumption.

Finally, Progressive may further present evidence that even if it undervalued a vehicle, this

did not cause a redressable injury to the putative class member. As another court recognized, a broad definition that includes those who did not receive compensation creates "an Article III standing problem for the class." *Volino*, 2023 WL 2532836, at *10 (certifying a narrow class that excluded all individuals who did not "receive[ ] compensation" from Progressive). This is because the putative class member may not be entitled to any additional payment. Out of the 150 Arkansas claim files sampled in this case, 31 insureds did not own the loss vehicle, and are not entitled to any payment under the terms of the Policy. Ex. X, Retton Decl. ¶¶ 28–31; Dkt. 41-3, Policy at 28 ("Payment … for a loss to a covered auto will be made according to your interest and the interest of any lienholder shown on the declarations page or designated by you." (emphasis omitted)).

These insureds lack Article III standing. *See United States v. One Lincoln Navigator 1998*, 328 F.3d 1011, 1013 (8th Cir. 2003) ("[A] a claimant's Article III standing turns on whether the claimant has a sufficient ownership interest in the property to create a case or controversy … Ownership interests are defined by the law of the State in which the interest arose, here, Arkansas … the Arkansas motor vehicle statutes define 'owner' as "a person who holds the legal title of a vehicle."). Further, 41 insureds did not receive any compensation from Progressive because the entire settlement amount was owed to their lienholders. Ex. X, Retton Decl. ¶ 27. For these insureds, it is unclear whether they would have been entitled to payment if the ACV estimate had been higher, and individualized inquiries would be necessary to make that determination. And in at least 13 of the 150 sample claims, GAP insurance stepped in to cover the difference between the amount paid by Progressive and the amount owed to a lienholder, meaning that the PSA may have had no impact on these insureds. *Id.* ¶¶ 35–38; *Denning v. Bond Pharmacy, Inc.*, 50 F. 4th 445, 450–51 (5th Cir. 2022) (holding that plaintiff lacked standing where a breach of contract would be redressable only by awarding damages to a third-party, not to plaintiff). In fact, for one

of those claims, Progressive provided the GAP coverage, meaning any purported undervaluation just resulted in Progressive paying more money through another avenue. Ex. X, Retton Decl. ¶ 36.

Without a redressable injury or damages, these putative class members cannot establish liability and lack Article III standing to proceed. As the *Kroeger* court aptly explained after reviewing the evidence, "[g]iven this variation, the resolution of one claim brought by one policy holder … will not shed light on—much less conclusively answer—the breach of contract question for all other class policyholders." 2023 WL 9059523 at *7.

## II.    Plaintiff Is an Atypical and Inadequate Class Representative.

Rule 23 requires that a named plaintiff establish typicality and adequacy. Fed. R. Civ. P. 23(a)(3)-(4). Typicality entails that there are "other members of the class who have the same or similar grievances as the plaintiff." *Alpern v. UtiliCorp United, Inc.*, 84 F.3d 1525, 1540 (8th Cir. 1996); *Elizabeth M. v. Montenez*, 458 F.3d 779, 787 (8th Cir. 2006) (even the "presence of a common legal theory does not establish typicality when proof of a violation requires individualized inquiry."). The focus of adequacy "is whether: (1) the class representatives have common interests with the members of the class, and (2) whether the class representatives will vigorously prosecute the interests of the class through qualified counsel." *Yasevich v. Heritage Co., Inc.*, No. 3:20-CV-00019-KGB, 2021 WL 8999318, at *5 (E.D. Ark. Feb. 12, 2021). Plaintiff cannot meet either requirement.

Plaintiff's claims are atypical because, as the evidence in this case shows, Progressive paid Plaintiff more based on its WCTL methodology containing PSAs than he would have been paid using another permissible valuation method under Arkansas law. *Supra* at 5–6. This defeats typicality because it makes Plaintiff "subject to a unique defense that threatens to play a major role in the litigation." *In re Milk Products Antitrust Litig.*, 195 F.3d 430, 437 (8th Cir. 1999). Specifically, Plaintiff Knight does not have a redressable injury. *See Hall v. Lhaco, Inc.*, 140 F.3d

1190, 1196 (8th Cir. 1998) (explaining that a person "is not a proper representative of the class where he himself lacks standing to pursue the claim."). Critically, while the use of Progressive's WCTL methodology likely resulted in a higher payout to Plaintiff than use of another permissible valuation method, that may not be true for another subset of the class he seeks to represent. *See* Ex. A, Walker Rpt. ¶¶ 41–42.

These typicality concerns bleed into adequacy because they also create a fundamental intraclass conflict. "The adequacy inquiry serves, among other things, to uncover conflicts of interest between the named parties and the class they seek to represent." *Pipes v. Life Invs. Ins. Co. of Am*., 254 F.R.D. 544, 549 (E.D. Ark. 2008). As a matter of law, Plaintiff cannot adequately represent putative class members who benefitted from Progressive's valuation and those who were harmed. *Id*. ("Named plaintiffs cannot fairly and adequately protect the interest of the class they seek to represent if the claim they pursue is antagonistic to the interests of other class members."). Addressing nearly identical facts as this case, the Fifth Circuit denied class certification for this reason. *Prudhomme v. GEICO*, No. 21-30457, 2022 WL 510171, at *1 (5th Cir. Feb. 21, 2022) (where the named plaintiff challenges a methodology that yielded higher valuations than other non-challenged, acceptable methodologies for part of the class, adequacy is "doomed").

Plaintiff is also inadequate because he has chosen to jeopardize potentially valuable class claims by focusing exclusively on the PSA. The tactical decision to accept all aspects of the Mitchell methodology except the PSA could have serious adverse consequences for absent class members, many of whom may dispute other aspects of their valuation. *See, e.g.*, Ex. X, Retton Decl. ¶¶ 18–26. Condition adjustments, for example, can amount to thousands of dollars. Ex. A, Walker Rpt. ¶ 21, n.20. Not only that, but Plaintiff also seeks to abandon any claim for damages based on the individualized ACV of a class member's vehicle, even though individual appraisals

may significantly exceed WCTL for a handful of putative class members. Plaintiff's willingness to sacrifice these putative class members' viable claims to obtain class certification demonstrates that his interests are not aligned with those of the class.[7]

## III. Class Treatment Is Not Superior and the Class Is Not Ascertainable.

Because a trial here would inevitably devolve into thousands of mini trials to "adjudicate[e] issues specific to each class member's claim," *Lara*, 25 F.4th at 1140, none of the superiority factors listed in Rule 23 favors certification. Fed. R. Civ. P. 23(b)(3). Class members have an interest in controlling their individual lawsuits to pursue their most valuable claims. Moreover, superior alternatives to class treatment exist. Arkansas policyholders have taken—and can continue to take—advantage of their ability to reject Progressive's settlement offers and negotiate for more money. Ex. A, Walker Rpt. ¶ 73 n.128; *see also* Ex. X, Retton Decl. ¶¶ 18–26. In the event insureds cannot reach agreement with Progressive, they also have the right under the Policy to request an independent appraisal. Dkt. 41-3, Policy at 28–29 (outlining the appraisal process).

For example, in Claim No. 22-2375939, Progressive offered the insured a settlement of $11,577.88 based on a WCTL report. Ex. X, Retton Decl. ¶ 25. The insured disputed this value, saying that she believed the value should be closer to $16,000 based on Kelley Blue Book. *Id.* The Progressive adjuster ultimately offered to make an "exception on ACV" by offering an additional $1,000 dollars to settle the claim, bringing the total settlement up to $12,577.88. *Id.* Notably, the

---

[7] Moreover, courts have found class representatives inadequate where they have convictions for fraud or other crimes of dishonesty, or if they have extensive criminal histories. *See, e.g.*, *Passman v. Peloton Interactive, Inc.*, No. 19-CV-11711 (LJL), 2023 WL 3195941, at *17 (S.D.N.Y. May 2, 2023) (collecting cases). During his deposition, Plaintiff confirmed that he has a lengthy criminal record involving several crimes of dishonesty. *See* Ex. B, Knight Dep. Tr. 98:11–120:6. Plaintiff also testified that he may not be able to attend and testify at trial. *Id.* at 96:15–97:9, 127:21–128:9. Knight's criminal record and apparent inability to vigorously prosecute his claims on behalf of a class at trial are additional grounds undermining his adequacy to represent the class.

average PSA applied in the insured's final WCTL valuation report was just $489.33, well below the additional $1,000 Progressive paid to settle this claim. *Id.*

Further, any class would be unmanageable and unascertainable. *See Johannessohn v. Polaris Indus. Inc.*, 9 F.4th 981, 986 (8th Cir. 2021) (explaining that the district court is uniquely positioned to weigh whether "the underlying issues in the case 'would present a significant risk of jury confusion and would create enormous challenges to trial management'"); *see also McKeage v. TMBC, LLC*, 847 F.3d 992, 998 (8th Cir. 2017) (analyzing ascertainability and explaining that in the Eight Circuit, "ascertainability is an implicit requirement that [the] court enforces through 'a rigorous analysis of the Rule 23 requirements'").

Here, identifying class members would require resolving labor-intensive individualized questions. Plaintiff does not propose any way to identify which insureds are excluded from the class by definition, or who may lack standing for any of the reasons identified above—*i.e.*, lack of ownership, payment based on a different type of report or based on a report without PSAs, negotiated payments, or payments made by GAP insurers—even though these issues, or others like them, existed for at least 95 of the 150 sampled claims. *See, e.g.*, Ex. X, Retton Decl. ¶ 11 (WCTL reports did not apply any PSAs), ¶ 12 (final settlement based on different type of estimate), ¶¶ 20–25 (insured negotiated a higher value), ¶ 27 (payment owed to the lienholder, not to the insured), ¶ 28 (payment owed to leasing company, not insured), ¶¶ 29–31 (insured was not the titled owner of the loss vehicle), ¶ 32 (loss vehicle was repossessed during the claim), ¶¶ 35–37 (insured had GAP coverage, so any additional payment would go to the insurer or lienholder, not to the insured).

Plaintiff ignores these myriad problems and relies solely on Dr. Lacey's report to claim that the Court can determine class membership based "on objective, identifiable criteria in the

electronic claims data and documentation." Mot. at 16. But Dr. Lacey conceded, however, that she "cannot determine membership in the class simply by reviewing the relevant data in [the] claims system database." Ex. Z, Lacey *Ambrosio* Dep. Tr. 36:11–37:15; Ex. AA, Lacey *Brown* Dep. Tr. 65:17-24. Far from establishing a feasible way to work through these issues, Dr. Lacey said she did not "have any idea how [determining class members would] be handled if there's a class certified[.]" Ex. BB, Lacey *Schroeder* Dep. Tr. 49:6–51:13. Plaintiff cannot establish superiority or ascertainability.

## **CONCLUSION**

For these reasons, Plaintiff's motion for class certification should be denied.

Dated March 22, 2024.                          Respectfully submitted by,

Jeffrey S. Cashdan (*pro hac vice*)
Zachary A. McEntyre (*pro hac vice*)
J. Matthew Brigman (*pro hac vice*)
Allison Hill White (*pro hac vice*)
Logan Hobson (*pro hac vice*)
**KING & SPALDING LLP**
1180 Peachtree Street, N.E.
Atlanta, Georgia 30309
Telephone: (404) 572-4600
Fax: (404) 572-5100
jcashdan@kslaw.com
zmcentyre@kslaw.com
mbrigman@kslaw.com
awhite@kslaw.com
lhobson@kslaw.com

Julia C. Barrett (*pro hac vice*)
**KING & SPALDING LLP**
500 W. Second Street, Suite 1800
Austin, TX 78701
Telephone: (512) 457-2053
jbarrett@kslaw.com

Graham Talley (ABN 2015159)
**MITCHELL, WILLIAMS, SELIG,
GATES & WOODYARD PLLC**
425 West Capitol Avenue, Suite 1800

Little Rock, Arkansas 72201
Telephone: (501) 688-8800
Facsimile: (501) 688-8807
gtalley@mwlaw.com

*Counsel for Defendant Progressive*
*Northwestern Insurance Company*